CA NO. 23-1022

IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,

        Plaintiff-Appellee,

v.

BRIESHANAY QUENISE FORD,

        Defendant-Appellant.

DC NO. 2:20-cr-00200-PA

———————————

**APPELLANT'S OPENING BRIEF**

**[REDACTED]**

———————————

APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
CENTRAL DISTRICT OF CALIFORNIA

HONORABLE PERCY ANDERSON
United States District Judge

CUAUHTEMOC ORTEGA
Federal Public Defender
DEBORAH E. GONZALEZ
Deputy Federal Public Defender
321 East 2nd Street
Los Angeles, California 90012-4202
Telephone: (213) 894-7867
Facsimile: (213) 894-0081
Email: Deborah_Gonzalez@fd.org
Attorneys for Defendant-Appellant

**TABLE OF CONTENTS**

Page(s)

I.  INTRODUCTION ............................................................................1

II. QUESTIONS PRESENTED ............................................................2

III. STATEMENT OF THE CASE .......................................................3

    A.  Statement of Jurisdiction ......................................................3

    B.  Custody Status .......................................................................3

IV. STATEMENT OF FACTS..............................................................3

    A.  Ms. Ford's Federal Case Started with Unconstitutional
        Government Retaliation ..........................................................3

        1.  After Ms. Ford Invokes Her Right to an Attorney Seven
            Times, Vinton Threatens to Make Her State Case Federal if
            She Does Not Answer His Questions .........................................3

        2.  When Ms. Ford Stays Fast, Vinton Follows through on His
            Threat and Refers the Case to the FBI .......................................5

    B.  Ms. Ford Is Indicted Federally and Files Two Motions to Dismiss,
        which the District Court Denies ..........................................9

        1.  The Retaliation Motion ...............................................9

        2.  The *Bruen* Motion......................................................14

    C.  The District Court Sentences Ms. Ford to 30 Months, Two-and-a-
        Half Times More than She Faced in State Court ..............................14

        1.  The Presentence Report ........................................14

        2.  The Defense Sentencing Position Focuses on Ms. Ford's
            Carrying of the Gun for Self-Defense......................................15

        3.  The Government's Position Paper ...........................................17

        4.  At Sentencing, the District Court Focuses on Gun Violence
            Statistics Instead of the Relevant Section 3553(a) Factors.......18

i

**TABLE OF CONTENTS**

**Page(s)**

V.  SUMMARY OF ARGUMENT ...................................................20

VI.  ARGUMENT.............................................................22

    A.  This Court Should Reverse the District Court's Denial of the Retaliation Motion.................................................22

        1.  Standards of Review .............................................22

        2.  The District Court Should Have Dismissed the Indictment for Outrageous Government Conduct and in its Inherent Authority ...................................................23

            a.  Vinton's Conduct Was Outrageous ...............................23

            b.  Vinton's Conduct Warranted the Exercise of the Court's Supervisory Powers ...........................................28

        3.  The District Court Should Have Dismissed the Indictment for Selective Enforcement...........................................31

        4.  At the Very Least, this Court Should Remand with Directions to Compel Further Discovery.................................34

    B.  This Court Should Also Reverse the District Court's Denial of the Motion to Dismiss under *Bruen* ...........................................39

        1.  Standard of Review .............................................39

        2.  Section 922(g)(1) Is Unconstitutional ...................................39

            a.  The Second Amendment's Plain Text Covers Ms. Ford and her Conduct .......................................41

            b.  Section 922(g)(1) Is Facially Unconstitutional .............44

            c.  Section 922(g)(1) Is Unconstitutional As Applied to All Non-Violent Felons .................................50

            d.  Section 922(g)(1) Is Unconstitutional As Applied to Ms. Ford.........................................................51

## TABLE OF CONTENTS

**Page(s)**

C.   Resentencing Is Warranted ................................................................53

   1.   Standards of Review ................................................................53

   2.   The District Court Procedurally Erred by Relying on Irrelevant Statistics it Did Not Disclose to the Parties Beforehand ..............................................................55

   3.   Ms. Ford's 30-Month Sentence Is Substantively Unreasonable in Light of the Relevant Section 3553(a) Factors ..................................................................59

VII.   CONCLUSION ................................................................61

CERTIFICATE OF RELATED CASES ................................................................62

CERTIFICATE OF COMPLIANCE ................................................................63

## <u>TABLE OF AUTHORITIES</u>

Page(s)

**Federal Cases**

*Atkinson v. Garland,*
    70 F.4th 1018 (7th Cir. 2023) ..............................................................41

*Burns v. United States,*
    501 U.S. 129 (1991) ..........................................................................56

*Descamps v. United States,*
    570 U.S. 254 (2013) ..........................................................................50

*District of Columbia v. Heller,*
    554 U.S. 570 (2008) ...........................................................2, 42, 49

*Edwards v. Arizona,*
    451 U.S. 477 (1981) ..........................................................................26

*Elkins v. United States,*
    364 U.S. 206 (1960) ..........................................................................27

*Kanter v. Barr,*
    919 F.3d 437 (7th Cir. 2019) ................................................*passim*

*Lacey v. Maricopa County,*
    693 F.3d 896 (9th Cir. 2012) (en banc) ................................32, 33, 34

*McDonald v. City of Chicago, Ill,*
    561 U.S. 742, 780 (2010) ...................................................................40

*Mesarosh v. United States,*
    352 U.S. 1 (1956) ..............................................................................28

*Miller v. Gammie,*
    335 F.3d 889 (9th Cir. 2003) (en banc) ............................................41

*Miranda v. Arizona,*
    384 U.S. 436 (1966) ..........................................................................26

*N.R.A. v. A.T.F.,*
    700 F.3d 185 (5th Cir. 2012) ............................................................44

i

## TABLE OF AUTHORITIES

**Page(s)**

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*,
142 S. Ct. 2111 (2022)................................................................*passim*

*Range v. Attorney General United States of Am.*,
69 F.4th 96 (3d Cir. 2023) (en banc) ......................................*passim*

*United States v. Armstrong*,
517 U.S. 456 (1996)..........................................................................35

*United States v. Autery*,
555 F.3d 864 (9th Cir. 2009) ....................................................54, 55

*United States v. Baldrich*,
471 F.3d 1110 (9th Cir. 2006) ...........................................................56

*United States v. Barrera-Moreno*,
951 F.2d 1089 (9th Cir. 1991) ..........................................28, 29, 31

*United State v. Black*,
733 F.3d 294 (9th Cir. 2013) .......................................22, 23, 24, 25

*United States v. Blinkinsop*,
606 F.3d 1110 (9th Cir. 2010) ...........................................................55

*United States v. Bogart*,
783 F.2d 1428 (9th Cir. 1986) .........................................24, 25, 26

*United States v. Bullock*,
2023 WL 4232309 (S.D. Miss. June 28, 2023) ........................47, 52

*United States v. Carty*,
520 F.3d 984 (9th Cir. 2008) .............................................................55

*United States v. Castillo-Casiano*,
198 F.3d 787 (9th Cir. 1999) .............................................................54

*United States v. Choate*,
619 F.2d 21 (9th Cir. 1980) ...............................................................23

*United States v. Cotton*,
535 U.S. 625 (2002)...........................................................................54

## TABLE OF AUTHORITIES

**Page(s)**

*United States v. Culliton,*
    328 F.3d 1074 (9th Cir. 2003) ...............................................23

*United States v. Daniels*,
    541 F.3d 915 (9th Cir. 2008) .................................................54

*United States v. Dixon,*
    805 F.3d 1193 (9th Cir. 2015) ...............................................50

*United States v. Garcia-Lopez,*
    903 F.3d 887 (9th Cir. 2018) .................................................50

*United States v. Gillings,*
    568 F.2d 1307 (9th Cir. 1978) ...............................................23

*United States v. Gray,*
    905 F.3d 1145 (9th Cir. 2018) (per curiam) .........................56

*United States v. Hasting,*
    461 U.S. 499 (1983).................................................................29

*United States v. Jacobs,*
    855 F.2d 652 (9th Cir. 1988) .................................................29

*United States v. Jimenez-Shilon,*
    34 F.4th 1042 (11th Cir. 2022) .............................................43

*United States v. Joseph,*
    716 F.3d 1273 (9th Cir. 2013) ...............................................58

*United States v. Lillard,*
    57 F.4th 729 (9th Cir. 2023) ..................................................59

*United States v. McWilliams,*
    730 F.2d 1218 (9th Cir. 1984) ...............................................32

*United States v. Meza-Rodriguez,*
    798 F.3d 664 (7th Cir. 2015) .................................................42

*United States v. Morrison,*
    449 U.S. 361 (1981).................................................................30

## TABLE OF AUTHORITIES

Page(s)

*United States v. Oaks,*
    527 F.2d 937 (9th Cir. 1975) ...................................................23

*United States v. Olano,*
    507 U.S. 725 (1993)..............................................................57

*United States v. Ressam,*
    679 F.3d 1069 (9th Cir. 2012) (en banc) ...............................55

*United States v. Restrepo,*
    930 F.2d 705 (9th Cir. 1991) ...................................................24

*United States v. Scott,*
    521 F.2d 1188 (9th Cir. 1975) .................................................24

*United States v. Sellers,*
    906 F.3d 848 (9th Cir. 2018) ...............................24, 35, 36, 37

*United States v. Simpson,*
    927 F.2d 1088 (9th Cir. 1991) .................................................29

*United States v. Steele,*
    461 F.2d 1148 (9th Cir. 1972) .................................................23

*United States v. Tapia,*
    665 F.3d 1059 (9th Cir. 2011) .................................................59

*United States v. Vongxay,*
    594 F.3d 1111 (9th Cir. 2010) .......................40, 41, 45, 46

*United States v. W.R. Grace,*
    526 F.3d 499 (9th Cir. 2008) ...................................................28

*United States v. Warr,*
    530 F.3d 1152 (9th Cir. 2008) ...........................................56, 57

*United States v. Williams,*
    791 F.2d 1383 (9th Cir. 1986) ...........................................24, 35

*United States v. Wilson,*
    639 F.2d 500 (9th Cir. 1981) ...................................................23

## TABLE OF AUTHORITIES

Page(s)

*Wayte v. United States*,
470 U.S. 598 (1985)...................................................................32, 33

*Whren v. United States*,
517 U.S. 806 (1996)........................................................................32

*Young v. Hawaii*
992 F.3d 765 (9th Cir. 2021) (en banc) ...........................................40

## Federal Statutes and Rules

Fed. R. App. 32(a)(7)(C)................................................................64

Fed. R. Crim. Proc. 32(i)(1)(C).....................................................55

18 U.S.C. § 922(g)(1)................................................................*passim*

18 U.S.C. § 1464............................................................................52

18 U.S.C. § 3231..............................................................................3

18 U.S.C. § 3553(a) ....................................................................*passim*

18 U.S.C. § 3742........................................................................*passim*

28 U.S.C. § 1291..............................................................................3

## U.S. Consitituion

U.S. Const. amend. I ..................................................................42, 43

U.S. Const. amend. II.................................................................*passim*

U.S. Const. amend. IV ...............................................................42, 43

U.S. Const. amend. V...................................................................26

U.S. Const. amend. XIV ................................................................32

## TABLE OF AUTHORITIES

Page(s)

**State Statutes, Regulations, and Rules**

Cal. Code of Regs. § 3043.2(b)(4) ..............................................................31

Cal. Penal Code § 18...................................................................................31

Cal. Penal Code § 1170(b)(1) .....................................................................31

Cal. Penal Code § 3451(a), (b)....................................................................32

Cal. Penal Code § 3456(a)(3).......................................................................32

Cal. Penal Code § 29800(a)(1).....................................................................31

Cal. Rules of Ct. 4.421, 4.423......................................................................31


**Other Authorities**

Adam Winkler, *Heller's Catch-22*, 56 UCLA L. Rev. 1551, 1563
    (2009).........................................................................................................45

C. Kevin Marshall, *Why Can't Martha Stewart Have A Gun?*, 32
    Harv. J.L. & Pub. Policy 695, 708 (2009) ..........................................45

Carlton F.W. Larson, *Four Exceptions in Search of A Theory: District
    of Columbia v. Heller and Judicial Ipse Dixit*, 60 Hastings L.J.
    1371, 1376 (2009)...............................................................................44

Don B. Kates, Jr., *The Second Amendment: A Dialogue*, 49 Law &
    Contemp. Probs. 143, 146 (1986)........................................................46

Glenn Harlan Reynolds, *A Critical Guide to the Second Amendment*,
    62 Tenn. L.Rev. 461, 480 (1995).........................................................46

Joseph G.S. Greenlee, *The Historical Justification for Prohibiting
    Dangerous Persons from Possessing Arms*, 20 Wyo. L. Rev. 249,
    272-74 (2020)......................................................................................44

Robert E. Shalhope, *The Armed Citizen in the Early Republic*, 49 Law
    & Contemp. Probs. 125, 134 (1986)....................................................50

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America*, 25 Law & Hist. Rev. 139, 155 (2007) ............................................................................................................45

# I.  INTRODUCTION

Brieshanay Ford may have witnessed a murder.  During an interrogation about that murder, a Los Angeles Police Department detective became so frustrated by Ms. Ford's repeated requests for an attorney that he threatened her: if she did not stop invoking her constitutional right to counsel and start answering his questions, he would get his friend at the FBI to send the felon-in-possession-of-a-firearm case she had pending in state court to federal court, where she would face more time in prison.  When Ms. Ford stayed fast in her decision, the detective followed through on his threat and referred her case to an FBI agent he knew.  As a result, Ms. Ford—who likely faced either eight or twelve months in state prison—was sentenced to 30 months in federal prison.

In denying Ms. Ford's motion to dismiss for the detective's retaliation, the district court failed to appreciate the outrageousness of that retaliation and how offensive it is to our justice system for Ms. Ford's case to remain federal as the detective's punishment for her invocation of a constitutional right.  This Court should remedy that error.

This Court should also vacate Ms. Ford's conviction and dismiss her indictment because Section 922(g)(1) is unconstitutional under *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022).  Ms. Ford had a firearm to protect herself in case the man who ███ and then harassed her for over a

1

decade came to harm her again. Self-defense is the core of the Second Amendment's protection. *District of Columbia v. Heller*, 554 U.S. 570, 630 (2008).

Finally, if it reaches the question, this Court should vacate Ms. Ford's sentence and remand for resentencing: the district court erred by relying on irrelevant gun violence statistics without notice to the parties and then used those statistics to give Ms. Ford an unreasonable sentence despite her self-defense purpose in having a gun and the distasteful origin of her federal case.

## II.  QUESTIONS PRESENTED

1.  Did the district court err in denying Ms. Ford's motion to dismiss for outrageous government conduct, inherent authority, or selective enforcement? At the very least, should the court have compelled further discovery on those claims?

2.  Did the district court err in denying Ms. Ford's other motion to dismiss because Section 922(g)(1) is unconstitutional, both facially and as applied?

3.  Did the district court err in sentencing Ms. Ford by relying on gun violence statistics without notice to the parties and by giving her a 30-month sentence despite the relevant Section 3553(a) factors?

## III.  STATEMENT OF THE CASE

### A.    Statement of Jurisdiction

Ms. Ford appeals from a final judgment rendered by the Honorable Percy Anderson, United States District Judge.  (1-ER-66-70.)  On May 22, 2023, following a stipulated-facts bench trial, Judge Anderson sentenced Ms. Ford to 30-months imprisonment, a $100 special assessment, and three years of supervised release.  (1-ER-66.)  The Court entered judgment the next day.  (*Id.*)  Ms. Ford filed a timely notice of appeal on May 24, 2023.  (4-ER-673.)  The District Court had jurisdiction under 18 U.S.C. § 3231.  This Court has jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742.

### B.    Custody Status

Ms. Ford is in custody serving her sentence.  Her expected release date is July 3, 2025.

## IV.  STATEMENT OF FACTS

### A.    Ms. Ford's Federal Case Started with Unconstitutional Government Retaliation

#### 1.    After Ms. Ford Invokes Her Right to an Attorney Seven Times, Vinton Threatens to Make Her State Case Federal if She Does Not Answer His Questions

On December 13, 2021, LAPD Homicide Detective David Vinton arrested Ms. Ford for a murder that police and prosecutors would soon determine she was not suspected of committing, although she may have witnessed.  (2-ER-113, 117-

3

118, 122.) During the recorded part of the interrogation that ensued, Ms. Ford

unambiguously invoked her right to counsel *seven* times. (Exh. A[1] at 8:33-8:34 ("I

need a lawyer."); 8:41-8:44 ("I need one [a lawyer] before I answer any

questions."); 11:57-11:59 ("Can I get a lawyer please?"); 12:03-12:04 (Can I get a

lawyer please?"); 14:25-14:26 ("Can I get a lawyer please?"); 14:28-14:29 ("Can I

get a lawyer please?"); 14:38-14:40 ("I'd just really like to have a lawyer.").)

Despite Ms. Ford's clear invocations, Vinton continued to question her.

(*Id.*) Sometime after her seventh invocation, Vinton told Ms. Ford she was being

charged with murder and that he would drive her to jail for booking. (2-ER-114.)

In the car, despite her earlier invocations, Vinton continued to try to interrogate

Ms. Ford about the murder. (2-ER-114.) During booking at the jail, despite her

earlier invocations, Vinton continued to try to interrogate her. (*Id.*)

Apparently frustrated by her insistence on speaking with an attorney, Vinton

then told Ms. Ford that he knew she had a felon-in-possession-of-a-firearm case

pending in state court. (2-ER-114.) He threatened that if she continued to invoke

her right to counsel, he would have his friend at the FBI upgrade the case by

---

[1] "Exh. A" refers to an under seal audio recording submitted as Exhibit A to
the government's opposition to the retaliation motion. That recording, along with
Exhibit G to Ms. Ford's Position Regarding Sentencing ("Exh. G.") (an under seal
sentencing video), are the subject of unopposed Motions to Transmit Physical
Exhibits and to File Under Seal, filed concurrently with this brief.

making it federal so Ms. Ford would face more prison time. (*Id.*) Vinton showed Ms. Ford his phone to prove he was serious. (2-ER-115.) On it, she saw that he was texting someone named "Sarah," asking "Sarah" to make the firearm case federal. (*Id.*)

Despite Vinton's threat, Ms. Ford remained steadfast in her request to speak with counsel. (*Id.*) She was booked but released two days later when the District Attorney rejected the murder charge for lack of evidence. (2-ER-115, 162.) Ignoring her prior invocations, Vinton contacted Ms. Ford for information about the murder many times over the ensuing months, claiming that he wanted to "clear [her] name," although he knew she was no longer a suspect. (2-ER-115, 122, 177, 179.) Ms. Ford was so alarmed by Vinton that she called an attorney. (2-ER-125.)

### 2. When Ms. Ford Stays Fast, Vinton Follows through on His Threat and Refers the Case to the FBI

It turned out that the "Sarah" Vinton was texting during Ms. Ford's December 2021 interrogation was FBI Special Agent Sarah Corcoran. Vinton and Corcoran knew each other because part of Corcoran's job was to assist LAPD homicide detectives. (2-ER-251.) In that role, she sometimes worked out of Vinton's building, and the two were friendly.[2] (*Id.*) She had told Vinton and the

---

[2] (*See, e.g.*, 5-ER-691 (On January 3, 2022, Corcoran texted Vinton that she ███████. A few days later, he wrote to her "making sure you're still alive. We would[n't] know what to do without you." She responded "Hahahahhaha[.] It's

5

other homicide detectives that she could help pursue federal firearm charges. (*Id.*) It was not part of Vinton's job to investigate gun cases, however, and he did not normally refer such cases for federal prosecution. (2-ER-123.)

Although Corcoran was not and would never be assigned to work on the homicide case for which Vinton arrested Ms. Ford, Vinton spoke with Corcoran about Ms. Ford before her December 2021 arrest and told Corcoran that he planned to arrest her. (2-ER-251-252.) The two surely were in contact just before Vinton asked Corcoran to make the case federal during Ms. Ford's interrogation because in that text exchange, Vinton did not provide Ms. Ford's name or any information about her: instead, the first text disclosed in discovery asked only, "Will you file federal charges on *her* if need be." (5-ER-690 (emphasis added).) Corcoran replied, "I need a few details but if I can charge it, I will 100 percent." (*Id.*) Vinton wrote, "Ok cool I'll call you after I book her." (*Id.*) It is unknown what they talked about during that call.

_____

whooping me pretty good, but I'm still hanging in there"); 2-ER-323-324 (email exchange in which Corcoran asked for a meeting Monday, Wednesday, or Thursday. Vinton wrote back, "Sure, no problem." Corcoran responded, "Lol. Which one of those days works for you." Vinton wrote back, "Received, thank you." In an email one minute later, he wrote, "Kidding I will check the dates and let you know." Corcoran responded, "Lol. Thanks dave. You're an ass. But, thank you.").)

6

Vinton and Corcoran frequently contacted each other thereafter as Corcoran worked to get federal prosecutors to adopt Ms. Ford's firearm case. For example, on December 16, 2021—the same day Ms. Ford was released from state custody after the DA rejected the murder charge—Corcoran called Vinton and then followed with a text message stating, "AUSA has been pitched and is on board, pending seeing the reports, video and talking to DA. See you tomorrow." (5-ER-690.) It is unknown what they discussed the next day. But later, Corcoran sent Vinton text messages requesting more information about the state firearm case and referred to Ms. Ford as "our girl." (5-ER-690-695.)

The two also discussed the murder investigation. For example, in December 2021, Corcoran asked Vinton whether ███████████████████████████ ██████. (5-ER-690.) In March 2022, Corcoran—who must have known from a prior interaction with Vinton that this might happen—asked whether Ms. Ford had gotten her phone back from him yet. (5-ER-695.) On March 30, 2022, federal prosecutors filed the criminal complaint and arrest warrant application in this case.[3] The next day, Corcoran informed Vinton. (5-ER-695.) He answered,

---

[3] There is nothing in the record suggesting that the federal government would have learned about Ms. Ford's case, much less charged her, had Vinton not referred it to Corcoran. Every day, people are convicted in Los Angeles Superior Court of being felons in possession of a firearm. Indeed, Corcoran had to ask Vinton for Ms. Ford's state case number and Vinton sent Corcoran the name and

telling Corcoran that "[s]he"—referring to Ms. Ford—"isn't responding to my texts." (*Id*.) Corcoran wrote, "if we can grab Ford tomorrow do you want to interview her again?  If not I will likely just do a quick interview in the back of the car and push for a proffer at a later date, which you will obviously be at." (5-ER-696.)  Vinton said that he wanted to try to interview Ms. Ford again and they coordinated, including about who would bring a recording device because Corcoran had to record the interview. (*Id*.) Ultimately, Vinton said he would bring one. (*Id*.) Corcoran then asked Vinton to send her ███████████ ████████████████████████████ (*Id*.)

On April 21, 2022, Corcoran arrested Ms. Ford when she appeared in Los Angeles Superior Court for the then-pending state firearm case.[4] (2-ER-115, 256.) The agent took Ms. Ford to meet Vinton, who attempted to interrogate her about the murder again, this time in front of Corcoran. (2-ER-115, 253, 256, 259.) During the interrogation, Vinton told Ms. Ford, "You have one more chance to tell us who did it." (2-ER-116.)  Ms. Ford declined to speak about the murder. (2-ER-115, 253, 259.)  Vinton then told her, "You see? I told you this was going to

---

contact information of the DA the federal prosecutor needed to coordinate with to adopt the case. (5-ER-691-692.)

[4] The state case was then dismissed without prejudice.  Ms. Ford could be charged state side again if her federal case is dismissed.

happen," referencing his threat to send her case to the FBI for federal prosecution if she refused to speak with him.  (2-ER-116.)

The government did not produce a recording of this interrogation in discovery and even refused to confirm if one existed.  Vinton would later deny that he was present for Ms. Ford's federal arrest.  (2-ER-122.)  And Corcoran's report memorializing the arrest omitted Vinton's presence and his attempted interrogation of Ms. Ford.  (2-ER-256-257.)  It was not until after Ms. Ford was federally indicted and her attorneys moved to dismiss based on Vinton's conduct that Corcoran would write a second report, this time stating that Vinton *was* present and attempted to interview Ms. Ford.  (2-ER-259.)

## B. Ms. Ford Is Indicted Federally and Files Two Motions to Dismiss, which the District Court Denies

Ms. Ford was indicted on one count of being a felon in possession of a firearm, in violation of 18 U.S.C. Section 922(g)(1).  (2-ER-72-73.)  The defense filed two motions to dismiss.  The first sought dismissal for Vinton's retaliation.  The second sought dismissal because Section 922(g)(1) is unconstitutional following *Bruen*.  The government opposed both motions.  The district court denied them both in an oral ruling.

### 1. The Retaliation Motion

As relevant to this appeal, Ms. Ford's first motion sought dismissal based on outrageous government conduct, inherent authority, and selective enforcement due

9

to Vinton's retaliation.  The motion also sought to have the court compel related discovery.[5]

In support of the motion, the defense submitted, *inter alia*, declarations from counsel (2-ER-117-121, 300-306), Ms. Ford (2-ER-113-116, 298-299), the attorney Ms. Ford contacted about Vinton's repeated attempts to question her despite her invocations of the right to counsel (2-ER-125), and an investigator (2-ER-122-124).  The defense also submitted Vinton's text messages to Ms. Ford

---

[5] The full retaliation motion sought dismissal for Vinton's, Corcoran's, and the federal prosecutors' conduct under theories of vindictive prosecution and enforcement, selective prosecution and enforcement, outrageous government conduct, and inherent authority.  It sought discovery related to Vinton, Corcoran, and the federal prosecutors based on each of those theories.  This appeal does not challenge the district court's order rejecting the claims of vindictive or selective prosecution, vindictive enforcement, the requests for discovery related to those claims, or any aspect of the district court's order regarding the federal prosecutors' conduct.  Instead, this appeal raises only Ms. Ford's outrageous government conduct and inherent authority claims as they relate to Vinton and Corcoran's conduct, and the denial of her selective enforcement claim as it relates to Vinton's conduct, and the request for discovery on the claims pursued on appeal.  The defense discovery request included the following: 1) all text messages, call logs, emails, voicemails, and other written, or memorialized verbal, communications between Vinton and Corcoran regarding Ms. Ford; 2) all audio or video recordings of Ms. Ford's April 21, 2022, interrogation; 3) surveillance footage of Ms. Ford providing buccal swabs when she was booked by Vinton on December 14, 2021 (believed to be where Vinton showed Ms. Ford the text messages with Corcoran); 4) a copy of the affidavit supporting the statement of probable cause for ██████ ████████████████████████████████████████; 5) a list of all persons Vinton has referred for federal prosecution; 6) LAPD policies on making referrals for federal prosecution; and 7) a list of all persons Vinton arrested and interrogated who could have qualified for federal prosecution under 18 U.S.C. section 922(g)(1) but whom he did not refer for such prosecution.  (2-ER-110-112.)

seeking information about the murder (2-ER-176-179), and emails between Corcoran and Vinton (2-ER-307-329).

Although the government referred to Vinton's retaliation as only "alleged conduct" in its opposition (2-ER-245), nowhere did it contest that Vinton threatened Ms. Ford with federal prosecution if she did not stop invoking her right to counsel. It did not submit a declaration from Vinton, argue that Ms. Ford's declaration was uncredible, or request to cross examine her. To the contrary, the government affirmatively stated that it "does not condone" Vinton's *Miranda* violation. (2-ER-229.) As to his threat and retaliation, however, the government claimed in a footnote that it did "not have the information necessary to respond to those allegations and believes they are not relevant to the pending Motion." (2-ER-229, 245.)

The government *did* attempt to defend Corcoran's conduct with a declaration from her. In it, Corcoran claimed Vinton never told her that Ms. Ford invoked her right to counsel during her December 2021 interrogation. (2-ER-252.) Corcoran stated that she also did not know Vinton had threatened to make Ms. Ford's state case federal if she did not stop invoking that right and speak with him about the murder. (*Id.*) She claimed that when Vinton asked via text whether she would prosecute Ms. Ford's case federally "if need be," she understood him to be referring to what he wanted to happen if the DA rejected the murder charge, not

11

what he wanted to happen if Ms. Ford did not stop invoking her right to counsel. (*Id.*) Corcoran understood it this way, she asserted, because of her conversations with LAPD homicide detectives about the FBI adopting state firearm cases. (*Id.*)

Conspicuously absent from Corcoran's declaration was any explanation for why her original report omitted Vinton's presence and attempted interrogation of Ms. Ford at the federal arrest. (*See generally* 2-ER-251-254.)

At the retaliation motion hearing, the district court said that it assumed that Vinton threatened Ms. Ford with federal prosecution to overcome her invocation of the right to counsel. (1-ER-20.) Despite this assumption, however, the court held that Vinton's conduct did not rise to the level of outrageous government conduct. "If anything," the court said, "it presents something akin to a Miranda violation for which the proper remedy is to suppress rather than dismissal of the indictment."[6] (1-ER-27.) The court was silent about Ms. Ford's request for dismissal in the court's inherent authority to remedy the constitutional violation or deter future illegal conduct.

The court denied the selective enforcement claim on the basis that Ms. Ford had not shown a discriminatory effect because, in its view, individuals similarly situated to Ms. Ford frequently were prosecuted. (1-ER-26.) In so holding, the

---

[6] Ms. Ford did not make incriminating statements about the felon-in-possession case during her December 2021 arrest. (*See generally* Exh. A.)

12

court defined "similarly situated defendants" not as those individuals Vinton knew he could refer for federal prosecution, but instead as "repeat felons caught with a firearm just like this defendant while on probation with an open warrant." (*Id.*) Such individuals, it found, "are frequently prosecuted under Title 18 of the United States Code, Section 922(g)(1)." (*Id.*)

The court also denied the selective enforcement claim because Vinton supposedly "had no involvement in the enforcement of the federal charge against this defendant" as he was not the officer who arrested Ms. Ford for possessing the firearm in November 2021, nor was he the FBI agent who presented the case to federal prosecutors. (1-ER-26.) Although it was uncontested that Vinton referred the case for federal prosecution and there was no indication the case would have been prosecuted federally absent that referral, the court still found that Vinton had "no influence or control over the charging decision." (1-ER-27.) As for Corcoran, the court held that the defense had made "no showing" of discriminatory purpose (ie, no showing she had presented the case to federal prosecutors to retaliate against Ms. Ford for exercising her constitutional right to counsel). (1-ER-26.)

The court denied further discovery on the basis that the defense had not shown that the federal government failed to prosecute other similarly situated individuals (as it defined that class), or a likelihood of vindictiveness or animus by federal authorities. (1-ER-27-28.)

13

### 2. The *Bruen* Motion

The defense's second motion to dismiss was based on Section 922(g)(1)'s unconstitutionality under *Bruen*. The court denied the motion as foreclosed, holding that *Bruen* did not alter the constitutionality of Section 922(g)(1) and therefore left prior precedent in place. (1-ER-6.) The court held that under *Heller*, felons are not part of "the people" protected by the Second Amendment. (1-ER-5-6.) It also held that the United States has a "long-standing tradition of disarming citizens who are not engaging in lawful activity." (1-ER-6.)

***

After the court denied her motions, Ms. Ford waived jury trial and had a stipulated-facts bench trial. The court found her guilty and set a sentencing date. (4-ER-663.)

### C. The District Court Sentences Ms. Ford to 30 Months, Two-and-a-Half Times More than She Faced in State Court

### 1. The Presentence Report

The Probation Office calculated Ms. Ford's base offense level as 14. (PSR-195.) Her criminal history category was IV. (*Id.*) Her resulting guidelines range was 27 to 33 months.[7] (*Id.*)

---

[7] The parties disputed whether Ms. Ford accepted responsibility. The district court held that she did not. This appeal does not challenge that holding.

2. **The Defense Sentencing Position Focuses on Ms. Ford's Carrying of the Gun for Self-Defense**

The defense's sentencing position highlighted why Ms. Ford carried a gun despite being a felon. Specifically, Ms. Ford is ▮▮ and, unfortunately, her ▮▮▮▮ has been problematic for others since she ▮▮▮▮ in sixth grade. (PSR-11.) For example, ▮▮▮▮ middle school teachers allowed schoolmates to bully her and "beat ▮▮▮ out of her." (Exh. G at 00:46.) Her family did not accept her ▮▮▮▮ either. Her parents sent her to a religious school and to church, where she had to ▮▮▮▮▮▮ ▮▮. (PSR-11, 207.) When she was twelve, her father—just released from a decade-long prison term—told Ms. Ford, ▮▮▮▮▮▮ ▮▮▮▮▮▮," and he beat her. (87-9.) That same year, her parents kicked her out of the house. (PSR-11.) Ms. Ford found herself homeless, sleeping at friends' houses, bus stops, or anywhere she could just outside her house. (PSR-11.)

These early abandonment and rejection experiences taught Ms. Ford that the only person she could rely on was herself. (Exh. G at 2:37.) This belief was further entrenched when, at sixteen years old, she was ▮▮▮ by ▮▮▮▮ ▮▮▮ and disappointed by the justice system's response afterwards. (PSR-100, 207.) ▮▮▮▮ happened one day when the boyfriend—▮▮▮▮▮▮— gave Ms. Ford pills for a headache. They were, in fact, ecstasy. (PSR-33, 35.)

15

██████ ██████████████████████████████████████████████████████

████████. (PSR-35-36.) Ms. Ford's mother believes ██████ was his way of attempting to █████ Ms. Ford to ██████████ (Exh. G at 3:32.)

When Ms. Ford got home that day, her mother called the police and took her to ██████████████. (PSR-29.) But the police did not arrest ████ He began harassing Ms. Ford ████████████ showing up at her house and calling her incessantly. (PSR-101.) Ms. Ford was scared: ████ was a Rolling 30s Crips gang member and she had seen him carry a handgun and beat ████ (PSR-100.) Her mother called the police many times but ████ remained free. The harassment got so bad that Ms. Ford changed her phone number and her family moved. (PSR-101.)

It was not until a year later that ████ was finally arrested and charged. But, he pleaded guilty to ██████, did not have to ████████████, and served under two years, <u>less than Ms. Ford's sentence here</u>. (PSR-74, 86-88, 102.)

The harassment continued. Three of ████ nieces attacked Ms. Ford on her college campus. (PSR-102-103.) They kicked her in the face, called her a ████ and said she should have ████████████ (*Id.*) They warned that they would come back again. (PSR-103.) Ms. Ford was so afraid, she dropped out of college. (*Id.*) While in custody on a prior case, Ms. Ford was

16

attacked several times by associates of the Rolling 30s Crips for her involvement in █████ ██ (PSR-103.) In 2019, she was approached by one of the women who had attacked her at the college. (PSR-106.) The woman called Ms. Ford █ "████ and threatened that the matter was not over. (*Id*.)

Ms. Ford knew that █████ harassed █████ too, by then █████. He drove by her house, approached the front door, or parked and blasted music. (PSR-103-106, 138.) He sent her text messages, including that she was going to die. (PSR-143.) In 2021, he brandished a gun at █████ boyfriend. (PSR-106.) █████ got a restraining order, listing Ms. Ford as a protected party. (PSR-139.)

From this ordeal, Ms. Ford learned that law enforcement would not protect her. (Exh. G at 2:37.) Yet, the idea of having to protect herself was daunting: she is 4'11" and weighs 110 pounds. (PSR-207.) By 2021, she had become so scared of █████ that she would pull over to let cars pass her or take the wrong exit in case anyone was following her. (PSR-107.) She also carried a gun with her. (PSR-107, 110.) As she told the officers who arrested her in November 2021, she had a gun because she thought someone was after her. (PSR-110.)

### 3. The Government's Position Paper

The government agreed with Probation's guidelines calculations and requested a 30-month sentence. As to the Section 3553(a) factors, it pointed out

17

that Ms. Ford was arrested every year that she was not in prison starting in 2010 and that she had pleaded guilty to a state felon-in-possession charge a few months before her arrest in this case. (4-ER-666-667.) It argued that her prior sentences were not long enough to deter her. (4-ER-671.)

### 4. At Sentencing, the District Court Focuses on Gun Violence Statistics Instead of the Relevant Section 3553(a) Factors

After the parties argued, the district court announced Ms. Ford's sentence and the reasons for it. The court first noted that when she was arrested in November 2021, Ms. Ford was on probation for the other felon-in-possession-of-a-firearm case and another offense, and had an outstanding arrest warrant. (1-ER-53.) It held, however, that the guidelines accounted for the nature of the offense and this criminal history. (1-ER-54.)

Turning to the Section 3553(a) factors, the court characterized Ms. Ford's traumatic upbringing in a religious family unaccepting of her ████ as "difficulties," and her ███ by ████ as an "████." (1-ER-54.) After stating that "no one should have to go through" what she went through, the court said that Ms. Ford's history and characteristics do "not excuse the lack of respect for the law that she's repeatedly shown." (1-ER-55.) The court noted that Ms. Ford initially lied to police when she was pulled over in November 2021 by saying she did not have a firearm in the car. (1-ER-57.) It did not mention that later in the stop, Ms. Ford admitted the gun was hers. (1-ER-57.)

18

The court then discussed how public protection and general deterrence were important considerations for Ms. Ford's sentence. (1-ER-57, 59.) Although she was convicted only of *possessing* a gun and she possessed the gun for self-defense, the court made a long speech about tragedies like mass shootings, school shootings, carjackings at gunpoint, and other "loss of innocent life" because of gun violence. (1-ER-55-57.) It mentioned by name the Highland Park, Illinois, Fourth of July parade shooting and the shooting at Robb Elementary School in Uvalde, Texas. (1-ER-56.) It stated that there were more than 300 mass shootings in 2022 and the country was on track to surpass that number in 2023. (1-ER-56.) It announced that "[h]undreds [o]f people die every day because of violence committed with firearms." (*Id.*) It noted that California accounted for 65-percent of the ATF's ghost gun seizures in 2020. (1-ER-57.)

Ignoring Ms. Ford's nightmarish ordeals with the gun-toting ████ the district court discussed how "the mere presence of a firearm can make people feel threatened and fearful for their lives with severe and long-term psychological effects on individuals and communities." (1-ER-56.) Ignoring that Ms. Ford moved, changed her phone number, dropped out of college, and starting driving evasively because of ████ harassment, the court bemoaned that "[m]any people can't even allow their kids to walk to school or watch a parade" and that "people are literally forced to live behind bars, prisoners in their own home from

19

fear that they're going to be hit by some stray bullet fired by some gang banger or some crazed individual who is mad at the world." (1-ER-55-56.) Ignoring that Ms. Ford is a ██████ Black woman,[8] the court lamented how gun violence "disproportionately impacts the communities of color, women, and other marginalized groups in our society." (1-ER-56.) The court concluded by announcing that it was imposing a 30-month sentence to "send a message, not only to this Defendant, but to others that, if you're a prohibited person who chooses to possess a firearm, there's a steep price to pay." (1-ER-59.) The court did not warn the parties that it would rely on these statistics beforehand. Nor did it reveal its sources.

This appeal followed.

## V.  SUMMARY OF ARGUMENT

The district court erred in denying Ms. Ford's retaliation motion. Vinton referred Ms. Ford for federal prosecution to punish her for invoking her constitutional right to counsel. In the process, he used the federal court as a pawn. His conduct was outrageous and irreparably tainted Ms. Ford's federal case. Along with showing that his purpose was to discriminate against her for her exercise of her constitutional right, Ms. Ford also showed that Vinton's conduct

---

[8] Ms. Ford now ████████████████ .

20

had a discriminatory effect because Vinton did not normally refer people for federal firearm prosecution. This Court should reverse the district court's denial and dismiss the indictment.

At the very least, this Court should remand with instructions to grant Ms. Ford's discovery request. Ms. Ford's showing was more than sufficient to obtain additional information about her arrest, Vinton's federal referral history, and Corcoran's complicity in his retaliation. The district court's denial of the discovery motion was an abuse of discretion.

This Court should also vacate Ms. Ford's conviction and dismiss the indictment because Section 922(g)(1) is unconstitutional following *Bruen*, both facially and as applied to nonviolent felons and to Ms. Ford in particular. *Range v. Attorney General United States of Am.*, 69 F.4th 96, 106 (3d Cir. 2023) (en banc) (holding that Section 922(g)(1) is unconstitutional as applied to nonviolent felons). The Second Amendment's plain text and core protection covers Ms. Ford and her conduct of possessing a gun for self-defense. The government did not show a historical tradition of permanently disarming all felons, all nonviolent felons, or individuals like Ms. Ford.

Finally, if it reaches the question, this Court should remand for resentencing because the district court erred by relying on irrelevant gun violence statistics without notice to the parties and gave Ms. Ford an unreasonable sentence in light

21

of the Section 3553(a) factors, including the self-defense purpose she had the gun, the distasteful origin of her case, and the time she would have served in state prison.

## VI.  ARGUMENT

### A.    This Court Should Reverse the District Court's Denial of the Retaliation Motion

#### 1.    Standards of Review

The Court reviews *de novo* a district court's denial of a motion to dismiss an indictment for outrageous government conduct.  *United State v. Black*, 733 F.3d 294, 301 (9th Cir. 2013).  In doing so, the Court views the evidence in the light most favorable to the government and accepts the district court's factual findings unless they are clearly erroneous.  *Id.*

The Court reviews for abuse of discretion a district court's decision not to use its supervisory powers to dismiss an indictment.  *Id.*

Neither the Supreme Court nor this Court has articulated a standard of review for a district court's denial of a motion to dismiss based on selective enforcement.  The standard should be *de novo*.  This Court has long applied a *de novo* standard to appeals of the denial of a motion to dismiss for selective *prosecution* claims, which are similar to selective enforcement claims.  *United States v. Culliton*, 328 F.3d 1074, 1080-81 (9th Cir. 2003) (citing *United States v. Choate*, 619 F.2d 21 (9th Cir. 1980); *United States v. Gillings*, 568 F.2d 1307,

1309 (9th Cir. 1978); *United States v. Oaks*, 527 F.2d 937, 940 (9th Cir. 1975);

*United States v. Scott*, 521 F.2d 1188, 1195 (9th Cir. 1975); and *United States v.*

*Steele*, 461 F.2d 1148, 1151-52 (9th Cir. 1972)).[9]

Whether a district court applied the correct discovery standard is a legal

question this Court reviews *de novo*. *United States v. Sellers*, 906 F.3d 848, 851-

52 (9th Cir. 2018). The Court reviews a district court's determination that a

defendant did not make the requisite discovery showing for abuse of discretion.

*Id.*; *United States v. Williams*, 791 F.2d 1383, 1387 (9th Cir. 1986)

### 2. The District Court Should Have Dismissed the Indictment for Outrageous Government Conduct and in its Inherent Authority

#### a. Vinton's Conduct Was Outrageous

A district court should dismiss an indictment when a law enforcement

officer's conduct is "so outrageous that due process principles would absolutely

bar the government from invoking judicial processes to obtain a conviction."

*Black*, 733 F.3d at 302 (quoting *United States v. Russell*, 411 U.S. 423, 431–32

---

[9] As *Culliton* Court noted, *United States v. Wilson*, 639 F.2d 500, 503 n.2 (9th Cir. 1981), may have created intra-circuit tension by purporting to adopt a clearly erroneous standard for selective prosecution claims. *Culliton*, 328 F.3d at 1080-81. As a three-judge panel, however, the *Wilson* Court lacked authority to overrule prior precedent. Accordingly, the *de novo* standard this Court has used since 1972 for selective prosecution claims should apply to this selective enforcement claim as well.

(1973)).  Due process principles bar the government from invoking the judicial process to obtain a conviction when the conduct is "so grossly shocking and so outrageous as to violate the universal sense of justice."  *United States v. Restrepo*, 930 F.2d 705, 712 (9th Cir. 1991); *see also United States v. Bogart*, 783 F.2d 1428, 1438 (9th Cir. 1986), *vacated in part on other grounds sub nom. United States v. Wingender*, 790 F.2d 802 (9th Cir.1986) ("[L]aw enforcement conduct becomes constitutionally unacceptable when it 'shocks the conscience.'").  "There is no bright line dictating when law enforcement conduct crosses the line between acceptable and outrageous, so 'every case must be resolved on its own particular facts.'"  *Black*, 733 F.3d at 302 (quoting *Bogart*, 783 F.2d at 1438).  However, this Court has given "unwarranted physical, or perhaps mental, coercion" as one example of law enforcement conduct that could rise to the level of a due process violation requiring dismissal.  *Bogart*, 783 F.2d at 1438.

Here, the district court assumed—and the government all but conceded—that Vinton threatened Ms. Ford with federal prosecution of her state felon-in-possession case to try to overcome her invocation of the right to counsel.  (1-ER-20.)  It was uncontested and clear from the record that federal authorities learned about Ms. Ford's case only because Vinton referred it to Corcoran.  (2-ER-227-228.)  To the extent they conflict with that evidence, the district court's findings (made with respect to the selective enforcement claim) that Vinton "had no

24

involvement in the enforcement of the federal charge" against Ms. Ford and had "no influence or control over the charging decision" (1-ER-26, 27) are clearly erroneous: had Vinton not referred the case to Corcoran for federal prosecution, there is *no* evidence that Ms. Ford would have been charged federally. Given these facts, the district court should have dismissed for outrageous government conduct. Vinton's conduct was unacceptable. It offends our justice system.

The district court failed to appreciate the scope and stench of that conduct, ruling instead that what Vinton did was akin to a *Miranda* violation. (1-ER-27.) But the *Miranda* violation was not minor and it was only the beginning of Vinton's outrageous conduct. To start, it is plainly unconstitutional for a police officer to question someone after the person has invoked her right to counsel, let alone for the officer to barrel through seven clear invocations with further questioning. U.S. const. amend. V; *Miranda v. Arizona*, 384 U.S. 436, 474 (1966). *See also Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981).

Vinton did not stop there, though. He then tried to coerce Ms. Ford to stop invoking her right to counsel by threatening her with more prison time if she did not speak to him. Threatening to increase a person's sentence if they do not withdraw their assertion of a constitutional right is the kind of mental coercion that

shocks the conscience. It is an impermissible investigative tactic that warrants dismissal. *Cf. Bogart*, 783 F.2d at 1438.[10]

That was not the end, either, because Vinton did not just threaten Ms. Ford, he retaliated against her. When she refused to succumb to his threat, he followed through and referred her for federal prosecution. As a result, Ms. Ford was federally indicted and faced a sentence five times higher than she faced in state court. Ultimately, she got a longer sentence than she would have gotten in state court, by two-and-a-half times. It is unacceptable for a law enforcement officer to retaliate against someone for exercising a constitutional right. And it is even more unacceptable for him to use the federal courts as a pawn in that retaliation. *See Elkins v. United States*, 364 U.S. 206, 223 (1960) (federal courts should not be "accomplices in the willful disobedience of a Constitution they are sworn to uphold.").

On top of this, despite Ms. Ford's prior invocations, in the months after her first interrogation, Vinton contacted Ms. Ford many times requesting information. In those communications, he falsely implied that she was still a murder suspect by telling her he wanted to clear her name. Despite her prior invocations, he then

---

[10] There is sparse outrageous-conduct caselaw with facts similar to those here. Indeed, it appears no Circuit has addressed a motion with comparable facts. This lack of relevant caselaw is more proof that Vinton's conduct falls far outside the norm and is outrageous.

attempted to interrogate her again during her federal arrest. When questioned later by her attorneys, he denied his presence. Corcoran appears to have attempted to cover up his presence too, by inexplicably omitting it from her report. The inference from her failure to explain that omission in her declaration is that she had some unacceptable motivation for hiding what happened. These facts add to the outrageousness of the government conduct here.

Vinton's conduct is even more shocking because within two days of the referral to Corcoran, Ms. Ford had been cleared as a suspect in the murder and was identified instead as a potential witness. It violates our universal sense of justice for law enforcement to retaliate against people suspected of crimes who invoke their constitutional rights. But it perhaps violates our universal sense of justice all the more when the person is not even a suspect, but is instead a potentially traumatized witness to a killing.[11]

Under these circumstances, on *de novo* review, this Court should conclude that Vinton's conduct was so grossly shocking that Ms. Ford's federal case should be dismissed.

---

[11] For her part, being pressured to disclose information to police was surely especially upsetting for Ms. Ford given everything she went through after ███ ███████.

### b. Vinton's Conduct Warranted the Exercise of the Court's Supervisory Powers

The district court also erred in declining to exercise its supervisory powers to dismiss the indictment or craft some other remedy like a lower sentence. The Supreme Court has cautioned that federal courts should use their supervisory powers in criminal cases "to see that the waters of justice are not polluted." *Mesarosh v. United States*, 352 U.S. 1, 14 (1956). Following that edict, it has recognized that a court may exercise its supervisory powers for several reasons, including "to remedy a constitutional or statutory violation; to protect judicial integrity by ensuring that a conviction rests on appropriate considerations validly before a jury; or to deter future illegal conduct." *United States v. Barrera-Moreno*, 951 F.2d 1089, 1091 (9th Cir. 1991); *see also United States v. W.R. Grace*, 526 F.3d 499, 511 n.9 (9th Cir. 2008) (noting that the court's supervisory powers are not limited to those three reasons); *United States v. Hasting*, 461 U.S. 499, 505 (1983).

Dismissal is appropriate in the exercise of a court's supervisory powers where "no lesser remedial action is available." *Barrera-Moreno*, 951 F.2d at 1092. *Cf. Hasting*, 461 U.S. at 506 (reversal of a conviction is inappropriate use of supervisory powers where "means more narrowly tailored to deter objectionable prosecutorial conduct are available."); *United States v. Jacobs*, 855 F.2d 652, 655 (9th Cir. 1988) (dismissal for prosecutorial misconduct based on the court's

28

supervisory powers is appropriate where the misconduct was "flagrant" and "caused substantial prejudice to the defendant").

When "sleazy investigatory tactics" are "so offensive that they amount to a violation of due process," a court may dismiss an indictment using its supervisory powers. *United States v. Simpson*, 927 F.2d 1088, 1090 (9th Cir. 1991), *abrogated on other grounds by W.R. Grace*, 526 F.3d at 511 n.9. Here, for all the reasons Vinton's sleazy tactics should have led to dismissal for outrageous government conduct, the district court also abused its discretion by refusing to dismiss in its inherent authority.

The district court also abused its discretion by declining to exercise that authority to deter Vinton from future illegal conduct. His retaliation was flagrant. Without exercise of the court's supervisory powers, the lesson he takes away from Ms. Ford's case is that he is free to trample the rights of those he is supposed to protect and serve in his underhanded pursuit of answers.[12]

---

[12] It is worth noting that Vinton was implicated in the Rampart Scandal, during which officers in the LAPD's Rampart Division falsified evidence and committed perjury, resulting in 106 criminal convictions being overturned. (2-ER-88-89.) Vinton, who was assigned to the Rampart Division at that time, had several cases dismissed after DNA evidence refuted his testimony. Regarding those cases, a source in the DA's office said prosecutors were "deeply troubled by Vinton's willingness to make a positive ID that could have sent someone to prison when clearly he was not certain. 'It was extremely reckless,' . . . 'His attitude was so bad that quite frankly it was as if he were lying.'" (*See* 2-ER-90.) Another case was dismissed, "due to attitude and problems of credibility with Officer Vinton."

Dismissal is the appropriate remedy. Vinton's conduct prejudiced Ms. Ford by resulting in a longer sentence than she would have received had her case remained state side. It also caused her tremendous stress, further eroded her confidence in law enforcement, and undermined the integrity of her federal case. These consequences cannot be resolved by a lesser remedy than dismissal.

Should the Court determine that a lesser remedy is available for some reason, it should at least ensure that Ms. Ford does not end up with worse punishment because of Vinton's unconstitutional misconduct. One way it might do this is to remand with instructions to sentence Ms. Ford to no more than 12 months imprisonment and 13 months of supervised release: this is likely the maximum time Ms. Ford would have served in state custody and on state post-release supervision.[13]

_____

(*Id.*) According to a DA document, when interviewed about that case, then-Officer Vinton said that the prosecutor and the LAPD were doing things the "old way" and that they did "not understand the way things had to be done to catch these gangbangers." (*Id.*) More recently, Vinton has been named in at least eleven civil rights lawsuits alleging that he retaliated against individuals who did not cooperate with him by destroying and fabricating evidence, entering a private home without a warrant, and failing to read rights. (2-ER-89-90, 2-ER-330-3-ER-612.) *See United States v. Morrison*, 449 U.S. 361, 365 n.2 (1981) ("[A] pattern of recurring violations by investigative officers [ ] might warrant the imposition of a more extreme remedy [like dismissal] in order to deter further lawlessness.").

[13] It is impossible to say with certainty what Ms. Ford's sentence would have been had her case remained state side. California's sentencing scheme is different than the federal scheme and Ms. Ford's state case was dismissed as a result of

30

### 3. The District Court Should Have Dismissed the Indictment for Selective Enforcement

This Court should also reverse because the district court erred in denying

Ms. Ford's selective enforcement claim. The equal protection component of the

Due Process clause and the Fourteenth Amendment prohibit law enforcement

officers from selectively enforcing laws for a discriminatory reason, such as a

---

Vinton's retaliatory referral to Corcoran, so there is no benefit of hindsight here. These facts further show why a lesser remedy than dismissal is unavailable. *See Barrera-Moreno*, 951 F.2d at 1092. Nevertheless, the defense has recommended a lesser remedy based on the following: the California crime of being a felon in possession of a firearm is a felony punishable by either 16 months, two, or three years in prison. *See* Cal. Penal Code § 29800(a)(1) (making the crime of being a felon in possession of a firearm a felony); Cal. Penal Code § 18 (prescribing punishment for felonies). Although the maximum sentence technically is three years, the California legislature recently amended the penal code to make mid-term sentences the new maximum unless aggravating factors justify increasing the maximum and are either stipulated to by the defendant or found beyond a reasonable doubt. Cal. Penal Code § 1170(b)(1). In selecting between low and middle terms, courts consider all relevant sentencing factors. Cal. Rules of Ct. 4.421, 4.423. Individuals with no prior strikes serving time in prison for non-violent offenses like being a felon in possession of a firearm receive 50-percent custody credit (in other words, they serve half of their stated sentence). Cal. Code of Regs. § 3043.2(b)(4). Under these authorities, it appears likely that Ms. Ford would have received a maximum sentence of two years in state court and would have served half that time.

Finally, most people released from California prisons, including those released after serving time for being a felon in possession of a firearm, are put on Post-Release Community Supervision ("PRCS"). Cal. Penal Code § 3451(a), (b). PRCS is automatically terminated after 13 months if the person has had no violations that resulted in a custodial sanction. Cal. Penal Code § 3456(a)(3). Accordingly, it appears likely that Ms. Ford would have been on PRCS for 13 months had her case remained state side.

31

person's race, religion, or—as pertinent here—the exercise of a constitutional right. *Whren v. United States*, 517 U.S. 806, 813 (1996); *Wayte v. United States*, 470 U.S. 598, 608 & n.9 (1985). To prevail on a selective enforcement claim, a defendant must show that police had a discriminatory purpose in enforcing the law and that that enforcement had a discriminatory effect. *Lacey v. Maricopa County*, 693 F.3d 896, 920 (9th Cir. 2012) (en banc).

To prove discriminatory purpose, a defendant must show that law enforcement selected her for enforcement "on the basis of an impermissible ground such as . . . exercise of [ ] constitutional rights." *United States v. McWilliams*, 730 F.2d 1218 (9th Cir. 1984); *see also Lacey*, 693 F.3d at 922. Here, the discriminatory purpose was clear: after Ms. Ford invoked her right to counsel seven times, Vinton threatened that he would refer her case for federal prosecution if she did not stop invoking that right. When she remained steadfast, he did in fact make that referral.

The district court assumed this was true. Yet it took a myopic view of enforcement to deny Ms. Ford's claim: it held that she did not show a discriminatory purpose because, according to its reasoning, Vinton did not enforce the law against her since he was not the officer who arrested her for possessing a firearm nor the FBI agent who presented the case to federal prosecutors. (1-ER-26.) This reasoning was error because, as this Court made clear *en banc*,

enforcement does not refer only to arrest or presentation to prosecutors. In *Lacey*, this Court explained that the term enforcement has an expansive definition, holding that "[e]nforcement may be shown through a variety of actual or threatened arrests, searches and temporary seizures, citations, and *other coercive conduct by the police*." 693 F.3d at 920 (emphasis added). *Cf. Wayte*, 470 U.S. at 610 (showing discriminatory purpose for selective prosecution claims requires that "the decisionmaker . . . selected or reaffirmed a particular course of action" (internal citation and alterations omitted)). Vinton enforced the law against Ms. Ford by referring her case to the FBI for federal prosecution. The district court's holding to the contrary was wrong.

To prove discriminatory effect, a defendant must show that law enforcement could have enforced the law against similarly situated individuals, but did not. *Lacey*, 693 F.3d at 920. The district court held that Ms. Ford did not show discriminatory effect because "repeat felons caught with a firearm just like this defendant while on probation with an open warrant . . . are frequently prosecuted under Title 18 of the United States Code, Section 922(g)(1)." (1-ER-26.) This was not the group of similarly situated individuals implicated by Ms. Ford's claim. Rather, to establish that Vinton's referral had a discriminatory effect, Ms. Ford needed to show that Vinton knew of others who qualified for federal prosecution under Section 922(g)(1) who did not invoke constitutional rights, and did not refer

33

those people for such prosecution. *See Lacey*, 693 F.3d at 920-21 (defining similarly situated group as those websites that also published a sheriff's address but were not investigated or charged by special prosecutor at sheriff's request).

Ms. Ford made that showing. Corcoran told Vinton that he could refer gun cases to her. Vinton has been an LAPD officer since the 1990s: no doubt Ms. Ford was not the first person he encountered chargeable under Section 922(g)(1). Yet, when asked by the defense whether it was normal for him to refer gun cases for federal prosecution, Vinton responded that "he doesn't investigate gun cases." (2-ER-123.) By implication, his answer was no. Because he does not normally refer people for Section 922(g)(1) prosecution, Vinton's referral of Ms. Ford had a discriminatory effect.

***

For all these reasons, this Court should reverse the district court's denial of Ms. Ford's retaliation motion, vacate her conviction, and dismiss her indictment.

### 4. At the Very Least, this Court Should Remand with Directions to Compel Further Discovery

At the very least, this Court should remand with instructions to grant Ms. Ford further discovery. Whether and how much discovery to grant on a claim of outrageous government conduct is within the district court's discretion. *Williams*, 791 F.2d at 1387. The court can balance the competing interests in determining whether and how to exercise that discretion. *Id.*

34

Neither this Court nor the Supreme Court has articulated a legal standard for obtaining discovery in all selective enforcement claims. But this Court did set a very low standard for selective enforcement claims in the reverse-sting stash house setting in *Sellers*, stating that "a defendant must [only] have *something* more than mere speculation to be entitled to discovery." *Sellers*, 906 F.3d at 855. In setting this standard, the *Sellers* Court cited two reasons for distinguishing selective enforcement claims from selective *prosecution* claims—which have a heightened standard, *see United States v. Armstrong*, 517 U.S. 456 (1996).

While *Sellers* focused on stash-house reverse stings, the opinion explicitly distinguishes *all* selective enforcement claims from selective prosecution claims. 906 F.3d at 852-854. First, the opinion notes that law enforcement officers "occupy a different space and role in our system than prosecutors; they are not charged with the same constitutional functions, and their decisions are more often scrutinized by—and in—courts." *Sellers*, 906 F.3d at 853. The Court held that because no presumption of regularity or deference applies to law enforcement's decisions whom to enforce laws against, the standard for obtaining discovery for selective enforcement claims should be lower than the standard for selective prosecution claims. *Id.* Second, this Court noted that, unlike selective prosecution claims for which statistical evidence of differential treatment is available, proving whom law enforcement could have enforced the law against but did not "is asking

35

[the defendant] to prove a negative; there is simply no statistical record for a defendant to point to." *Id*.

> Because of these two material differences, the Court concluded that a defendant need not proffer evidence that similarly-situated individuals of a different race were not investigated or arrested to receive discovery on his selective enforcement claim in a stash house reverse-sting operation case. While a defendant must have *something* more than mere speculation to be entitled to discovery, what that *something* looks like will vary from case to case. The district court should use its discretion—as it does for all discovery matters—to allow limited or broad discovery based on the reliability and strength of the defendant's showing.

*Sellers*, 906 F.3d at 855.

*Sellers'* two reasons for setting a low discovery bar in reverse-sting stash house cases are equally applicable here: first, Vinton is owed no deference in his choice of whom to refer to for federal prosecution, and second, there is no statistical evidence Ms. Ford can collect about his referral history absent a discovery order. Accordingly, this Court should adopt *Sellers'* relaxed standard for discovery in Ms. Ford's selective enforcement claim.

36

On the merits, the court's discovery ruling was an abuse of discretion. At minimum, Ms. Ford demonstrated that Vinton's conduct was outrageous. She also made a sufficient showing that Corcoran was complicit in that misconduct to warrant further discovery. For example, Ms. Ford produced evidence of: 1) Corcoran's and Vinton's friendly relationship; 2) their communication about the murder investigation although Corcoran was not assigned to it and Ms. Ford was quickly ruled out as a suspect; 3) Vinton's text asking whether Corcoran would prosecute Ms. Ford "if need be"; 4) Vinton's texts to Corcoran about Ms. Ford not responding to him and not retrieving her phone; 5) the fact that Vinton felt comfortable telling Ms. Ford that he "told [her] this would happen" in front of Corcoran; 6) Corcoran's statement that after Ms. Ford was charged, they could push for her to proffer about the murder; 7) Corcoran inexplicably omitting from her report Vinton's presence and attempted interrogation of Ms. Ford during the federal arrest; and 8) Corcoran inexplicably failing to explain that omission in her declaration.

For these reasons, the district court should have compelled the government to produce the requested discovery regarding Corcoran's complicity in Vinton's retaliation, which would have supported the outrageous government conduct and inherent supervisory powers claims. The court also should have granted the defense's request for further information about Vinton to enhance those claims as

they related to him. The categories of discovery the court should have compelled, are listed above. (*See, supra*, no. 5.) Notably, the government did not argue that producing this discovery would be burdensome. (2-ER-248.)

The district court also abused its discretion by denying further discovery on the selective enforcement claim. Ms. Ford's evidence of selective enforcement was much more than "mere speculation." Her evidence of discriminatory purpose was strong and reliable: her seven invocations of the right to counsel were recorded, Vinton's referral to Corcoran was documented in their many texts and emails, and the government did not substantively contest that Vinton threatened Ms. Ford with referral if she did not withdraw her request for counsel. Moreover, given his implied answer that he did not normally refer firearms cases for federal prosecution, the defense sufficiently demonstrated entitlement to discovery about the discriminatory effect of Vinton's enforcement. The defense's showing on the discriminatory-effect prong was reliable and as strong as can be expected in a claim like Ms. Ford's where she must prove a negative for which public information is unavailable.

Rather than addressing this evidence, the district court denied discovery on the selective enforcement claim on the basis that the defense did not make a showing of discriminatory effect because it did not show that *federal* authorities declined to *prosecute* felon-in-possession cases. In doing so, the court

38

misunderstood the basis of Ms. Ford's selective enforcement claim: that *Vinton*—not federal prosecutors—had opportunities to *refer* others for federal prosecution but did not do so.

For all these reasons, should the Court reach this question, it should remand to the district court with instructions to grant Ms. Ford further discovery including the categories listed above.

## B. This Court Should Also Reverse the District Court's Denial of the Motion to Dismiss under *Bruen*

The district court also should have dismissed Ms. Ford's indictment because Section 922(g)(1) is unconstitutional under *Bruen*.

### 1. Standard of Review

This Court reviews the constitutionality of a statute *de novo*. *United States v. Vongxay*, 594 F.3d 1111, 1114 (9th Cir. 2010).

### 2. Section 922(g)(1) Is Unconstitutional

In *Bruen*, the Supreme Court held that the "constitutional right to bear arms in public for self-defense is not 'a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees.'" *Bruen*, 142 S. Ct. at 2156 (quoting *McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 780 (2010)). It also held that Second Amendment analysis begins and ends with the Constitution's "text and history." *Id*. at 2128-29. Analysis under *Bruen* starts by asking whether "the Second Amendment's plain text covers an individual's conduct." *Id*. at 2126.

If it does, then "the Constitution presumptively protects that conduct." *Id*. To rebut the presumption, "the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id*. If the government fails to meet that burden, then the challenged regulation is unconstitutional. *See id.*

*Bruen* upended precedent from this Court and nearly all the other Circuits. For example, before *Bruen* this Court, like most other Circuits, employed a different two-step framework. *See Young v. Hawaii*, 992 F.3d 765, 783 (9th Cir. 2021) (en banc), *cert. granted, judgment vacated*, 142 S. Ct. 2895 (2022), and *abrogated by Bruen*. This Court first asked if the regulation accorded with the Second Amendment's text and history.[14] *Bruen*, 142 S. Ct. at 2126. But if not, the Court gave the government a second chance to validate the regulation by satisfying means-end scrutiny. *Id*. *Bruen* rejected this framework, holding that "it is one step too many" and stating that "*Heller* does not support applying means-end scrutiny" to Second Amendment claims. *Bruen*, 142 S. Ct. at 2127. "Instead, the government must affirmatively prove that its firearms regulation is part of the

---

[14] This Court would alternatively look to *Heller* dicta about "presumptively lawful regulatory measures" to uphold a law without even conducting a historical analysis. *See e.g., Vongxay*, 594 F.3d at 1115.

40

historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id*.

Because *Bruen* is intervening Supreme Court authority that is clearly irreconcilable with this Court's prior authority, that precedent is overruled. *See Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003) (en banc); *see also Atkinson v. Garland*, 70 F.4th 1018, 1022 (7th Cir. 2023) (stating that rather than relying on *Heller*'s dicta to "sidestep *Bruen*," courts "must undertake the text-and-history inquiry the Court so plainly announced and expounded upon at great length."). The Court must follow *Bruen's* framework.

> **a.  The Second Amendment's Plain Text Covers Ms. Ford and her Conduct**

Ms. Ford satisfies the first step of the *Bruen* analysis: the Second Amendment's plain text covers her and her conduct. In terms of conduct, Ms. Ford was charged with Section 922(g)(1) for possessing a handgun in public. As noted, the *Bruen* Court explained that the Amendment's plain text protects the act of carrying a concealed firearm in public—specifically, in the phrase "bear arms." *Bruen*, 142 S. Ct. at 2134-35. Moreover, the *reason* Ms. Ford had the handgun was to protect herself from ███ In *Heller*, the Supreme Court noted that self-defense was the "core" conduct the Second Amendment protects and its "central component." 554 U.S. at 599, 630.

41

The Second Amendment's plain text also covers Ms. Ford herself, notwithstanding her prior convictions. The Second Amendment "codifies a 'right of the people.'" *Heller*, 554 U.S. at 579 (quoting U.S. Const., amend II). In *Heller*, the Supreme Court explained that the Bill of Rights uses the phrase "right of the people" three times—in the First, Second, and Fourth Amendments. *Id.* The Court concluded that all three times, the term "the people" "unambiguously refers to *all* members of the political community, not an unspecified subset." *Id.* at 580 (emphasis added). Thus, *Heller* concluded, "the Second Amendment right is exercised individually and belongs to all Americans." *Id.* at 581. *See also United States v. Meza-Rodriguez*, 798 F.3d 664, 670-71 (7th Cir. 2015) ("the term 'the people' in the Second Amendment has the same meaning as it carries in other parts of the Bill of Rights" and therefore extends to all "persons who are part of a national community"); *United States v. Jimenez-Shilon*, 34 F.4th 1042, 1044-45 (11th Cir. 2022) (same). As an American, Ms. Ford has Second Amendment protection.

Just as there is no serious argument that a felony conviction excludes a person from the protections of the First and Fourth Amendments, a person with prior felonies is also among "the people" covered by the text of the Second Amendment. Nevertheless, the government argued below—and the district court agreed—that felons are not part of "the people." (1-ER-5, 4-ER-654.) After

42

*Heller*, but before *Bruen*, some courts asserted that individuals with prior felonies "fall entirely outside the Second Amendment's scope." *See Kanter v. Barr*, 919 F.3d 437, 451-52 (7th Cir. 2019) (Barrett, J., dissenting). As then-Judge, now-Justice Barrett wrote in her *Kanter* dissent, the notion that felons fall outside of "the people" is both "analytically awkward" and at odds with *Heller*. *Id.* at 453. *Heller* "interpreted the word 'people' as referring to 'all Americans,'" and "[n]either felons nor the mentally ill are categorically excluded from our national community." *Kanter*, 919 F.3d at 451-52 (quoting *Heller*, 554 U.S. at 580-81).

*Bruen* vindicated that position by explicitly abrogating *Kanter's* majority opinion. *Bruen*, 142 S. Ct. at 2126-27. The *Bruen* Court cited the same discussion from *Heller* about the term "the people" to conclude that "The Second Amendment guaranteed to '*all Americans*' the right to bear commonly used arms in public[.]" *Id.* at 2134, 2156 (emphasis added).

Because the Second Amendment's plain text covers Ms. Ford and her conduct, Section 922(g)(1) is presumptively unconstitutional. *Bruen*, 142 S. Ct. at 2127. To rebut this presumption, the government had to show that permanently disarming Ms. Ford "is consistent with this Nation's historical tradition of firearm regulation." *Id.* at 2135. It failed to do so.

43

### b. Section 922(g)(1) Is Facially Unconstitutional

Section 922(g)(1) is facially unconstitutional because no historical tradition permanently disarmed all felons. Neither the federal government nor a single state barred all felons from possessing guns until the twentieth century. *See, e.g.*, *Range*, 69 F.4th at 104; *N.R.A. v. A.T.F.*, 700 F.3d 185, 196 (5th Cir. 2012), *abrogated on other grounds by Bruen*; *Kanter*, 919 F.3d at 454 (Barrett, J., dissenting); *Chovan*, 735 F.3d at 1137 ("[O]ne can with a good degree of confidence say that bans on convicts possessing firearms were unknown before World War I" (citation omitted)).[15] Moreover, the current iteration of Section 922(g)(1) is the first-enacted regulation in the Nation's history that permanently disarmed people following conviction of any type of felony. *Range*, 69 F.4th at 104. And that law dates to 1961. *Id.* (citing Pub. L. No. 87-342, 75 Stat. 757 (1961)). As the *en banc* Third Circuit concluded in *Range*, "a law passed in 1961 . . . falls well short of 'longstanding' for purposes of demarcating the scope of a constitutional right." *Id.*

---

[15] *See also* Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 Wyo. L. Rev. 249, 272-74 (2020); Carlton F.W. Larson, *Four Exceptions in Search of A Theory: District of Columbia v. Heller and Judicial Ipse Dixit*, 60 Hastings L.J. 1371, 1376 (2009); C. Kevin Marshall, *Why Can't Martha Stewart Have A Gun?*, 32 Harv. J.L. & Pub. Policy 695, 708 (2009); Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America*, 25 Law & Hist. Rev. 139, 155 (2007); Adam Winkler, *Heller's Catch-22*, 56 UCLA L. Rev. 1551, 1563 (2009).

The government acknowledged below that "felon-in-possession laws are of mid-20th century vintage." (4-ER-661 (quotation marks and citation omitted).) But it argued that other sources justify Section 922(g)(1)'s blanket disarmament of all felons. These sources each fail as "historical analogues" to § 922(g)(1). *Range*, 69 F.4th at 104. To begin, the government's main argument below was that only "virtuous citizens" have gun rights. (4-ER-657-658.) For this argument, it cited this Court's pre-*Bruen* decision in *Vongxay*. (4-ER-657-658.) But as discussed above, *Bruen* overruled *Vongxay*. For starters, *Vongxay* acknowledged that the "historical question" underpinning the "virtuous citizenry" theory was not "definitively resolved." *Vongxay*, 594 F.3d at 1118. Under *Bruen*, "ambiguous history" is "not sufficiently probative" to uphold a gun law. *Bruen*, 142 S. Ct. at 2139.

Next, *Vongxay*'s scholarly sources inferred this "virtue" limitation from "classical republican political philosophy," not from historical regulations. *See* Don B. Kates, Jr., *The Second Amendment: A Dialogue*, 49 Law & Contemp. Probs. 143, 146 (1986), and Glenn Harlan Reynolds, *A Critical Guide to the Second Amendment*, 62 Tenn. L.Rev. 461, 480 (1995); *see also Vongxay*, 594 F.3d at 1118. *Bruen* stressed, repeatedly, that only enacted "regulations" can satisfy the government's burden. *See, e.g.*, *Bruen*, 142 S. Ct. at 2126, 2130, 2131-32, 2135.

45

Finally, as then-Judge Barrett explained, because there are no Founding-era laws depriving those with felony convictions of their gun rights, the "virtuous citizenry" arguments rely by analogy to the rights to vote and serve on juries. *Kanter*, 919 F.3d at 462 (Barrett, J., dissenting). The analogy fails because those are civic rights; rights held by the people for collective purposes. *See id.* (citing, among others, Saul Cornell, *A New Paradigm for the Second Amendment*, 22 Law & Hist. Rev. 161, 165 (2004); Saul Cornell, *"Don't Know Much About History"*: *The Current Crisis in Second Amendment Scholarship*, 29 N. Ky. L. Rev. 657, 679 (2002)). By contrast, *Heller* rejected the argument that the right to bear arms is a collective, civic right, holding instead that "the Second Amendment confer[s] *an individual right* to keep and bear arms," and emphasizing that the Second Amendment is rooted in the individual's right to self-defense, rather than the collective right to serve in a militia. *Id.* (quoting *Heller*, 554 U.S. at 595).

The Supreme Court again emphasized the individual nature of the right to bear arms in *Bruen*, stating that "individual self-defense is 'the *central component*' of the Second Amendment right.'" *Bruen*, 142 S. Ct. at 2133 (quoting *McDonald*, 561 U.S. at 767). The virtuous-citizen argument thus rests on a rejected notion of gun ownership as a civic-right serving the greater good. *United States v. Bullock*, 2023 WL 4232309, at *12 (S.D. Miss. June 28, 2023) (rejecting virtuous-citizenry

defense of § 922(g)(1) because "*Heller* made clear that the Second Amendment's right to bear arms is an individual right, not a civic right").

The analogy to civic rights also fails because historical exclusions from the exercise of civic rights were explicit: several state constitutions excluded or authorized excluding those who committed certain crimes from voting and serving on juries. *Kanter*, 919 F.3d at 463 (Barrett, J., dissenting) (citing, among others, Alexander Keyssar, *The Right to Vote* 62–63 & tbl. A.7 (2009)). By contrast, state constitutions protecting the right to bear arms did not exclude criminals, even as many of those same constitutions excluded criminals from the right to vote. *Id.* (citing Eugene Volokh, *State Constitutional Rights to Keep and Bear Arms*, 11 Tex. Rev. L. & Pol. 191, 208-10 (2006), and Keyssar, *supra*, at tbl. A.7).

Aside from its virtuous-citizen argument, the government also attempted to demonstrate historical analogues by pointing to Revolution-era laws disarming people who would not swear loyalty to state or federal governments. (4-ER-661.) But these laws are hardly analogous, let alone "distinctly similar," to Section 922(g)(1)'s total, lifetime ban on all felonies. First, the laws were limited to times of turmoil and rebellion. Second, people disarmed under loyalty statutes could regain their rights by swearing a loyalty oath. *See* Churchill, *supra* n.14, at 157. For example, leaders of the Massachusetts Bay colony once disarmed supporters of a banished seditionist. Greenlee, *supra* n.14, at 263. But "[s]ome

47

supporters who confessed their sins were welcomed back into the community and able to retain their arms." *Id.*

Even people who refused to take oaths could acquire new firearms or retrieve their old ones. *See* Marshall, *supra* n.14, at 724. For example in 1787, after the participants in Shay's Rebellion committed "crimes bordering on treason," they were required to "deliver up their arms." *Range*, 69 F.4th at 106 n.10. But Massachusetts law required the Commonwealth to *return* the arms three years later. *Id.*

The government's final attempt to locate historical analogues was to point to rejected proposals from three state ratifying conventions. (4-ER-659-661.) These three proposals "cannot counter the Second Amendment's text, or serve as an analogue . . . because, inter alia, they were not enacted." *Rahimi*, 61 F.4th at 457. They thus cannot establish a history and tradition of actual "regulations," as required by *Bruen*. *See, e.g.*, *Bruen*, 142 S. Ct. at 2126; *see also Heller*, 554 U.S. at 590 ("It is always perilous to derive the meaning of an adopted provision from another provision deleted in the drafting process.").

Moreover, *Heller* cautioned that "the drafting history of the Second Amendment—the various proposals in the state conventions and the debates in Congress"—is a "dubious" source for Second Amendment interpretation. *Id.* at 603. That's because the Second Amendment was "widely understood to codify a

48

pre-existing right, rather than to fashion a new one." *Id*. If these rejected proposals codified the preexisting right, the government should be able to point to Founding-era laws imposing similar firearms restrictions. Indeed, such evidence exists when it comes to limitations on other rights, like voting. *Kanter*, 919 F.3d at 463 (Barrett, J., dissenting) (identifying 10 early-19th-century state constitutions that excluded certain convicted persons from voting). Yet no such evidence exists for the right to bear arms.

These three rejected proposals also cannot demonstrate a historical tradition because they did not represent a majority of the states' views. Indeed, proposals from Rhode Island, New York, and Virginia advocated an *unqualified* constitutional "right to keep and bear arms[.]" Elliott, *supra* n.14, at 328, 335; Robert E. Shalhope, *The Armed Citizen in the Early Republic*, 49 Law & Contemp. Probs. 125, 134 (1986). Additionally, none of the four parallel state constitutional provisions enacted before the ratification of the Second Amendment had any limitation. *Kanter*, 919 F.3d at 463 (Barrett, J., dissenting). The government cannot cherry-pick the rejected proposals that fit its preferred limitation on the right, given that three other proposals that more closely mirror the enacted Amendment did not carry that limitation.

\*\*\*

49

For these reasons, the government did not carry it's burden of rebutting the presumption that Section 922(g)(1) is facially unconstitutional.

### c. Section 922(g)(1) Is Unconstitutional As Applied to All Non-Violent Felons

Section 922(g)(1) is also unconstitutional as applied to non-violent felons like Ms. Ford.[16] After conducting *Bruen's* historical analysis, the *en banc* Third Circuit in *Range* concluded that, at minimum, Section 922(g)(1) cannot survive constitutional scrutiny as applied to people with nonviolent felony convictions. *See Range*, 69 F.4th at 103-06; *see also Kanter*, 919 F.3d at 451 (Barrett, J., dissenting) ("History is consistent with common sense: it demonstrates that legislatures have the power to prohibit dangerous people from possessing guns. But that power extends only to people who are dangerous.") (emphasis in original).

---

[16] In a footnote below, the government contended that Ms. Ford's California convictions for burglary and robbery were violent felonies. (4-ER-653-654.) They are not, either considered as a categorical matter or based on the record below. *See Descamps v. United States*, 570 U.S. 254 (2013) (California burglary is categorically not a crime of violence for purposes of the Armed Career Criminal Act); *United States v. Dixon*, 805 F.3d 1193 (9th Cir. 2015) (California robbery is not a crime of violence for purposes of the ACCA); *United States v. Garcia-Lopez*, 903 F.3d 887 (9th Cir. 2018) (same for purposes of Section 16(a)). (*See also* PSR-199 (summarizing a police report, stating Ms. Ford entered and took property from a residence, and noting that she originally received probation with a suspended sentence), PSR-201 (providing no information about the facts of the crime). Moreover, despite this one-sentence footnote, above the line, the government's opposition made a point to focus on non-violent felonies. (2-ER-648-662.)

This Court should follow *Range's* well-reasoned decision and conclude that Section 922(g)(1) is unconstitutional as applied to nonviolent felons like Ms. Ford.

### d. Section 922(g)(1) Is Unconstitutional As Applied to Ms. Ford

Ms. Ford's Section 922(g)(1) conviction is also unconstitutional in light of her prior conduct, which the government did not show would have resulted in permanent disarmament under Founding-era laws. *Bruen*, and *Heller* before it, instructed that (1) the Second Amendment codifies a "pre-existing" right that retains the same scope today as it did at the founding, and (2) later laws, whether civil or criminal, cannot narrow the scope of the right. *Bruen*, 142 S. Ct. at 2127, 2135. What matters for Second Amendment purposes is thus not the *label*, but whether the government can convincingly establish a historical tradition of similar regulation based on the "individual's *conduct*." *Id.* at 2126 (emphasis added).[17]

---

[17] Were that not the rule, the Second Amendment's strength would gradually wither, as modern legislatures have expanded the definition of "felony" to encompass far more conduct than was imaginable at the Founding. As the *Range* Court explained, in English common law, felonies were limited to the most serious crimes punishable by "estate forfeiture and even death." 69 F.4th at 103. By contrast, today, "felonies include a wide swath of crimes, some of which seem minor." *Id.* For example, under federal law it is a felony to utter "any obscene, indecent, or profane language by means of radio communication." 18 U.S.C. § 1464. Similarly, the petitioner in *Range* had a prior felony for making a false statement on a food-stamps application. *Range*, 69 F.4th at 98. *Range* also pointed to other state laws that impose the "felon" label for conduct as minor as "returning out-of-state bottles or cans," stealing library property worth over $150, or unauthorized reading of another's email. *Id.* at 103 n.5.

Ms. Ford's "felon" status arises from her California burglary, embezzlement, and robbery convictions. (2-ER-72-73.) None of these offenses is considered a violent crime for purposes of federal law as a categorical matter and there is no indication that any actually involved violence. *See supra*, n.16. Nor did the government show that this type of conduct would have resulted in permanent disarmament under Founding-era regulations. *Bruen*, 142 S. Ct. at 2145-50.

Even if this Court were to focus on the label, the government did not show that Ms. Ford's prior convictions were "felonies" at the time of the founding. *See Bullock*, 2023 WL 4232309, at *27 ("The problem is that 'felony' was not well understood in 1791. One might think that, at a minimum, we could agree that the nine felonies enumerated at common law would qualify for disarmament. Not so fast. Madison complained that the common-law definition of felony was 'vague.'"); *Kanter*, 919 F.3d at 459 ("'felony' was 'a term of loose signification even in the common law of England,' but more so in the States where '[t]he meaning of the term ... [was] not precisely the same in any two of the States; and varie[d] in each with every revision of its criminal laws.'"). For these reasons, the government failed to rebut the presumption that Ms. Ford's Section 922(g)(1) conviction is unconstitutional as applied to her.

***

Because the Second Amendment's plain text covers Ms. Ford and her

conduct and because the government failed to rebut the presumption of unconstitutionality that flows from that showing, Ms. Ford's Section 922(g)(1) conviction is unconstitutional. Her case must be dismissed.

## C. Resentencing Is Warranted

Finally, if this Court reaches the question, it should conclude that the district court erred both procedurally and substantively at sentencing. The procedural error was relying on statistics without disclosure to the parties beforehand. The substantive error was meting out a 30-month sentence despite the relevant Section 3553(a) factors.

### 1. Standards of Review

In reviewing a sentencing decision, this Court "first consider[s] whether the district court committed significant procedural error, then . . . consider[s] the [sentence's] substantive reasonableness.'" *United States v. Daniels*, 541 F.3d 915, 921 (9th Cir. 2008) (quoting *Carty*, 520 F.3d at 993). Where a claim of procedural error was not raised below, this Court reviews for plain error. *See United States v. Autery*, 555 F.3d 864, 869, 873 (9th Cir. 2009). Plain error is "(1) error, (2) that is plain, and (3) that affects substantial rights." *United States v. Cotton*, 535 U.S. 625, 631 (2002) (citation, alteration, and internal quotation marks omitted). If these three conditions are met, the Court may then exercise discretion to grant

relief if the error "seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Id*.

In considering whether to grant relief for plain sentencing error, this Court has noted that "there is little reason not to correct plain sentencing errors when doing so is so simple a task. . . . Reversing a sentence does not require that a defendant be released or retried, but simply allows a district court to exercise properly its authority to impose a legally appropriate sentence." *United States v. Castillo-Casiano*, 198 F.3d 787, 792 (9th Cir. 1999), *amended by* 204 F.3d 1257 (9th Cir. 2000).

The Court reviews the substantive reasonableness of a sentence for abuse of discretion, regardless whether the appellant objected on that basis below. *United States v. Blinkinsop*, 606 F.3d 1110, 1116 (9th Cir. 2010); *Autery*, 555 F.3d at 871. There is no presumption that a sentence is reasonable simply because it is within the Guidelines range. *United States v. Carty*, 520 F.3d 984, 993-94 (9th Cir. 2008). "The touchstone of reasonableness is whether the record as a whole reflects rational and meaningful consideration of the factors enumerated in 18 U.S.C. § 3553(a)." *United States v. Ressam*, 679 F.3d 1069, 1089 (9th Cir. 2012) (en banc) (internal quotation marks omitted).

The "abuse of discretion standard is deferential, but it does not mean anything goes." *Ressam*, 679 F.3d at 1087. In other words, "appellate review for

54

substantive reasonableness should not be ... a rubber stamp." *Id*. (quotation marks omitted).

**2.    The District Court Procedurally Erred by Relying on Irrelevant Statistics it Did Not Disclose to the Parties Beforehand**

After the parties argued, the district court discussed gun violence extensively, including horrific mass shootings.  (1-ER-55-57.)  It did not warn the parties it would rely on this information beforehand.  This violated Rule 32.  That rule requires a district court to "allow the parties' attorneys to comment on . . . other matters relating to an appropriate sentence."  Fed. R. Crim. Proc. 32(i)(1)(C).  The provision "provides for focused, adversarial development of the factual and legal issues relevant to determining the appropriate Guidelines sentence." *Burns v. United States*, 501 U.S. 129, 134 (1991).  Under this Court's precedent, Rule 32 requires "that all facts relevant to the defendant's sentence be provided to the defendant for adversarial testing." *United States v. Baldrich*, 471 F.3d 1110, 1114 (9th Cir. 2006).  Thus, a district court violates Rule 32 where it "relie[s] . . . on factual information that ha[s] not been disclosed to [a defendant] and to which [she] had no opportunity to respond before sentence was imposed." *United States v. Gray*, 905 F.3d 1145, 1148 (9th Cir. 2018) (per curiam); *United States v. Warr*, 530 F.3d 1152, 1162–63 (9th Cir. 2008) (holding that the district court's reliance

55

on a Bureau of Prisons' study without "notif[ying] [defendant] of it before the sentencing hearing" violated Rule 32).

The government appears likely to concede that the district court's failure to disclose this information beforehand was error: in a case involving an almost-verbatim recitation of statistics and information by the same district judge without prior disclosure to the parties, the government recently conceded error on appeal. *See United States v. Molina*, Government's Answering Brief at 21, Case Nos. 22-50161, 22-50162 (March 30, 2023) ("The government agrees that the district court should not have cited statistics on gun violence without providing advance notice to the parties. *See Warr*, 530 F.3d at 1162-63.").[18]

Ms. Ford has also satisfied the remaining prongs of plain error. Under the authorities cited *supra*, the court's error was plain. The third prong is satisfied if the error affects a defendant's substantial rights. *United States v. Olano*, 507 U.S. 725, 734-35 (1993). "Normally, although perhaps not in every case, the defendant must make a specific showing of prejudice to satisfy the 'affecting substantial rights' prong[.]" *Id*. at 735. In *Olano*, the Supreme Court left open "whether the phrase 'affecting substantial rights' is always synonymous with 'prejudicial'" or,

---

[18] The same court made a similar error in at least one other case, citing identity theft statistics during sentencing without disclosing them beforehand. *See United States v. Augustus*, Appellant's Opening Brief at 12-13, Case No. 22-50311 (August 4, 2023).

on the other hand, whether some categories of forfeited errors may be either "presumed prejudicial" or "corrected regardless of their effect on the outcome[.]" *Id*. Because the district court never revealed its sources, this Court should presume that the error was prejudicial and affected Ms. Ford's substantial rights: the district court's failure to reveal its sources hinders Ms. Ford's ability to demonstrate prejudice by preventing her from assessing the statistics on appeal.

Even if Ms. Ford must show prejudice, she can do so because the statistics on which the court relied—even assuming they were accurate—were clearly irrelevant. A defendant can establish prejudice if she shows a reasonable probability she would have received even a *slightly* lower sentence but for the errors. *United States v. Joseph*, 716 F.3d 1273, 1280 (9th Cir. 2013). Here, had the court given notice of the statistics and allowed the defense to be heard about them, there is a reasonable probability the court would have given Ms. Ford a lower sentence because counsel would have been able to explain why the statistics were not appropriate considerations in her case.

For example, the defense could have explained that Ms. Ford did not possess a ghost gun. (2-ER-72.) It could have pointed out that, unlike the madmen, gangbangers, carjackers, and mass shooters the district court was concerned about, Ms. Ford possessed the firearm for self-defense. (PSR-18, 110, 196.) Instead of the loss of innocent life and psychological repercussions of seeing guns that the

57

court focused on, the defense could have explained that there is no indication that Ms. Ford ever used, brandished, killed, shot, or otherwise harmed anyone with the gun. (*See e.g.*, PSR-197 (not applying any specific offense characteristics to Ms. Ford's guidelines calculations).) In fact, the defense could have highlighted that there is no indication anyone else even knew she had the gun.

Ms. Ford, moreover, did not use gun violence to "disproportionately impact[] communities of color, women, or other marginalized groups in our society." She was herself a Black, ███████ woman who was fearful of a gun-toting, █████████ male gangmember who ███ ███ *her* (PSR-100): she was a member of the community the district court was so concerned with protecting. For these reasons, the Court's error prejudiced Ms. Ford.

For the same reasons, the court's error also seriously affected the fairness, integrity, and public reputation of the judicial proceedings. This Court has "regularly deemed the fourth prong of the plain error standard to have been satisfied where, as here, the sentencing court committed a legal error that may have increased the length of a defendant's sentence." *United States v. Tapia*, 665 F.3d 1059, 1063 (9th Cir. 2011). Indeed, it recently reaffirmed that "because re-sentencing is a simple task, a failure to exercise our discretion in order to allow a district court to correct an obvious sentencing error that satisfies the three prongs of the plain error test would in itself undermine the 'fairness, integrity, and public

58

reputation of judicial proceedings.'" *United States v. Lillard*, 57 F.4th 729, 737 (9th Cir. 2023) (quotation marks and citation omitted). Therefore, if the Court reaches the question, it should remand for resentencing so Ms. Ford's sentence can be based on appropriate considerations the parties have had an opportunity to address.

### 3. Ms. Ford's 30-Month Sentence Is Substantively Unreasonable in Light of the Relevant Section 3553(a) Factors

The Court should also remand because Ms. Ford's sentence is substantively unreasonable. It is excessively long because Ms. Ford had the firearm for self-defense. (PSR-18, 110, 196.) At the time of her arrest, she was living in constant fear because of ███'s years-long harassment and she believed—after her early familial abandonment and her disappointment in the justice system's treatment of ███—that she could only rely on herself. Although her conduct may have been unlawful, it was at the very least, to some extent, understandable.[19]

---

[19] This is not to ignore the aggravating aspects of Ms. Ford's case. She has a serious criminal history, but that history—as the Court found—was adequately captured by her criminal history category. She also had recently pleaded guilty to unlawfully possessing a gun when she was arrested in November 2021 for the conduct underlying this case. For the reasons noted above, however, her desire to possess a gun despite her felon and probationary status was, to some extent, understandable. In light of the mitigating factors in her case, these aggravating factors were not enough to warrant a 30-month sentence.

Moreover, Ms. Ford took great strides in the thirteen months she was on bond. She leaned into mental health therapy, which she received for the first time. (1-ER-51-52, 54-55.) She learned boxing. (Exh. G at 11:25.) She got to the point—a major arrival for her—that she no longer felt she needed to have a gun. (1-ER-51.) Given the self-defense reason she had the gun and the fact that by sentencing she no longer felt she needed a gun, Ms. Ford's was not the case to send a message of deterrence and public protection based on the evils of mass shootings.

Ms. Ford's sentence is also excessive because of her case's origin. Were it not for Vinton's retaliation against Ms. Ford for invoking a constitutional right, her case would have stayed in state court. As noted above, the most she would have served likely would have been 12 months in prison, followed by 13 months on PRCS. Under those circumstances, a thirty-month sentence with three years of supervised release was an abuse of discretion. The district court did not even mention the origin of Ms. Ford's federal case during sentencing. It was so focused on deterring felons from committing mass shootings that it utterly ignored the deterrence that really matters here: the message Ms. Ford's sentence sends to Vinton and the public about what we deem acceptable treatment of possible witnesses to horrific crimes.

## VII. CONCLUSION

For the foregoing reasons, this Court should vacate Ms. Ford's conviction and dismiss her indictment. In the alternative, this Court should remand with instructions to compel the disclosure of additional discovery or for resentencing.

Respectfully submitted,

CUAUHTEMOC ORTEGA
Federal Public Defender

DATED: September 29, 2023    By  */s/ Deborah E. Gonzalez*
DEBORAH E. GONZALEZ
Deputy Federal Public Defender
Attorney for Defendant-Appellant

## CERTIFICATE OF RELATED CASES

Counsel for appellant certifies that she is aware of the following pending cases presenting an issue related to those raised in this brief regarding the constitutionality of 18 U.S.C. § 922(g)(1) in light of the Supreme Court's decision in *Bruen*, 142 S. Ct. at 2111: *United States v. Duarte*, Case No. 22-50048; *United States v. Registe*, Case No. 20-30042; *United States v. Rojo*, Case No. 23-598; and *United States v. Ramos*, Case No. 22-50177.

Counsel is also aware of the following pending cases presenting an issue related to those raised in this brief regarding the district court's citation of statistics at sentencing without providing advance notice to the parties: *United States v. Molina*, Case Nos. 22-50161, 22-50162; and *United States v. Augustus*, Case No. 22-50311.

DATED: September 29, 2023

/s/ Deborah E. Gonzalez
DEBORAH E. GONZALEZ

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. 32(a)(7)(C) and Circuit Rule 32-1, I certify that this opening brief is proportionally spaced, has a typeface of 14 points or more, and contains approximately 14,476 words.


DATED: September 29, 2023            */s/ Deborah E. Gonzalez*
                                     DEBORAH E. GONZALEZ