No. 23-1022

# IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee*,

*v.*

BRIESHANAY QUENISE FORD,
*Defendant-Appellant.*

*APPEAL FROM THE UNITED STATES DISTRICT COURT*
*FOR THE CENTRAL DISTRICT OF CALIFORNIA*
*DISTRICT COURT NO. 2:22-CR-200-PA*

## GOVERNMENT'S ANSWERING BRIEF

E. MARTIN ESTRADA
United States Attorney

BRAM M. ALDEN
Assistant United States Attorney
Chief, Criminal Appeals Section

DAVID W. WILLIAMS
ALEXANDER SU
Assistant United States Attorneys

1200 United States Courthouse
312 North Spring Street
Los Angeles, CA 90012
Telephone: (213) 894-2400
Email: david.williams3@usdoj.gov
alexander.su@usdoj.gov

Attorneys for Plaintiff-Appellee
UNITED STATES OF AMERICA

# TABLE OF CONTENTS

**DESCRIPTION**                                                    **PAGE**

I.     INTRODUCTION.................................................................1

II.    ISSUES PRESENTED ......................................................3

III.   STATEMENT OF THE CASE .........................................4

    A.  Jurisdiction, Timeliness, and Bail Status ..............4

    B.  Statement of Facts and Procedural History...........4

        1.  Defendant carries a loaded firearm in her pants..........4

        2.  Defendant files a pretrial motion to dismiss, or for discovery, based on allegedly "outrageous conduct".............................................................7

        3.  Defendant files a pretrial motion to dismiss under Bruen and the Second Amendment............................11

        4.  The government's obtains documents and recordings related to defendant's "outrageous conduct" allegations, and provides them to defendant........................................................11

        5.  The government opposes the "outrageous conduct" motion, the discovery request, and the constitutional challenge to § 922(g)(1).........................16

        6.  The district court denies defendant's motions to dismiss, and denies her requests for additional discovery......................................................19

        7.  The district court finds defendant guilty of being a felon with a firearm .................................23

        8.  Defendant receives a within-Guidelines sentence ......23

# TABLE OF CONTENTS (continued)

**DESCRIPTION** **PAGE**

IV.   SUMMARY OF ARGUMENT .........................................................26

V.    ARGUMENT ...................................................................29

    A.   The District Court Correctly Denied the Motion to Dismiss for Outrageous Government Conduct and Selective Enforcement....................................................29

        1.   Standard of review ....................................................29

        2.   Improper or discriminatory motive cannot be imputed from one sovereign to another......................30

        3.   The district court correctly found no "outrageous government conduct"...................................32

        4.   The district court correctly found no selective enforcement................................................39

        5.   Defendant's "inherent authority" argument is likewise unsupported ...................................45

    B.   The District Court Did Not Abuse Its Discretion by Denying the Requested Discovery ............................47

        1.   Standard of review ....................................................47

        2.   Defendant waived any claim to the discovery she now seeks ..................................................47

        3.   Even if she had not waived the claim, she was not entitled to the requested discovery......................49

    C.   Section 922(g)(1) Does Not Violate the Second Amendment ..................................................53

        1.   Standard of review ....................................................53

# TABLE OF CONTENTS (continued)

**DESCRIPTION**                                                    **PAGE**

2.  Section 922(g)(1) is not facially unconstitutional........53

    a.  This Court has held that the felon-in-possession law is constitutional..........................54

    b.  Bruen is not clearly irreconcilable with this Court's cases upholding § 922(g)(1) ..................55

    c.  Defendant offers no convincing reason to hold otherwise. ....................................................59

    d.  Historical analysis shows that the felon-in-possession law is constitutional..........................59

        i.  Historical felony penalties support § 922(g)(1)'s validity...............................................60

        ii.  Laws disarming the dangerous and unlawful sup- port § 922(g)(1)'s validity............62

3.  Section 922(g)(1) is not plainly unconstitutional as applied to defendant or non-violent felons..............65

D.  The Within-Guidelines Sentence Was Neither Procedurally Nor Substantively Unreasonable...................66

1.  Standard of review ......................................................66

2.  The sentence was procedurally reasonable .................68

3.  The sentence was substantively reasonable................71

VI.  CONCLUSION ..................................................................74

iii

# TABLE OF AUTHORITIES

**DESCRIPTION** **PAGE(S)**

## Cases

*Avilez v. Garland,*
    69 F.4th 525 (9th Cir. 2023) ........................................................ 53, 56

*Bordenkircher v. Hayes,*
    434 U.S. 357 (1978) ............................................................................ 34

*Chavez v. Martinez,*
    538 U.S. 760 (2003) ............................................................................ 35

*District of Columbia v. Heller,*
    554 U.S. 570 (2008) ........................................................ 20, 54, 58, 69

*Elkins v. United States,*
    364 U.S. 206 (1960) ............................................................... 17, 18, 41

*Freeman v. City of Santa Ana,*
    68 F.3d 1180 (9th Cir. 1995) ............................................................ 40

*Greene v. United States,*
    454 F.2d 783 (9th Cir. 1971) ...................................................... 33, 36

*Irizarry v. United States,*
    553 U.S. 708 (2008) ............................................................................ 68

*Kyles v. Whitley,*
    514 U.S. 419 (1995) ..................................................................... 40, 41

*Lacey v. Maricopa Cnty.,*
    693 F.3d 896 (9th Cir. 2012) ............................................................ 39

*New York State Rifle & Pistol Ass'n v. Bruen,*
    597 U.S. 1 (2022) ................................................................................ 11

## TABLE OF AUTHORITIES (continued)

**DESCRIPTION**                                                **PAGE(S)**

*Papas v. Leonard,*
  No. 3:10–CV–00550–BR, 2012 WL 1445853 (D. Or. Apr. 25, 2012)...40

*Papas v. Leonard,*
  544 F. App'x 764 (9th Cir. 2013)........................................................40

*People v. Gallardo,*
  4 Cal. 5th 120 (2017)...........................................................................46

*People v. Vargas,*
  59 Cal. 4th 635 (2014).........................................................................46

*Range v. Att'y Gen.,*
  69 F.4th 96 (3d Cir. 2023).......................................................58, 61, 65

*Rochin v. California,*
  342 U.S. 165 (1952).............................................................................36

*Rosenbaum v. City & Cnty. of San Francisco,*
  484 F.3d 1142 (9th Cir. 2007)........................................................39, 40

*Tingley v. Ferguson,*
  47 F.4th 1055 (9th Cir. 2022) ........................................................56, 61

*United States v. Amezcua-Vasquez,*
  567 F.3d at 1058 ..................................................................................71

*United States v. Anekwu,*
  695 F.3d 967 (9th Cir. 2012)...............................................................65

*United States v. Armstrong,*
  517 U.S. 456 (1996)......................................................39, 40, 49, 50

*United States v. Autery,*
  555 F.3d 864 (9th Cir. 2009)...............................................................67

# TABLE OF AUTHORITIES (continued)

**DESCRIPTION**                                                           **PAGE(S)**

*United States v. Baldrich,*
    471 F.3d 1110 (9th Cir. 2006)...............................................68

*United States v. Bassford,*
    812 F.2d 16 (1st Cir. 1987) ...................................................31

*United States v. Bautista,*
    989 F.3d 698 (9th Cir. 2021)................................................44

*United States v. Beers,*
    189 F.3d 1297 (10th Cir. 1999).............................................31

*United States v. Bogart,*
    783 F.2d 1428 (9th Cir. 1986)...............................................37

*United States v. Bundy,*
    968 F.3d 1019 (9th Cir. 2020)......................................30, 46

*United States v. Bussell,*
    504 F.3d 956 (9th Cir. 2007)................................................43

*United States v. Cardenas-Mendoza,*
    579 F.3d 1024 (9th Cir. 2009)...............................................47

*United States v. Carty,*
    520 F.3d 984 (9th Cir. 2008)........................................67, 71

*United States v. Chong,*
    720 F. App'x 329 (9th Cir. 2017).........................................44

*United States v. Cope,*
    527 F.3d 944 (9th Cir. 2008)................................................67

*United States v. Crowe,*
    563 F.3d 969 (9th Cir. 2009)................................................71

# TABLE OF AUTHORITIES (continued)

**DESCRIPTION**                                          **PAGE(S)**

*United States v. Dougan*,
  839 F. App'x 81 (9th Cir. 2020)............................................29

*United States v. Dunn*,
  728 F.3d 1151 (9th Cir. 2013)....................................... 46, 56

*United States v. Eckford*,
  77 F.4th 1228 (9th Cir. 2023) .........................................56

*United States v. Erne*,
  576 F.2d 212 (9th Cir. 1978).............................................31

*United States v. Franco*,
  136 F.3d 622 (9th Cir. 1998)............................................36

*United States v. Gonzalez Becerra*,
  784 F.3d 514 (9th Cir. 2015)............................................66

*United States v. Hernandez-Garcia*,
  840 F. App'x 198 (9th Cir. 2021).......................................68

*United States v. Hinkson*,
  585 F.3d 1247 (9th Cir. 2009)...................................... 29, 43

*United States v. Hinton*,
  222 F.3d 664 (9th Cir. 2000)...........................................44

*United States v. Jackson*,
  69 F.4th 495 (8th Cir. 2023) ................................. 58, 61, 64

*United States v. Jackson*,
  656 F. Supp. 3d 1239 (W.D. Wash. 2023)..........................56

*United States v. Jacobs*,
  855 F.2d 652 (9th Cir. 1988)...........................................29

## TABLE OF AUTHORITIES (continued)

**DESCRIPTION**                                                         **PAGE(S)**

*United States v. Jimenez-Shilon,*
  34 F.4th 1042 (11th Cir. 2022) ........................................... 63

*United States v. Jones,*
  159 F.3d 969 (6th Cir. 1998) ............................................... 41

*United States v. Kidder,*
  869 F.2d 1328 (9th Cir. 1989) ............................................ 39

*United States v. Liew,*
  856 F.3d 585 (9th Cir. 2017) .............................................. 67

*United States v. Lopez,*
  474 F.3d 1208 (9th Cir. 2007) ................................. 27, 33, 34

*United States v. Mak,*
  683 F.3d 1126 (9th Cir. 2012) ............................................ 53

*United States v. Manarite,*
  44 F.3d 1407 (9th Cir. 1995) .............................................. 48

*United States v. Marcus,*
  560 U.S. 258 (2010) ............................................................ 67

*United States v. Molina,*
  No. 22-50161, 2023 WL 8715649 & n.1 (9th Cir. Dec. 18, 2023) ........ 70

*United States v. Ng,*
  699 F.2d 63 (2d Cir. 1983) ................................................. 30

*United States v. One 1985 Mercedes,*
  917 F.2d 415 (9th Cir. 1990) .............................................. 49

*United States v. Padilla,*
  387 F.3d 1087 (9th Cir. 2004) ............................................ 45

# TABLE OF AUTHORITIES (continued)

**DESCRIPTION** **PAGE(S)**

*United States v. Phillips,*
  827 F.3d 1171 (9th Cir. 2016)..............................................................55

*United States v. Polanco,*
  93 F.3d 555 (9th Cir. 1996)..................................................................45

*United States v. Ressam,*
  679 F.3d 1069 (9th Cir. 2012)..............................................................71

*United States v. Robison,*
  644 F.2d 1270 (9th Cir. 1981)..............................................................30

*United States v. Rogers,*
  751 F.2d 1074 (9th Cir. 1985)..............................................................46

*United States v. Russell,*
  411 U.S. 423, 93 S. Ct. 1637, 36 L. Ed. 2d 366 (1973) .......................32

*United States v. Sanders,*
  211 F.3d 711 (2d Cir. 2000) ..................................................................

*United States v. Sandoval-Orellana,*
  714 F.3d 1174 (9th Cir. 2013)..............................................................66

*United States v. Selfa,*
  720 F. App'x 856 (9th Cir. 2018)..........................................................30

*United States v. Sellers,*
  906 F.3d 848 (9th Cir. 2018)............................................. 47, 49, 50, 51

*United States v. Simpson,*
  813 F.2d 1462 (9th Cir. 1987)..............................................................38

*United States v. Stinson,*
  647 F.3d 1196 (9th Cir. 2011)........................................................29, 33

## TABLE OF AUTHORITIES (continued)

**DESCRIPTION**                                    **PAGE(S)**

*United States v. Streich,*
    560 F.3d 926 (9th Cir. 2009)................................................48

*United States v. Torres,*
    853 F. App'x 151 (9th Cir. 2021)........................................44

*United States v. Twigg,*
    588 F.2d 373 (3d Cir. 1978) ...........................................33, 36

*United States v. Ubaldo,*
    859 F.3d 690 (9th Cir. 2017)..........................................29, 47

*United States v. Valencia-Barragan,*
    608 F.3d 1103 (9th Cir. 2010).............................................72

*United States v. Vongxay,*
    594 F.3d 1111 (9th Cir. 2010)........................................ passim

*United States v. Walker,*
    742 F. App'x 284 (9th Cir. 2018)........................................34

*United States v. Walker,*
    828 F. App'x 452 (9th Cir. 2020)........................................34

*United States v. Whitehead,*
    532 F.3d 991 (9th Cir. 2008).............................................68

*United States v. Wilson,*
    392 F.3d 1055 (9th Cir. 2004).............................................48

*United States v. Younger,*
    398 F.3d 1179 (9th Cir. 2005).............................................54

*United States v. Zhou,*
    838 F.3d 1007 (9th Cir. 2016).............................................67

x

# TABLE OF AUTHORITIES (continued)

**DESCRIPTION**                                      **PAGE(S)**

*Van Der Hule v. Holder,*
   759 F.3d 1043 (9th Cir. 2014).............................................55

*Vega v. Tekoh,*
   597 U.S. 134 (2022)...........................................................35

**Statutes**

18 U.S.C. § 922 ................................................................ passim

18 U.S.C. § 3231 ....................................................................4

18 U.S.C. § 3553(a) .......................................................... passim

18 U.S.C. § 3742(a) ...............................................................4

28 U.S.C. § 1291 ....................................................................4

Cal. Penal Code § 211............................................................65

Cal. Penal Code § 29800.........................................................6

**Rules**

Fed. R. App. P. 4(b)(1)(A)(i)...............................................4, 5

Fed. R. Crim. P. 17(a).........................................................35

Fed. R. Crim. P. 52(b).........................................................53

**Other Authorities**

*The German Model of Felon Disenfranchisement As an Alternative,*
   84 Minn. L. Rev. 753 (2000)...............................................61

## TABLE OF AUTHORITIES (continued)

**DESCRIPTION**                                              **PAGE(S)**

*In Defense of Felon-in-Possession Laws,*
   43 Cardozo L. Rev. 1573 (2022) .......................................................... 62

*The Historical Justification for Prohibiting Dangerous Persons from*
   *Possessing Arms, Firearms,*
   20 Wyo. L. Rev. 249 (2020) .................................................................. 63

No. 23-1022

# IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

BRIESHANAY QUENISE FORD,

*Defendant-Appellant*.

*APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
DISTRICT COURT NO. 2:22-CR-200-PA*

## GOVERNMENT'S ANSWERING BRIEF

# I

# INTRODUCTION

Defendant Brieshanay Ford is a serial felon with a long history of robbery, burglary, and firearm convictions. In November 2021, two local patrol officers conducting a traffic stop caught her with a loaded pistol tucked inside her pants and an active (unrelated) arrest warrant. She was charged with possessing a firearm in violation of 18 U.S.C. § 922(g)(1). Unwilling to admit her guilt, but unable to dispute the

officers' bodycam footage, she was convicted at a stipulated-facts bench trial in October 2022.

Defendant now challenges the district court's resolution of a motion to dismiss for selective enforcement and outrageous conduct. But it is hardly "selective enforcement" to charge a violent six-time felon with illegally possessing a firearm. The district court also correctly found no outrageous conduct—any improprieties in December 2021, during an interrogation in a separate state murder investigation, could not be imputed to the federal case.

Alternately, defendant contends the district court should have ordered discovery related to her selective-enforcement/outrageous-conduct claim. But, while in district court, she expressly abandoned her request for discovery concerning those topics. And to the extent she did not, the court did not abuse its discretion in denying additional discovery. All pertinent discovery was provided, and the remaining requests (*e.g.*, for most of the murder book from the ongoing and unrelated state investigation) were baseless.

Defendant additionally challenges the constitutionality of the felon-in-possession statute, 18 U.S.C. § 922(g)(1), and argues that her

sentence was procedurally and substantively unreasonable. But § 922(g)(1) does not violate the Second Amendment, and there was nothing procedurally or substantively unreasonable about the within-Guidelines sentence she received. Defendant's long history of criminality, and total lack of remorse, amply supported the sentence.

This Court should affirm.

## II

## ISSUES PRESENTED

A. Did the district court err by denying a motion to dismiss for outrageous government conduct or selective enforcement?

B. Should the district court have ordered further discovery in connection with defendant's misconduct claim?

C. Does 18 U.S.C. § 922(g)(1) violate the Second Amendment?

D. Was the sentence procedurally unreasonable, where the district court discussed the dangers of gun violence at sentencing without advance notice and defendant failed to object? Was the sentence substantively unreasonable, where the district court imposed a prison term squarely in the middle of the Guidelines range?

3

# III

# STATEMENT OF THE CASE

## A.    Jurisdiction, Timeliness, and Bail Status

The district court's jurisdiction rested on 18 U.S.C. § 3231.  This

Court's jurisdiction rests on 18 U.S.C. § 3742(a) and 28 U.S.C. § 1291.

The district court entered judgment on May 23, 2023.  (1-ER-66–67.)[1]

Defendant filed a timely notice of appeal on May 24, 2023.  (4-ER-673.)

*See* Fed. R. App. P. 4(b)(1)(A)(i).  Defendant is in custody.  Her

anticipated release date is August 7, 2025.  *See* BOP Inmate Locator,

https://www.bop.gov/inmateloc, Reg. No. 97234-509.

## B.    Statement of Facts and Procedural History

### 1.    *Defendant carries a loaded firearm in her pants*

On November 23, 2021, two LAPD patrol officers stopped

defendant because the BMW she was driving did not have a license

---

[1]  "ER" refers to defendant's Excerpts of Record, and "SER" refers
to the government's Supplemental Excerpts of Record.  "Ex. 1" and "Ex.
2" are videos admitted at trial, which will be transmitted to the Court.
"AOB" refers to Appellant's Opening Brief and is followed by page
numbers.  "PSR" refers to the Presentence Investigation Report and
sentencing documents, and is followed by paragraph or page references.

plate.  (2-ER-203; SER-49; PSR ¶ 7.)  No one else was in the car.  (*See* 2-ER-310–11.)

Officers then learned that defendant had an active arrest warrant and that she was on state probation with search conditions.  (2-ER-203; PSR ¶ 7.)  After getting her out of the car, they patted defendant down and found a loaded pistol stuffed inside her pants.  (2-ER-203; SER-49.)

The entire incident was captured on bodycam.  (*See* Ex. 1 & 2.) Defendant initially denied possessing any weapons.  (*Id.*; PSR ¶ 7.) Officers found the firearm almost immediately:

| | |
|---|---|
| OFFICER 1: | What's this? |
| DEFENDANT: | That's my strap.  My strap. |
| OFFICER 1: | Alright.  Partner?  Partner? Gun. |
| OFFICER 2: | For real? . . . What happened? You just told me you didn't have anything? |
| | *** |
| OFFICER 1: | I'm going to take it out, okay? |
| DEFENDANT: | Yeah, it's all good. |
| | *** |

5

| | |
|---|---|
| OFFICER 2: | I know [the flashlight is] bright. We just don't want [the gun] to go off in you. |
| DEFENDANT: | Yeah, me either. |

(Ex. 1 at 7:30–8:18; Ex. 2 at 7:35–8:23.)

As it turned out, defendant had a long history of felony convictions, so she was prohibited from possessing a "strap." (*See* 4-ER-666–67 (summarizing offenses).) She had a robbery petition sustained against her as a juvenile, in 2007 (PSR ¶ 27), followed by adult convictions for distinct felony cases of first-degree burglary in 2010 (PSR ¶ 29), grand theft in 2010 (PSR ¶ 31), first-degree robbery in 2012 (PSR ¶ 34), attempted burglary in 2020 (PSR ¶ 36), and being a felon in possession of a firearm in 2020 (PSR ¶ 37). She also had numerous misdemeanor convictions in that time. (*See* PSR ¶¶ 27–53 (listing all prior convictions).) In fact, since 2010, the only years in which defendant had managed to avoid a criminal conviction were 2013 through 2017—a gap that corresponded exactly to the time she served in California state prison. (*See* 4-ER-666–67.)

State prosecutors charged defendant with being a felon in possession of a firearm (in violation of California Penal Code § 29800)

6

on November 30, 2021. (PSR ¶ 52; *see* Criminal Docket, Los Angeles County Superior Court, Case No. LA095877, available at www.lacourt.org/criminalcasesummary/ui.) Federal prosecutors subsequently charged defendant with violating 18 U.S.C. § 922(g)(1) (2-ER-72–75), and the state dismissed its case (PSR ¶ 52).

## 2. *Defendant files a pretrial motion to dismiss, or for discovery, based on allegedly "outrageous conduct"*

Defendant subsequently filed a pretrial motion to dismiss the federal indictment, or for discovery. She alleged (among other things) that she was the victim of outrageous government conduct and selective enforcement.[2] (2-ER-79–218.)

---

[2] Defendant initially made a raft of allegations against an LAPD detective (David Vinton), an FBI agent (Sarah Corcoran), and federal prosecutors. (*See* 2-ER-83–107.) She claimed vindictive prosecution, vindictive enforcement, selective prosecution, selective enforcement, and outrageous conduct, and sought dismissal under the court's inherent authority. (*Id.*)

As noted in the opening brief, most of those claims and allegations—including all claims of vindictiveness and all claims against the prosecutors—have now been abandoned. (*See* AOB 10 n.5.) As expressly limited by defendant, "this appeal raises *only* Ms. Ford's outrageous government conduct and inherent authority claims as they relate to Vinton and Corcoran's conduct, and the denial of her selective enforcement claim as it relates to Vinton's conduct." (AOB 10 n.5, emphasis added.)

This motion related to actions taken by LAPD homicide Detective David Vinton, after he arrested her for an unrelated murder and interrogated her on December 14, 2021 (*i.e.*, three weeks after the charged conduct). (2-ER-84, 105.) The way she described it in her motion, Det. Vinton asked defendant what she knew about a recent murder while she was handcuffed in a police interrogation room. (*See* 2-ER-84–85.) She refused to answer, invoking her right to a lawyer and her right to remain silent. (2-ER-84–85.) However, Det. Vinton kept questioning defendant. (2-ER-84–85.)

According to defendant, at some point Det. Vinton threatened her: she claims he "told her that he knew she had a pending state charge for possessing a firearm, and if she insisted on remaining silent, he would contact a 'friend' at the Federal Bureau of Investigation who would upgrade her state case into a federal one," with a much longer potential sentence. (2-ER-85.) Defendant still refused to answer, and Det. Vinton sent a text message to FBI Agent Sarah Corcoran (showing the message to defendant in real time) asking if Agent Corcoran would consider federal charges. (2-ER-85–86.)

8

Defendant argued that Det. Vinton's threat of federal prosecution violated her constitutional rights. She also argued that Agent Corcoran was complicit. According to defendant, Agent Corcoran must surely have known "exactly why Detective Vinton referred [defendant's] case for federal prosecution." (2-ER-103.)[3]

In the end, defendant never answered Det. Vinton's questions about the murder. (*See* 2-ER-86.) She was released from state custody on December 16, 2021, and the murder charges were dropped. (*Id.*)

As an alternative to immediate dismissal, defendant asked for numerous categories of discovery ostensibly designed to bolster her claims. But more than half of the discovery demands sought LAPD

---

[3] Defendant offered "four reasons" for this conclusion. First, Agent Corcoran only began investigating after Det. Vinton interrogated defendant. Second, shortly before Agent Corcoran obtained federal warrants in March 2022, Det. Vinton asked defendant about the murder again (and defendant ignored him). Third, Det. Vinton was present after defendant's federal arrest in April 2022. And fourth, after defendant's arrest, counsel for the government asked defense counsel for the passcode to defendant's phone, and asked if she wanted to discuss the murder. (2-ER-102–03.)

However, defendant concluded her argument by saying that these facts actually showed Agent Corcoran "wanted to assist [the] homicide investigation." (2-ER-103.)

9

records concerning the state's then-ongoing homicide investigation.[4]

Defendant argued that she was entitled to these items because she had

shown evidence of selective enforcement. Specifically, she claimed that

Det. Vinton had discriminated against her based on her "invocation of

her Fifth Amendment rights" and that similarly situated individuals

were not similarly prosecuted. (2-ER-106–07; *see* 2-ER-107 (arguing

that "a similarly situated person who waived their rights would not

have been referred for federal prosecution").)

Finally, and separate from the request for discovery from the

government, defendant issued a trial subpoena to the LAPD containing

substantially similar discovery demands (SER-25–26), plus many more

(SER-26–32).

---

[4] *See* Demand Nos. 1–5, 7–8, and 12–13. (2-ER-107–12.) The
opening brief suggests there were seven requests. (AOB 10 n.5.)
Actually, there were nineteen, and one included a further eight sub-
parts. (2-ER-110-112.) They included such broad categories as a "list of
all persons interrogated by Detective Vinton," without time or subject
matter limitations (Request No. 12), and a list of everyone the LAPD
has ever arrested who could have been charged with violating
§ 922(g)(1), regardless of whether they were so charged (Request Nos.
14 & 15). (2-ER-110-112.)

### 3.   *Defendant files a pretrial motion to dismiss under* **Bruen** *and the Second Amendment*

Defendant also filed another motion to dismiss.  This second motion claimed that § 922(g)(1) violates the Second Amendment.  (3-ER-613–41.)  She argued that § 922(g)(1) was unconstitutional on its face, because the "plain text" of the Second Amendment "does not differentiate between convicted felons and other members of 'the people.'"  (2-ER-626.)  Defendant's district court motion did not argue that the motion was unconstitutional specifically as applied to her, or as applied to any subset of felons—*i.e.*, it made a facial rather than an as-applied challenge, arguing that "felon-disarmament laws" are inherently unconstitutional (*e.g.*, 3-ER-619, 639–40) under *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022).

### 4.   *The government's obtains documents and recordings related to defendant's "outrageous conduct" allegations, and provides them to defendant*

After learning of defendant's allegations concerning Det. Vinton, the government obtained an audio recording of defendant's December 14 interrogation from the LAPD.  (2-ER-227.)  The government then

11

provided that recording to defendant.  (2-ER-227, 250; *see* Ex. A.)[5]  The government also obtained and reviewed all text message communications between Agent Corcoran and Det. Vinton.  (2-ER-227–28, 5-ER-690–99.)  Those messages, like the interview recording, were provided to defendant.  (*See* 2-ER-253, 5-ER-690–99.)  Finally, the government obtained and provided a sworn statement from Agent Corcoran describing what she knew about the issue.  (2-ER-251–54.)

As captured on the audio recording, Det. Vinton provided a *Miranda* warning at the beginning of defendant's December 14 interrogation.  (Ex. A at 7:47–8:10.)  The interview and Det. Vinton's questioning lasted approximately 10 minutes.  During that time, defendant requested a lawyer on three occasions, but questioning continued after each request.  (Ex. A at 8:32–9:02, 11:41–12:15, and 14:27–14:52.)  Nothing about defendant's possession of a firearm on November 23 was discussed during the interview.  (*See generally*, Ex. A.)  Instead, the entire interview focused on defendant's involvement in,

---

[5] "Ex. A" refers to the audio recording, and "Ex. G" refers to a sentencing video, transmitted to the Court with the opening brief.

or knowledge of, a separate murder. (*Id.*)[6] At no point during the interview did Det. Vinton refer to federal prosecution, nor did he make any threats of retribution. (*Id.*)

The text messages obtained by the government indicated that Det. Vinton did contact Agent Corcoran on December 14 to ask whether the FBI would pursue federal firearm charges. Specifically, Det. Vinton sent a text message to Agent Corcoran, asking whether she would "file federal gun charges on [defendant] if need be." (2-ER-252, 5-ER-690.) Agent Corcoran agreed that she would if she could, and Det. Vinton responded that he would call Agent Corcoran after he had booked defendant. (*Id.*)

Agent Corcoran provided more context for these text messages in a sworn statement. (2-ER-251–53.) She had no role in the LAPD's murder investigation. (2-ER-251–52.) She therefore was not present during defendant's arrest on December 14, nor was she involved in the ensuing interview or interactions between Det. Vinton and defendant.

---

[6] The murder was committed with a firearm different from the one found in defendant's possession on November 23. (*See* 5-ER-690; *see also* 2-ER-105 (conceding that the murder investigation "had nothing to do with [the] firearm investigation").)

(*Id.*) Rather, Agent Corcoran knew Det. Vinton because she sometimes assisted LAPD homicide detectives in other matters, and she had previously told them that the FBI could pursue federal firearms charges if the detectives presented her with an appropriate case. (*Id.*) Additionally, because Agent Corcoran and Det. Vinton worked near one another, he had spoken to her previously about his investigations, including the fact that he planned to arrest defendant for murder on December 14. (*Id.*)

Based on those conversations, when Det. Vinton asked whether Agent Corcoran would adopt defendant's firearm case for federal prosecution, Agent Corcoran already knew that defendant was a suspect in a murder investigation and had recently been arrested by LAPD officers for being a felon in possession of a firearm. (2-ER-251.) Thus, Agent Corcoran understood Det. Vinton's request to mean that he was asking whether the FBI would be interested in pursuing federal firearm charges if the state prosecutor did not file murder charges against defendant. (2-ER-252.)

Subsequent text messages, exchanged over the following four months, included updates on whether and when defendant would be

14

charged federally. (5-ER-690–99.)[7] At no point did Det. Vinton indicate to Agent Corcoran that defendant had invoked her *Miranda* rights during the December 14 interrogation, nor did he convey any other information that would suggest any impropriety or threat against defendant. (*Id.*; *see* 2-ER-252–53.)

Finally, Det. Vinton was notified when Agent Corcoran arrested defendant on federal charges the following April, because the murder investigation was still open. (2-ER-253, 256.) He was not present for the arrest itself, which took place at the Van Nuys Courthouse. (2-ER-256.) However, he was at the Van Nuys police station across the street from the courthouse, where federal agents took defendant for processing after her arrest. (2-ER-256, 259.) Det. Vinton asked to interview defendant again while she was there, but defendant "declined to be

---

[7] Agent Corcoran also specified that she could not pursue federal charges unless defendant had previously been sentenced to more than 12 months in prison, the state prosecutor agreed to drop the related state firearm charges, and the state case was still in its early stages. (2-ER-252, 5-ER-690.) That is, she listed several criteria for bringing a § 922(g)(1) case.

interviewed . . . so no interview took place." (2-ER-253; *see* 2-ER-256–59.)[8]

In short, Det. Vinton and Agent Corcoran did not discuss whether defendant had invoked her Fifth Amendment rights. (2-ER-252.) Agent Corcoran also was unaware of Det. Vinton's alleged threats of federal prosecution, until defense counsel raised the issue with prosecutors following defendant's federal indictment. (2-ER-252–53.)

### 5. *The government opposes the "outrageous conduct" motion, the discovery request, and the constitutional challenge to § 922(g)(1)*

The government opposed the "outrageous conduct" and selective enforcement motion on several grounds. (2-ER-219–59.)

Many of the arguments related to defendant's now-abandoned vindictiveness claims. (*E.g.*, 2-ER-231–37.) However, as to the selective-enforcement and outrageous-conduct claims, the government noted that Det. Vinton was the only individual with any alleged

---

[8] The opening brief (mistakenly) claims that the government "refused to confirm" the existence of any recordings from the day of the arrest. (AOB 9.) Body cameras had not been assigned to any members of the federal arresting team, so no recordings were available—as the government informed defense counsel. (2-ER-249; *see* 2-ER-259.)

16

improper or discriminatory motive, and Det. Vinton "did not, has not, and will not enforce federal firearm laws against defendant." (2-ER-238.) Instead, the individuals involved in enforcing federal law were Agent Corcoran and the two arresting officers from November 23. (2-ER-238.) None of them had a discriminatory purpose. (2-ER-238; *see* 2-ER-237 ("Agent Corcoran had no knowledge of the allegations defendant makes in her motion"); 2-ER-252.) And Det. Vinton's alleged improper motives could not be imputed to any of the individuals involved in the federal enforcement action: no one involved in the federal enforcement even knew about his alleged conduct, and the motives of one sovereign (the State of California, through Det. Vinton) cannot be imputed to another (the federal government, through either Agent Corcoran or the prosecutors).[9] (2-ER-240–44.)

---

[9] The government also pointed out that there was no evidence or reason to think that Agent Corcoran must have known about Det. Vinton's "threats" (*see* n.3, above). (*See* 2-ER-236–38.) Her efforts were consistent with "the entirely commendable practice of state and federal agents . . . cooperat[ing] with each other." (2-ER-237 (quoting *Elkins v. United States*, 364 U.S. 206, 211 (1960)).) There was nothing wrong with Agent Corcoran—as defendant put it—"want[ing] to assist [the] homicide investigation." (2-ER-103.)

17

The government also argued that defendant's allegations were not so "extreme or outrageous" as to warrant dismissal. (2-ER-245.) To the contrary, even if true, her allegations "approximate[d] to a Fifth Amendment or *Miranda* violation -- not the sort of extreme or 'outrageous' conduct that would justify the extreme remedy of dismissal." (2-ER-245.) And the remedy for *Miranda*-type violations is suppression, not dismissal. (2-ER-245.)

Defendant also could not show "similarly situated" individuals would have avoided prosecution in the absence of Det. Vinton's alleged motives. To the contrary, repeat felons with a history of violence—who are also on active probation with active arrest warrants—are frequently charged with violating § 922(g)(1). (*E.g.*, 2-ER-247.)

The government opposed the discovery request too. Defendant had not made any showing of animus by any member of the prosecutorial or federal enforcement team. (2-ER-247–49.) She had not made any showing that similarly situated individuals would not have been prosecuted. (*Id.*) And the government had already provided all of the potentially discoverable categories of information—communications between Agent Corcoran and Det. Vinton, a recording of the

18

December 14 interview, and an answer to the question of whether recordings existed from defendant's arrest on federal charges. (2-ER-248–49.) The remaining items were either not discoverable at all (*e.g.*, internal charging policies of the United States Attorney's Office) or were both non-discoverable and also not in the government's possession (*e.g.*, communications between the LAPD and the local prosecutor's office about a state prosecution). (2-ER-249.)

Finally, the government opposed the *Bruen* motion. (4-ER-642–62.) As it noted, "nothing in *Bruen* cases doubt on the constitutionality of 18 U.S.C. § 922(g)(1)." (4-ER-648.) "The Second Amendment does not protect the rights of felons like defendant to begin with, and even if it did, § 922(g)(1) falls squarely within the nation's long-standing historical tradition of disarming citizens who engage in criminal activity or are otherwise not law-abiding." (*Id.*)

### 6. *The district court denies defendant's motions to dismiss, and denies her requests for additional discovery*

The district court held argument on the motions, made several factual findings, and orally denied defendant's motions in their entirety. (*See* 1-ER-24–28.)

19

As to the *Bruen* motion, the district court noted Supreme Court and Ninth Circuit precedent concerning the constitutionality of § 922(g)(1), "the nation's long-standing tradition of disarming citizens who are not engaging in lawful activity or are otherwise law abiding," and that *Bruen* changed none of it:

> [P]ossessing a gun and ammunition after having been convicted of a felony is conduct outside the scope of the Second Amendment's protections. . . . [T]he Second Amendment protections are reserved for law-abiding responsible citizens as set forth by the [Supreme] Court in [*District of Columbia v. Heller*, 554 U.S. 570 (2008)]. . . . The most recent Supreme Court case ruling in no way altered the constitutionality of Section 922(g)(1) and thus leaves intact Supreme Court and Ninth Circuit law.

(1-ER-5–6.)

As to the selective-enforcement and outrageous-conduct motion, the government observed that neither of defendant's two declarations had asserted that Agent Corcoran actually knew about Det. Vinton's alleged threats. (1-ER-8; *see* 2-ER-114–16, 298–99.) Defense counsel merely speculated that Agent Corcoran knew, based on the fact that she did not take the case until after December 14. (*See* 1-ER-8, 2-ER-102– 03.) The district court rejected this speculation about the government's discriminatory intent, and additionally concluded that defendant also

failed to show any discriminatory effect (*i.e.*, establish that she was treated differently than other "similarly situated" individuals):

> [T]he defendant has not shown that similarly situated individuals were not prosecuted.  [¶]  In fact, similarly situated defendants; that is, repeat felons caught with a firearm . . . on probation with an open warrant, are frequently prosecuted under [18 U.S.C. § 922(g)(1)].

> Detective Vinton has had no involvement in the enforcement of the federal charge against this defendant.  The, in fact, LAPD officer arrested defendant on November 23rd for illegally possessing a firearm are, in fact, the enforcing officers.

> And there's been no showing that either Agent Corcoran or the arresting officers had discriminatory purpose.  . . . And there is no valid or compelling reason in this record to impute Detective Vinton's actions to the prosecutors or to the FBI or from one sovereign to another.

> Detective Vinton had no influence or control over the charging decision.  And in the Court's view, this is not a case of outrageous misconduct.  If anything, it presents something akin to a *Miranda* violation for which the proper remedy is to suppress rather than dismissal of the indictment.  There's no evidence that the decision to prosecute this defendant was the result of improper motives.

(1-ER-26–28.)

Finally, while discussing the discovery request, defense counsel pared back his initial demands to exclude items relating to Det. Vinton. (*See* 1-ER-10–11.)  After the district court expressed skepticism about requests for information from an ongoing state investigation, defense

21

counsel asked for discovery concerning the federal prosecutors: "we would amend the request . . . to cabin that request . . . We are making a request seeking the information *only as it pertains to the charging decision in this case* because we think that it's extremely relevant, Your Honor, for the reasons that we've elaborated in our motion." (1-ER-10, emphasis added.) The district court then denied the discovery motion anyway, since defendant had made no showing of selective prosecution or enforcement, or outrageous government action. (1-ER-27–28.)

The district court also considered the subpoena that defendant had issued to the LAPD (which contained nearly identical requests to the discovery sought from the government). (SER-51; *compare* SER-25–26 (subpoena demands) *with* 2-ER-110–12 (discovery motion demands).) The City of Los Angeles had moved to quash the subpoena shortly after receiving it. (SER-3–45.) As the City noted, the discovery demands were irrelevant, overbroad (SER-12–19), and really just "a fishing expedition to discover [*sic*] unknown evidence" (SER-19.) Defendant, however, never responded.

The district court asked about defendant's failure to respond, and asked whether there was any reason the motion should not be granted

22

for failure to oppose. (SER-74–75.) Defense counsel offered no reason, and the court quashed the subpoena. (SER-75.)

### 7. *The district court finds defendant guilty of being a felon with a firearm*

On October 4, 2022, the district court held a stipulated-facts bench trial.[10] (*See* SER-77–87 (trial transcript); SER-46–50 (stipulations of fact); Ex. 1–2 (trial exhibits).) It found defendant guilty of violating § 922(g)(1) and set a sentencing date. (SER-83–86.)

### 8. *Defendant receives a within-Guidelines sentence*

The United States Probation Office calculated an offense level of 14 and criminal history category IV, corresponding to a Guidelines range of 27 to 33 months in prison. (PSR 192–216.) Both parties filed sentencing positions (PSR 3–191 (defense position); 4-ER-664–72 (government position)), and defendant included a sentencing video (Ex. G).

The government asked for a within-Guidelines 30-month sentence. (4-ER-664–72.) It relied on defendant's lengthy criminal history,

---

[10] The parties engaged in plea negotiations, and the prosecution offered a conditional plea bargain, which would have preserved defendant's appellate rights. (*See* SER-58; 1-ER-43.) She rejected that offer. (*See* SER-81–82.)

including prior state convictions for the same sort of conduct—carrying a firearm after a felony conviction—none of which had deterred her from ongoing criminal behavior. (4-ER-670–71.) The government also noted defendant's unwillingness to admit that she did anything wrong: even after being found guilty, she refused to discuss her offense with the USPO. (4-ER-668; PSR ¶ 12.)[11]

Defendant asked for a non-custodial term of 3 years' supervision. (1-ER-7.) She supported this request with a detailed account of her upbringing. She was sexually assaulted by a family-member when she was 16 years old, and her assailant continued to harass her for years after the incident. (PSR 12–18.) Defendant also suffered through years of homophobia and bullying.[12] (PSR 11–12.) Finally, she described her mental-health and substance-abuse problems. (PSR 18–19.)

---

[11] At the time, defendant was seeking credit for acceptance of responsibility. (*See* 4-ER-668–70; PSR 7–9.) However, her sentencing video (Ex. G), allocution (1-ER-50–52), and sentencing papers (PSR 3–20), ignored the offense conduct. Instead, they discussed defendant's difficult past, as well as her efforts to focus on her mental health. (*Id.*)

[12] At the time, defendant identified as gay. She now identifies as transgender. (*See* AOB 20 n.8.) Defense counsel indicates that she still uses she/her pronouns.

The district court agreed with USPO's calculation of an offense level of 14, classified defendant as a category IV offender, and applied a Guidelines range of 27 to 33 months in prison.[13] (1-ER-53.) The court discussed her criminal history (1-ER-53–54), and noted that defendant had been convicted of being a felon in possession of a firearm in state court just a month or two before the conduct giving rise to this case (1-ER-54). The court also described her upbringing, including homophobic treatment and sexual assault, and recognized that defendant had faced "struggles . . . no one should have to go through . . . [that] you wouldn't wish on your worst enemy." (1-ER-55.)

However, that history "d[id] not excuse the lack of respect for the law that she's repeatedly shown." (1-ER-55.) The district court noted the frequency of gun violence in our society, and the threat posed by illegal firearms, including people living in fear that they might be hit by a stray bullet. (1-ER-55–56.) It also described the frequency of mass shootings, and how "anyone can be affected by firearm violence." (1-ER-56.) And it detailed several gun violence statistics. In 2020, 65 percent

---

[13] Defendant no longer asks for acceptance of responsibility credit. (*See* AOB 53–60.) She therefore does not dispute this calculation.

of ghost guns seized by ATF were found in California. Illegal guns in Los Angeles have been linked to dozens of killings, assaults, and armed robberies. Hundreds of mass shootings occurred the prior year. And illegal possession of firearms by felons, like defendant, "are part of this epidemic." (1-ER-56–57.)

The court acknowledged the § 3553(a) sentencing factors (1-ER-57), and noted that defendant had "not been deterred by the punishment employed by various courts up until now." (1-ER-57.) However, it also took defendant's past trauma into account, as well as the support she had in attempting to get her life back on track— "otherwise," the court would impose "a far greater sentence." (1-ER-58.)

The district court ultimately sentenced defendant to 30 months in prison. (1-ER-61.)

## IV

## SUMMARY OF ARGUMENT

Defendant argues that her felon-with-a-firearm case should have been dismissed because (1) a local Los Angeles homicide detective violated her Fifth Amendment rights when interviewing her in connection with an unrelated murder investigation, and (2) this same

detective referred her firearm case for federal prosecution as purported retribution for her Fifth Amendment invocation.

But this case was not charged by the local police detective or a state prosecutor; this federal case was brought by the United States Attorney's Office after it determined that the firearms charge merited federal prosecution. The Court should reject defendant's novel claim that a local law enforcement officer's actions and motives are somehow imputed to the federal government—a separate sovereign—upon requesting federal assistance. No one involved in the enforcement of federal law had any discriminatory or otherwise improper motive, or knew about Det. Vinton's alleged threats, or about defendant's exercise of a constitutional right.

In any case, the Ninth Circuit has determined that a federal agent's "threat of 'serious federal time' falls short of evidence of vindictiveness." *United States v. Lopez*, 474 F.3d 1208, 1212 (9th Cir. 2007), *overruled on other grounds by United States v. King*, 687 F.3d 1189 (9th Cir. 2012). So a similar purported threat by a *local* officer surely cannot require dismissal. Unsurprisingly, defendant points to no

27

authority—from this Court or any other—supporting her argument that dismissal is mandatory under the circumstances of this case.

Similarly, the request to compel discovery had no basis. But even if it originally did, defendant modified that request while still in district court. She narrowed it to seek *only* information related to vindictive or selective *prosecution*. In so doing, she abandoned any request for discovery concerning selective *enforcement*. The appeal, which only asks for discovery about selective enforcement, therefore seeks discovery that defendant has already waived any right to.

Defendant's remaining claims fare no better. Section 922(g)(1) is not facially unconstitutional, for all the reasons set forth by the many other courts to have considered the issue. Nor is it plainly unconstitutional as applied to violent felons like defendant. And the district court did not commit plain procedural error when it cited gun-violence statistics, nor did it impose a substantively unreasonable sentence when it stuck to the middle of the Guidelines range.

# V

# ARGUMENT

## A.    The District Court Correctly Denied the Motion to Dismiss for Outrageous Government Conduct and Selective Enforcement

### 1.    *Standard of review*

"A district court may dismiss an indictment on any of three grounds:  (1) due process, (2) inherent supervisory powers (protecting the integrity of the judicial process), and (3) statutory grounds."  *United States v. Jacobs*, 855 F.2d 652, 655 (9th Cir. 1988).  The denial of a motion to dismiss on due process grounds is reviewed de novo, *id.*, although "the factual findings underlying the denial are reviewed for clear error" and "the evidence is viewed in the light most favorable to the prosecution."  *United States v. Ubaldo*, 859 F.3d 690, 699–700 (9th Cir. 2017); *see United States v. Dougan*, 839 F. App'x 81, 86 (9th Cir. 2020); *cf. United States v. Hinkson*, 585 F.3d 1247, 1262–63 (9th Cir. 2009) (en banc) (abuse of discretion means an error of law or clearly erroneous facts).

The denial of an "inherent supervisory dismissal" is reviewed for abuse of discretion.  *Jacobs*, 855 F.2d at 655; *United States v. Stinson*,

647 F.3d 1196, 1209 (9th Cir. 2011). A district court may dismiss an indictment under its supervisory powers only if there is "'(1) flagrant misbehavior and (2) substantial prejudice.'" *United States v. Bundy*, 968 F.3d 1019, 1031 (9th Cir. 2020).

### 2. *Improper or discriminatory motive cannot be imputed from one sovereign to another*

As a threshold matter, defendant's motion to dismiss centers on a threat made by Det. Vinton on December 14, 2021. But Det. Vinton was a state law enforcement officer, not a federal one. Nor was he involved in defendant's arrest on November 23, 2021, which gave rise to the federal offense. Because he was a state official, his actions cannot form the basis of an outrageous-conduct or selective-enforcement claim.

Caselaw is sparse concerning selective *enforcement* claims across separate sovereigns. But this Court has broadly expressed "doubt whether one sovereign's prosecution can be vindictive when it is alleged to have punished a defendant for rights he asserted against a different sovereign." *United States v. Selfa*, 720 F. App'x 856, 857 (9th Cir. 2018) (citing *United States v. Robison*, 644 F.2d 1270, 1273 (9th Cir. 1981)). "[T]he involvement of separate sovereigns tends to negate a vindictive prosecution claim." *Robison*, 644 F.2d at 1273; *cf. United States v. Ng*,

699 F.2d 63, 68 (2d Cir. 1983) ("the fact that the prosecutions of the defendants are by two different sovereigns, each acting independently under its own laws and in its own interest without any control of or by the other, renders inapplicable the concept of prosecutorial vindictiveness").

Other courts have reached similar conclusions. For instance, one defendant in the First Circuit "allege[d] that his case was 'selectively referred' for federal prosecution" by state officials. *United States v. Bassford*, 812 F.2d 16, 20 (1st Cir. 1987). However, "any improper selection . . . could not be imputed to the federal prosecution" unless the state and federal authorities "cooperated to single out [the defendant] for special treatment." *Id.*; *see also United States v. Beers*, 189 F.3d 1297, 1304 (10th Cir. 1999) (collecting cases for the proposition that knowledge possessed by state officials cannot be imputed federally, "especially when the information results from an unrelated state investigation").

The federal government has its own sovereign interests in pursuing defendant, separate and distinct from the state's interests. They are not the same actors. *Cf. United States v. Erne*, 576 F.2d 212,

31

216-17 (9th Cir. 1978) (rejecting selective-prosecution claim where IRS agent allegedly referred defendant for prosecution because he exercised his First Amendment rights; "even if [the officer's] initial role in referring the matter for prosecution involved an improper discriminatory motive," it could not taint the entire process).[14]

Even if the Court disagrees, though, there was no "outrageous conduct" or "selective enforcement."

### 3. *The district court correctly found no "outrageous government conduct"*

"Outrageous government conduct occurs when the actions of law enforcement officers or informants are 'so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction.'" *Black*, 733 F.3d at 302 (9th Cir. 2013) (quoting *United States v. Russell*, 411 U.S. 423, 431-32, 93 S. Ct. 1637, 36 L. Ed. 2d 366 (1973). "Dismissing an indictment for outrageous government conduct, however, is 'limited to extreme cases' in which the

---

[14] As explained in more detail below, the district court did not clearly err when it found that Agent Corcoran was unaware of Det. Vinton's alleged threats or alleged discriminatory purpose. The entire selective enforcement and outrageous conduct claim therefore hangs on Det. Vinton's actions alone.

defendant can demonstrate that the government's conduct 'violates fundamental fairness' and is 'so grossly shocking and so outrageous as to violate the universal sense of justice." *Black*, 733 F.3d at 302 (quoting *Stinson*, 647 F.3d at 1209).

The standard for dismissal is so "extremely high" that, in 2013, this Court could find "only two reported decisions in which federal appellate courts have reversed convictions under this doctrine." *Id.* (citing *United States v. Twigg*, 588 F.2d 373 (3d Cir. 1978) and *Greene v. United States*, 454 F.2d 783 (9th Cir. 1971)). This case does not rise to that "extreme" threshold. Indeed, this Court has even found similar conduct at the federal level to fall short of this standard. *See Lopez*, 474 F.3d at 1210.

In *Lopez*, the defendant was charged by state prosecutors with being a felon in possession of a firearm. 474 F.3d at 1210. An FBI agent wanted him to cooperate with a federal investigation, but Lopez pled to the state charges before that could happen. *Id.* The agent then threatened Lopez, telling him "that he 'could be looking at serious federal time' unless he cooperated." *Id.* He still refused to cooperate

33

and was subsequently indicted for being a felon in possession of firearms. *Id.*

This Court found nothing improper: law enforcement "may threaten a defendant with prosecution during an interview . . . and if that defendant chooses not to cooperate . . . the prosecutor is free to initiate a prosecution." *Lopez*, 474 F.3d at 1212 (citing *Bordenkircher v. Hayes*, 434 U.S. 357 (1978)).

In other words, even if it would violate *Miranda* for a law enforcement officer to attempt to coerce an incriminating statement by threatening a longer prison sentence after a suspect invokes her right to remain silent, the remedy would be suppression of any ensuing statement—not dismissal of a later-filed case. *See United States v. Walker*, 742 F. App'x 284, 285 (9th Cir. 2018) (where defendant "had not eaten since the previous evening, had already endured questioning for more than an hour and a half, and responded with mumbles and complaints, while the interrogator in forceful and threatening tones urged him to answer by inter alia, invoking the will of God," district court properly suppressed statements under *Miranda*); *United States v. Walker*, 828 F. App'x 452, 452 (9th Cir. 2020) (affirming that same

34

defendant's 420-month sentence). It is also not a constitutional violation. As the Supreme Court recently held, "a violation of *Miranda* is not itself a violation of the Fifth Amendment." *Vega v. Tekoh*, 597 U.S. 134, 152 (2022). As a general rule, then, even where officers violate *Miranda*, exclusion of evidence "should be 'a complete and sufficient remedy.'" *Id.* (quoting *Chavez v. Martinez*, 538 U.S. 760, 790 (2003) (Kennedy, J., concurring in part and dissenting in part)).[15]

---

[15] It would also not be a constitutional violation on the facts of this case because Det. Vinton asked defendant about *other* people, not to incriminate herself. (*See*, *e.g.*, Ex. A at 3:35–3:48 ("Listen, if you're not involved, right, we don't wanna, we don't wanna, basically, try to implicate you being involved in it."); *id.* at 10:08–10:17 ("DET. VINTON: I'm here . . . to clear your name so we can move, I can move on to somebody else. DEFENDANT: That man dying I had nothing to do with that, period."); *id.* at 10:28–10:41 (asking, apparently after showing pictures to defendant, "You don't recognize this guy . . . you were gambling with?"); *id.* at 11:15-11:20 ("What did you see or hear? That's all we're trying to get at.").)

The Constitution does not prohibit law enforcement from compelling a witness to provide information about *other* individuals. *See Chavez v. Martinez*, 538 U.S. at 767 ("The text of the Self-Incrimination Clause simply cannot support the Ninth Circuit's view that the mere use of compulsive questioning, without more, violates the Constitution."); Fed. R. Crim. P. 17(a) (subpoenas "command the witness to attend and testify"). In other words, retaliating against defendant for refusing to implicate other people would not be based on her invocation of a constitutional right at all. (*See* AOB 1 ("Brieshanay Ford may have *witnessed* a murder.") (emphasis added).)

The handful of cases that have actually found outrageous conduct only confirm this point. *See Twigg*, 588 F.2d 373; *Greene*, 454 F.2d 783. In *Twigg*, the government engaged in a protracted effort to lure two otherwise innocent dupes into a meth-cooking conspiracy. *Twigg*, 588 F.2d at 376, 381. One defendant provided only "minor" assistance: while the government informant made meth, he "ran errands for groceries or coffee" in an attempt to pay off a debt. *Id.* at 376. The other defendant was scarcely more involved; "as far as the record reveals, he was lawfully and peacefully minding his own affairs" when the government agent set him up and provided every necessary ingredient for the offense. *Id.* at 381.

Meanwhile, in *Greene*, government agents spent three-and-a-half years cajoling and threatening the defendants into bootlegging, going so far as to "reestablish, and then to sustain, criminal operations which had ceased." *Greene*, 454 F.2d at 787; *see also Rochin v. California*, 342 U.S. 165, 166 (1952) (police officers broke into the defendant's bedroom, attempted to pull drug capsules from his throat, and forcibly pumped his stomach to retrieve the capsules, violating due process); *United States v. Franco*, 136 F.3d 622, 629 (9th Cir. 1998) (completely

36

fabricating a crime constitutes outrageous government conduct). Here, by contrast, defendant's allegations of misconduct do not even relate to the charged offense itself—for which the independent evidence is overwhelming.

Across all its cases, this Court has noted a few broad categories of cases in which the "outrageous conduct" rule might apply. First, "that slim category of cases in which the police have been brutal, employing physical or psychological coercion against the defendant." *United States v. Bogart*, 783 F.2d 1428, 1435 (9th Cir. 1986). And next, "'where government agents engineer and direct the criminal enterprise from start to finish,' . . . or when governmental conduct constitutes 'in effect, the generation by police of new crimes merely for the sake of pressing criminal charges against the defendant.'" *Id.* (quoting *Ramirez*, 710 F.2d at 540).

This is plainly not a case of engineering or creating the offense; the allegedly outrageous conduct did not occur until after defendant committed her crime. No physical force was ever used against defendant. And it is not a case of "brutal" psychological coercion either. *Bogart*, 783 F.2d at 1435.

37

For instance, this Court has considered an informant who, "acting on instruction by the FBI, pretended to be a close personal friend of [the defendant's] for a period of over five months" and "had sex with him on a regular basis." *United States v. Simpson*, 813 F.2d 1462, 1465 (9th Cir. 1987). The defendant argued that using "sex to . . . lure him into selling heroin to undercover FBI agents constituted an outrageous invasion of his constitutionally protected realms of privacy and autonomy." *Id.* This Court reluctantly disagreed, "hold[ing] that the government's conduct was not so shocking as to violate the due process clause." *Id.*; *see id.* at 1468 ("the government's passive tolerance here of a private informant's questionable conduct [is] less egregious than the conscious direction of government agents typically present in outrageous conduct challenges").

In short, as *Lopez* and *Simpson* confirm, threatening a defendant with prosecution is permitted, not "brutal."[16]

---

[16] The Court has also identified several potentially relevant factors for outrageous-conduct claims:

> (1) known criminal characteristics of the defendants; (2) individualized suspicion of the defendants; (3) the government's role in creating the crime of conviction; (4) the

(continued . . . .)

38

### 4.  The district court correctly found no selective enforcement

To prove selective enforcement, defendant "must demonstrate that [1] enforcement had a discriminatory effect and [2] the police were motivated by a discriminatory purpose." *Lacey v. Maricopa Cnty.*, 693 F.3d 896, 920 (9th Cir. 2012) (citing *Rosenbaum v. City & Cnty. of San Francisco*, 484 F.3d 1142, 1152 (9th Cir. 2007)).  To do so, one making such a claim must prove that the decision to enforce the law against him was made "on the basis of an impermissible ground such as . . . exercise of . . . constitutional rights." *Lacey*, 693 F.3d at 922 (quoting *United States v. Kidder*, 869 F.2d 1328, 1336 (9th Cir. 1989).

The standard for proving a discriminatory effect "is a demanding one." *Lacey*, 693 F.3d at 920 (quoting *United States v. Armstrong*, 517 U.S. 456, 465 (1996)).  To establish discriminatory effect, a claimant must demonstrate that similarly situated individuals outside the

---

government's encouragement of the defendants to commit the offense conduct; (5) the nature of the government's participation in the offense conduct; and (6) the nature of the crime being pursued and necessity for the actions taken . . . .

*Black*, 733 F.3d at 303.  These *Black* factors do not apply—notably, because defendant's crime occurred before any allegedly improper actions by Det. Vinton.

39

protected class were treated differently. *Rosenbaum*, 484 F.3d at 1152 (citing *Armstrong*, 517 U.S. at 465); *Freeman v. City of Santa Ana*, 68 F.3d 1180, 1187 (9th Cir. 1995) ("it is necessary to identify a 'similarly situated' class against which the plaintiff's class can be compared").

Defendant attempts to satisfy the discriminatory-purpose prong by pointing to Det. Vinton's "explicit threats" after her invocation of the right to remain silent. As above, this argument has a significant flaw: regardless of what he said to her, Det. Vinton never "enforced" federal firearm laws.

The enforcing officers were (1) Agent Corcoran, who presented the matter to federal prosecutors, and (2) the LAPD officers who arrested defendant on November 23, 2021, for illegally possessing a firearm. *See Kyles v. Whitley*, 514 U.S. 419, 437 (1995) (for *Brady* purposes, inquiry includes those "*acting on the government's behalf* in the case, including the police") (emphasis added); *Papas v. Leonard*, No. 3:10–CV–00550–BR, 2012 WL 1445853, at *11 (D. Or. Apr. 25, 2012), *aff'd*, 544 F. App'x 764 (9th Cir. 2013) (no showing of selective enforcement where plaintiff challenged a liquor commission that was "a state agency unrelated to Defendants"). And Agent Corcoran had no discriminatory purpose, nor

40

did the arresting officers. *Contrast with United States v. Jones*, 159 F.3d 969, 976 (6th Cir. 1998) (finding selective prosecution where racial animus toward the defendant had been expressed by the arresting/investigating officers themselves).[17]

Defendant has never mentioned the arresting officers from November 23, focusing instead on Agent Corcoran. As to Agent Corcoran, defendant strung together several facts in the district court to suggest that she knew about Det. Vinton's threats. (*See* 2-ER-102–03; *see also* n.3, above.) But none of those arguments made sense.

Agent Corcoran attempted to help Det. Vinton. But "the entirely commendable practice of state and federal agents . . . cooperat[ing] with each other in the investigation and detection of criminal activity" is hardly a sign of animus. *Elkins*, 364 U.S. at 211. There is nothing nefarious about a homicide detective referring a then-murder suspect

---

[17] The Sixth Circuit's decision in *Jones* concerned local police officers. However, it did not consider the separate-sovereigns question—likely because the officers involved there actually did act on the federal government's behalf. *Kyles*, 514 U.S. at 437. Like the November 23 officers here, the racist officers in *Jones* were part of the enforcement team, and so their bad acts provided a potential basis for dismissal (although the Sixth Circuit ultimately affirmed the district court's exercise of its discretion to decline to dismiss the case).

with a significant criminal history who had recently been arrested for illegally possessing a firearm to the FBI for federal prosecution. Federal gun charges are frequently brought after state charges are initially filed. (1-ER-26–28 (district court findings).) Nothing about the referral in this case suggests that Agent Corcoran knew what allegedly happened between defendant and Detective Vinton during the December 14 murder interview—to the contrary, she had no knowledge of defendant's allegations. (1-ER-26–28 (district court findings); 2-ER-252 (Corcoran declaration).)

Moreover, for both the "outrageous conduct" and "selective enforcement" arguments, defendant now appears to have abandoned most of her prior reasons for doubting Agent Corcoran. The only argument about Agent Corcoran in the corresponding portions of the opening brief is that "Corcoran appears to have attempted to cover up [Det. Vinton's] presence [during her federal arrest], by inexplicably omitting it from her report." (AOB 27.) But Det. Vinton was *not* present at (and did not participate in) the arrest. (See 2-ER-253, 256, 259.) Omitting him from an *arrest* report is therefore hardly surprising. Even after the arrest was complete, when he asked to interview

42

defendant, no interview occurred because defendant refused. (2-ER-256–59.) And again, it is hardly strange that a report would omit the fact that something did *not* happen (particularly something personally involving defendant, and therefore something that could not possibly have been hidden).

In any event, in light of Agent Corcoran's denial and defendant's reliance on implausible inferences, the district court's factual finding—that Agent Corcoran was unaware of Det. Vinton's alleged threats or motives (1-ER-26–28)—was certainly not "clearly erroneous." *See Hinkson*, 585 F.3d at 1262–63 (a finding is clearly erroneous only if it is illogical, implausible, or without support in inferences that may be drawn from the record); *United States v. Bussell*, 504 F.3d 956, 962 (9th Cir. 2007) ("To be clearly erroneous . . . a decision must strike us more than just maybe or probably wrong; it must strike us as wrong with the force of a five-week-old, unrefrigerated dead fish." (cleaned up)).

Nor can defendant show that similarly situated individuals were not prosecuted. As the district court observed (1-ER-26), similarly situated individuals—*i.e.*, repeat felons, caught with a firearm, while on probation with an open warrant—are exactly the type of criminals

43

frequently prosecuted under § 922(g)(1). *See, e.g., United States v. Bautista*, 989 F.3d 698, 701 (9th Cir. 2021) (federal charges brought after state arrested defendant on an outstanding warrant for a probation violation and found a firearm when he was booked in county jail); *United States v. Hinton*, 222 F.3d 664, 667-68 (9th Cir. 2000) (federal charges brought after marshal and police officer arrested defendant on an outstanding warrant for a probation violation, searched his house, and found several firearms); *United States v. Torres*, 853 F. App'x 151, 153 (9th Cir. 2021) (federal charges brought after state found a firearm during defendant's arrest, where defendant had two prior felonies, was on felony probation, and was wanted for another recent domestic violence offense).

Similarly, while Agent Corcoran did not know about the alleged constitutional violation by Det. Vinton, defendant's argument would still fail even if she did. When the evidence of a particular case is strong (like this one) and the suspect has a substantial criminal history (like defendant), charges may still be filed, even where *Miranda* might have been violated. *See, e.g., Torres*, 853 F. App'x at 154 (McKeown, J. dissenting); *United States v. Chong*, 720 F. App'x 329, 333 (9th Cir.

2017); *United States v. Padilla*, 387 F.3d 1087, 1093 (9th Cir. 2004); *United States v. Polanco*, 93 F.3d 555, 559 (9th Cir. 1996). In other words, "similarly situated individuals" under defendant's theory includes people whose interrogations by local police failed to comply with *Miranda*, such that any confessions cannot be used—and defendant has failed to show that those similarly situated individuals are not charged federally. She therefore cannot show selective enforcement.

### 5. *Defendant's "inherent authority" argument is likewise unsupported*

Defendant does not actually seem to make an independent argument that the case should have been dismissed under the district court's inherent authority. Instead, she argues that the district court abused its discretion by not exercising its inherent authority "for all the reasons Vinton's sleazy tactics should have led to dismissal for outrageous government conduct," and because refusing to dismiss teaches Det. Vinton "that he is free to trample the rights of those he is supposed to serve." (AOB 29.)

For all the reasons listed above, though, the district court did *not* err. Additionally, the district court did not err because there was no

45

"substantial prejudice." *Bundy*, 968 F.3d at 1031; *see United States v. Rogers*, 751 F.2d 1074, 1079 (9th Cir. 1985) (dismissal not warranted where a breach of attorney-client privilege allowed IRS to continue investigation and obtain indictment, because the "prejudice relates only to the investigatory stage and does not affect Rogers's ability to defend himself at trial").

At the least, the district court had discretion to decline to dismiss under its inherent supervisory authority. *United States v. Dunn*, 728 F.3d 1151, 1159 (9th Cir. 2013) ("mere disagreement" with the district court's assessment "does not amount to an abuse of discretion").[18]

---

[18] Defendant asks for the alternative remedy of a shorter sentence, to match what she thinks she would have received in state court. She offers no authority for this disposition. The federal sentencing factors enumerated in § 3553(a) do not include consideration of state sentencing laws.

As she notes, it is also "impossible to say with certainty" what sentence defendant would have gotten in state court. (AOB 30 n.13.) She claims she would not have received more than 12 months imprisonment, but she ignores the consequence of her prior crimes. (*See* AOB 30–31 & n.13.) Robbery and first-degree burglary are both strikes under California's Three Strikes law. *See People v. Gallardo*, 4 Cal. 5th 120, 129 (2017) (robbery); *People v. Vargas*, 59 Cal. 4th 635, 639 n.3 (2014) (first-degree burglary). Defendant therefore has at least *three prior strikes* under California law (*see* PSR ¶¶ 27, 29, 34) resulting in a potential sentence of 25 years to life. Cal. Penal Code

(continued  . . . .)

## B. The District Court Did Not Abuse Its Discretion by Denying the Requested Discovery

### 1. *Standard of review*

Rulings on "discovery issues are reviewed for an abuse of discretion." *Ubaldo*, 859 F.3d at 700 (citing *United States v. Cardenas-Mendoza*, 579 F.3d 1024, 1029-30 (9th Cir. 2009)). Whether or not the district court applied a correct legal standard in issuing its discovery ruling is reviewed de novo. *United States v. Sellers*, 906 F.3d 848, 851-52 (9th Cir. 2018).

### 2. *Defendant waived any claim to the discovery she now seeks*

In the district court, defendant initially asked for 19 categories of discovery. (2-ER-107–12.) Some related to Det. Vinton, some related to Agent Corcoran, some related to the federal prosecutors, and some related to their various agencies.

However, defendant orally waived most of those requests: "we would amend the request . . . to cabin that request. . . . seeking the

---

§ 1170.12(c)(2)(A)(ii). The priors were not charged initially, but prosecutors often amend charges or add enhancements later in a case—particularly for defendants with lengthy criminal histories. The uncertainty over her state sentencing exposure is yet another problem with her argument.

47

information *only as it pertains to the charging decision in this case . . . .*"
(1-ER-10, emphasis added.) In other words, while her vindictive- and
selective-prosecution claims were still active, defendant knowingly
surrendered all requests for discovery apart from information
pertaining to the prosecutors' charging decision. *See United States v.
Streich*, 560 F.3d 926, 929-30 n.1 (9th Cir. 2009) (where defendant
withdraws an objection or informs the court that an issue has been
resolved, he waives that issue on appeal); *United States v. Manarite*, 44
F.3d 1407, 1419 (9th Cir. 1995) ("withdrawal of an objection is
tantamount to a waiver of an issue for appeal").

On appeal, though, defendant is not asking for discovery about the
charging decision at all. Instead, she seeks discovery pertaining to (1)
outrageous conduct by Det. Vinton or Agent Corcoran, and (2) selective
enforcement by Det. Vinton or Agent Corcoran. (AOB 10 n.5.) These
categories—because they pertain to enforcement rather than "charging
decisions"—have been waived. *See United States v. Wilson*, 392 F.3d
1055, 1059 (9th Cir. 2004) (prosecutors make the charging decisions,
not agents or police officers). This claim should therefore be rejected
outright.

48

### 3.   Even if she had not waived the claim, she was not entitled to the requested discovery

If the Court disagrees, defendant still has not shown that the district court abused its discretion in denying discovery.

As defendant says, neither this Court nor the Supreme Court has articulated a standard for obtaining discovery concerning selective-enforcement claims involving law-enforcement agents.  However, as to claims involving prosecutors, the Supreme Court has "adopted a 'rigorous standard,' whereby a defendant must show that 'the Government has failed to prosecute others who are similarly situated to the defendant' as evidence of discriminatory effect."  *United States v. Sellers*, 906 F.3d 848, 852 (9th Cir. 2018) (citing *United States v. Armstrong*, 517 U.S. 456, 468–69 (1996)).  This "standard for discovery for a selective prosecution claim should be nearly as rigorous as that for proving the claim itself."  *Id.*; *see Sanders*, 211 F.3d at 717 (defendant's burden is the same in seeking discovery for vindictive- and selective-prosecution claims); *cf. United States v. One 1985 Mercedes*, 917 F.2d 415, 421 (9th Cir. 1990) (to receive discovery, defendant must first make a "showing of a likelihood of vindictiveness by some evidence tending to show the essential elements of the defense").

Defendant claims the threshold is lower, though. According to her, a defendant must only show "something more than mere speculation." (AOB 35 (citing *Sellers*, 906 F.3d at 855).) In fact, even where *Sellers* applies (to reverse stash-house stings, where the nature of the operation implies that all targets will be charged, *see Sellers*, 906 F.3d at 853), it imposes a higher bar than defendant suggests. The district court should still "use its discretion—as it does for all discovery matters—to allow limited or broad discovery based on the reliability and strength of the defendant's showing." *Sellers*, 906 F.3d at 855. While not a high requirement, then, the showing should be proportionate to the discovery request.

In cases like this one, though, where "evidence of similarly situated individuals who were not targeted exists" (*i.e.*, suspects with probation search terms were stopped for traffic infractions), the standard described in *Armstrong* applies. *See Sellers*, 906 F.3d at 853. Specifically, the defendant must make a showing "nearly as rigorous as that for proving the claim itself." *Sellers*, 906 F.3d at 853 (citing *Armstrong*, 517 U.S. at 468).

50

Since defendant did not come close to making the necessary showing for dismissal, she has not made it for discovery. For a similar reason, even under *Sellers*' reduced requirements, defendant could not have made the necessary showing: the only vindictiveness she attempts to describe is Det. Vinton's—and as discussed above, he is not enforcing federal law. No matter how low the bar, so long as she focuses on Det. Vinton, defendant has not done more than speculate about whether the officers who actually enforced the law as to the November 23 offense acted with animus. *Sellers*, 906 F.3d at 855.

In the exercise of its considerable discretion, the district court therefore correctly determined that defendant's requested discovery was overbroad (or unnecessary). *Sellers*, 906 F.3d at 855. Of the requests maintained on appeal (AOB 10 n.5), the government already provided the communications between Det. Vinton and Agent Corcoran (item 1) (*e.g.*, 5-ER-690–99), and informed defense counsel that no interview took place on April 21, 2022 and no recording existed (item 2) (2-ER-249, 259). Most of the remaining items were not in the government's possession, including surveillance footage from the inside of a local police station (item 3), a state murder affidavit (item 4), LAPD policies

51

for making federal referrals (item 6), and a list of all persons interviewed by Det. Vinton who were *not* referred to the federal government (item 7).[19] (See 2-ER-248–49.) Even a list of all persons Det. Vinton has referred for federal prosecution (item 5) could have been quite difficult to compile if, for instance, he referred the matter to one of the dozens of law enforcement agencies that work with the United States Attorney's Office, and that agency declined to pass the referral along to the prosecutors.

In short, given defendant's weak showing, and the fact that the government did not have most of the items she sought (or had already provided them)—coupled with the fact that defendant did not even bother to oppose Los Angeles's motion to quash a subpoena seeking most of those same records—the district court cannot be said to have abused its discretion.

---

[19] According to defendant, "the government did not argue that producing this discovery would be burdensome." (AOB 38.) In fact, the government described the requests as seeking "an incredible trove of information," including broad categories like a "list of all persons arrested by LAPD who could have been charged with violating 18 U.S.C. § 922(g), with no temporal boundaries," and "significant documentation outside the control of the prosecution team." (2-ER-248.)

## C. Section 922(g)(1) Does Not Violate the Second Amendment

### 1. *Standard of review*

Generally, this Court reviews the constitutionality of a statute de novo. *United States v. Vongxay*, 594 F.3d 1111, 1114 (9th Cir. 2010). But where a defendant fails to preserve a claim before the district court, this Court reviews only for plain error. *See* Fed. R. Crim. P. 52(b); *United States v. Mak*, 683 F.3d 1126, 1133 (9th Cir. 2012) (unpreserved constitutional claims subject to plain error review).

Here, defendant argued in the district court only that § 922(g)(1) was facially unconstitutional. (*See* ER-613–41.) She did not make an as-applied challenge, and did not distinguish between violent and non-violent felons. (*Id.*) Accordingly, her as-applied challenges are reviewed for plain error.

### 2. *Section 922(g)(1) is not facially unconstitutional*

This Court has upheld § 922(g)(1) against Second Amendment challenges. *See Vongxay*, 594 F.3d at 1115. That precedent is binding, because *Bruen* is not "clearly irreconcilable" with it. *Avilez v. Garland*, 69 F.4th 525, 533 (9th Cir. 2023). The *Bruen* challenge to § 922(g)(1) and this Court's precedents have also been fully briefed before this

53

Court in *United States v. Rojo*, C.A. No. 23-598, and argued in *United States v. Duarte*, C.A. No. 22-50048.

But even starting from a blank slate, the historical analysis *Bruen* prescribes would lead to the same conclusion as this Court's earlier cases. The Court should reject defendant's facial challenge to § 922(g)(1).

### a. *This Court has held that the felon-in-possession law is constitutional.*

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. In *Heller*, the Supreme Court concluded, "on the basis of both text and history, that the Second Amendment conferred an individual right to keep and bear arms." 554 U.S. at 595. The Court made clear, however, that "the right secured by the Second Amendment is not unlimited," *id.* at 626, and it identified the right to keep and bear arms as belonging to "law-abiding, responsible citizens," *id.* at 635.

Following *Heller*, this Court reaffirmed its precedent holding that felons had no right to possess firearms. *Vongxay*, 594 F.3d at 1116 (citing *United States v. Younger*, 398 F.3d 1179, 1192 (9th Cir. 2005)).

As *Vongxay* explained, although *Younger*'s reasoning that the Second Amendment protected only a collective right had been "invalided" by *Heller*, its holding still "control[led]" on the felon question. *See* 594 F.3d at 1115. *Vongxay* cited *Heller*'s language on felon-in-possession laws and deemed it "binding," noting that "[c]ourts often limit the scope of their holdings, and such limitations are integral to those holdings." *Id.* This Court also found support in "cases from other circuits," "historical gun restrictions," and the analysis of "most scholars of the Second Amendment." *Vongxay*, 594 F.3d at 1116–18. This Court thus held that "felons are categorically different from the individuals who have a fundamental right to bear arms" and "that § 922(g)(1) does not violate the Second Amendment." *Id.* at 1115, 1118.

The Court has since reaffirmed *Vongxay* twice in published opinions. *United States v. Phillips*, 827 F.3d 1171, 1173–74 (9th Cir. 2016); *Van Der Hule v. Holder*, 759 F.3d 1043, 1051 (9th Cir. 2014). This Court should apply that binding precedent here.

### b. Bruen *is not clearly irreconcilable with this Court's cases upholding § 922(g)(1)*

*Bruen* did not expressly overrule any § 922(g)(1) cases or "upend" this Court's precedents on the subject. (AOB 40.) Nor is its holding or

55

mode of analysis "clearly irreconcilable" with those cases.[20]  *Avilez*, 69
F.4th at 533.  Clear irreconcilability is a "narrow," "high standard."
*United States v. Eckford*, 77 F.4th 1228, 1233 (9th Cir. 2023) (citations
omitted).  It requires a case "closely on point."  *United States v. Dunn*,
728 F.3d 1151, 1156 (9th Cir. 2013).  And that case cannot simply create
"tension" or "cast doubt" on earlier cases.  *Tingley v. Ferguson*, 47 F.4th
1055, 1075 (9th Cir. 2022) (citations omitted).  Instead, the case must
clearly "compel" a "holding" at odds with earlier ones.  *Dunn*, 728 F.3d at
1157.  *Bruen* does not meet that rigorous test.

First, *Bruen* simply "appl[ied]" *Heller*.  142 S. Ct. at 2131, 2134.
And "[n]othing in *Heller* can be read legitimately to cast doubt on the
constitutionality of § 922(g)(1)."  *Vongxay*, 594 F.3d at 1114.  So it follows
that nothing in *Bruen* can be read to cast doubt on § 922(g)(1).

That is especially true here, as *Bruen*'s illuminations are broadly
consistent with this Court's cases.  *Bruen* clarified that "the Constitution
presumptively protects" conduct covered by its "plain text," that a law
regulating that conduct must be "consistent with this Nation's historical

---

[20] *See United States v. Jackson*, 656 F. Supp. 3d 1239, 1243–1244 &
n.4 (W.D. Wash. 2023) (collecting cases).

tradition of firearm regulation," and that the government can show consistency by "identify[ing] a well-established and representative historical analogue" ("not a historical twin"). 142 S. Ct. at 2126, 2133. Consistent with that approach, this Court looked to "historical gun restrictions" and the views of "most scholars" who had read the history to uphold § 922(g)(1). *Vongxay*, 594 F.3d at 1116–18.

*Bruen* also nixed a "means-end scrutiny" step that some courts had applied to firearms laws. *Bruen*, 142 S. Ct. at 2125–27. Again, this Court's § 922(g)(1) precedents are consistent with that approach. In *Vongxay*, this Court *declined* to apply means-end scrutiny in upholding § 922(g)(1), even calling such means-end scrutiny "inapplicable." *Vongxay*, 594 F.3d at 1118. *Vongxay* was consistent with *Bruen*. Thus, there is no basis for finding that *Bruen* voided this Court's precedent.

Second, in *Bruen*, the Court described the gun rights at issue as the rights of "ordinary, law-abiding citizens." *Bruen*, 142 S. Ct. at 2122. Indeed, the Court used the term "law-abiding" 14 times. *Id.* at 2122, 2125, 2131, 2133-34, 2135 n.8, 2138 & n.9, 2150, 2156. It also noted that "nothing in our analysis should be interpreted to suggest the unconstitutionality" of licensing regimes that "ensure only that those

57

bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens.'" *Id.* at 2138 n.9 (quoting *Heller*, 554 U.S. at 635).

Finally, a majority of justices made explicit what everything above suggests: that *Bruen* did not affect felon-in-possession laws. *See Bruen*, 142 S. Ct. at 2157 ("[o]ur holding decides nothing about who may lawfully possess a firearm") (Alito, J., concurring); *id.* at 2162 ("[n]othing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons") (Kavanaugh, J., concurring, joined by Roberts, C.J.); *id.* at 2189 (the opinion "cast[s] no doubt on th[e] aspect of *Heller*'s holding" affirming the validity of felon-in-possession laws) (Breyer, J., dissenting, joined by Sotomayor and Kagan, JJ.).

If *Heller* offered no convincing reason to eschew prior precedent governing § 922(g)(1), then *Bruen* doesn't either.[21]

---

[21] Before *Bruen*, every other circuit had also rejected challenges to § 922(g)(1). Other circuits have reaffirmed that precedent post-*Bruen*, as well, *see, e.g.*, *United States v. Jackson*, 69 F.4th 495, 505 (8th Cir. 2023), with only the Third Circuit altering its precedent in the context of as-applied challenges to disarmament based on state-law misdemeanors in a divided, "narrow" opinion. *See Range v. Att'y Gen.*, 69 F.4th 96, 98, 106 (3d Cir. 2023) (en banc).

### c. Defendant offers no convincing reason to hold otherwise

Defendant does not address most of the above language from *Bruen*. She does not mention the term "law-abiding" at all. As for this Court's cases, defendant does not argue that they used the means-ends scrutiny invalidated by *Bruen*. She barely discusses *Vongxay*, arguing only that "*Bruen* overruled *Vongxay*" because "*Vongxay* acknowledged that the historical question "was not 'definitively resolved.'" (AOB 45.)

It is true that the Court said "the historical question has not been definitively resolved." *Vongxay*, 594 F.3d at 1118. But that does not make the case clearly irreconcilable with *Bruen*. The historical debate was sufficiently "resolved" for this Court to reject the defendant's legal challenge. *Bruen*'s in-depth historical analysis of the laws governing the public carry of firearms is hardly a wholesale invalidation of this Court's analysis.

### d. Historical analysis shows that the felon-in-possession law is constitutional

Even if this Court were to revisit § 922(g)(1)'s constitutionality, it should hold that the statute is supported by historical analogs and thus does not violate the Second Amendment.

59

i. Historical felony penalties support § 922(g)(1)'s validity

At the time of the founding, legislatures in both England and America defined felonies to encompass a broad range of violent and non-violent crimes. The penalties (like death) were often far more severe than bans on gun possession, and thus support the constitutionality of § 922(g)(1).

"The nine traditional felonies at common law [we]re murder, manslaughter, arson, burglary, robbery, rape, sodomy, mayhem, and larceny." *Folajtar*, 980 F.3d at 904 n.9. But by 1765, "no less than" 160 crimes had "been declared by act of parliament to be felonies . . . worthy of instant death." 4 William Blackstone, *Commentaries on the Laws of England* 18 (1769). Crimes qualifying as felonies "included nonviolent offenses that we would recognize as felonies today, such as counterfeiting currency, embezzlement, and desertion from the army." *Medina*, 913 F.3d at 158.

Penalties for felonies were severe. "The law treated felony of-fenders as if they had died, depriving them of their property and their civil and political rights, dissolving their marriages, and prohibiting them from concluding any contracts or bringing suit." Nora V.

60

Demleitner, *Continuing Payment on One's Debt to Society: The German Model of Felon Disenfranchisement As an Alternative*, 84 Minn. L. Rev. 753, 766 (2000). Punishments for felonies involved not only death in law, but also death in fact, through capital punishment. Blackstone, *supra*, at 98.

"American colonists imported the English concept of felonies and their consequences into their legal systems." *Folajtar*, 980 F.3d at 904. Thus, as in England, legislatures "authorized punishments that subsumed disarmament" even "for non-violent offenses." *Jackson*, 69 F.4th at 503 (collecting authorities). Capital punishment, for example, was "ubiquitous in the Founding Era, . . . even to punish non-violent felonies" like forgery, counterfeiting, horse theft, and dealing in forged securities. *Folajtar*, 980 F.3d at 904. So too were laws, or in many cases constitutional provisions, imposing disenfranchisement. *See* Ewald, *supra*, at 1061–63.

Most notably, the First Congress, which drafted and proposed the Second Amendment, made a variety of felonies punishable by death. Those included treason, murder on federal land, forging or counterfeiting a public security, and piracy on the high seas. *See* An Act

61

for the Punishment of Certain Crimes Against the United States, 1 Stat. 112–15 (1790).

Of course, "[t]he framers could not have intended Second Amendment guarantees to apply to felons if, as a rule, all the felons were dead." Dru Stevenson, *In Defense of Felon-in-Possession Laws*, 43 Cardozo L. Rev. 1573, 1587 (2022). Stated more broadly, "it is difficult to conclude that the public, in 1791, would have understood someone facing death and estate forfeiture"—among many other severe penalties—"to be within the scope of those entitled to possess arms." *Folajtar*, 980 F.3d at 905 (quoting *Medina*, 913 F.3d at 158).

Like the right to vote, serve on a jury, or hold public office—or the right to life itself—the right to bear arms could be lost for committing a felony.

    ii. Laws disarming the dangerous and unlawful support § 922(g)(1)'s validity

Historical laws barring gun possession by people or groups deemed dangerous or unlawful also support the constitutionality of the felon-in-possession law.

In England, the government's ability to disarm groups that, in its view, would not obey the law or were otherwise dangerous was well-

established.  For example, an early 1400s law restricted Welshmen's ability to carry guns, and laws in the late 1500s and early 1600s barred Catholics from owning guns.  *See* Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Firearms*, 20 Wyo. L. Rev. 249, 258 (2020).

Later laws were similar.  In 1689, Parliament enacted the English Bill of Rights, which contained the "predecessor to our Second Amendment."  *Bruen*, 142 S. Ct. at 2141.  But that provision said only that "[s]ubjects which are Protestants, may have Arms for their Defence suitable to their Conditions, and as allowed by Law."  1 W. & M., Sess. 2, ch. 2, § 7 (1689).  So "by the time of American independence, England had established a well-practiced tradition of disarming" groups "perceived as threatening to the crown."  Greenlee, *supra*, at 261.

The American colonies kept up this tradition.  See *United States v. Jimenez-Shilon*, 34 F.4th 1042, 1047 (11th Cir. 2022) (describing "complete bans on gun ownership" by slaves and Native Americans).  During the Revolutionary War, the Continental Congress recommended that the colonies disarm those who were "notoriously disaffected to the

cause of America" or who simply "have not associated" with the colonial governments in the war effort. 4 *Journals of the Continental Congress 1774–1789*, at 205 (1906) (resolution of March 14, 1776). At least seven colonies passed legislation disarming the "disaffected." *See Davila*, 2023 WL 5361799, at *4 n.5 (collecting laws).

As those enactments show, "colonies did not require violence or dangerousness for disarmament." *Folajtar*, 980 F.3d at 908. Some of the "categorical prohibitions" on gun ownership discussed above are repugnant, and "of course would be impermissible today under other constitutional provisions" (like the First or Fourteenth Amendments). *Jackson*, 69 F.4th at 503. But "they are relevant here in determining the historical understanding of the right to keep and bear arms." *Id*. And they show that "the founders thought the legislature should decide which groups pose a threat to the social order or the community." Stevenson, *supra*, at 1586. Stated differently, "the public in the founding era understood that the right to bear arms could exclude" "dangerous persons" and "at least some nonviolent persons." *Medina*, 913 F.3d at 159.

### 3. Section 922(g)(1) is not plainly unconstitutional as applied to defendant or non-violent felons

As noted above, defendant's as-applied challenges must be reviewed for plain error. However, defendant failed to argue plain error in her opening brief. The issue has therefore been forfeited. *See United States v. Anekwu*, 695 F.3d 967, 985 (9th Cir. 2012) (stating that an appellant waives arguments by failing to raise them in the district court or in his opening brief on appeal).

Even if it had not been forfeited, defendant could not show plain error. No appellate court has previously held that violent felons, like defendant, are entitled to possess firearms.[22] At the time the district court denied her motion, no appellate court had held that any felon of any sort, violent or nonviolent, had a right to possess firearms.[23] And

---

[22] Defendant claims she is not a violent felon. But while robbery might not be a categorical match for federal crimes of violence, nothing in Second Amendment jurisprudence requires a categorical "crime of violence" Guidelines or statutory match. The Guidelines and statutes like the Armed Career Criminal Act would likely be deemed ahistorical by *Bruen* standards, and California robbery still requires the taking of property from a person "by means of force or fear"—*i.e.*, by violence. *See* Cal. Penal Code § 211.

[23] The Third Circuit issued its decision in *Range*, 69 F.4th 96, several months after the district court's decision here—and that involved state-law misdemeanors.

as explained above, ample authority supports the proposition that even non-violent felons may be disarmed. Any error by the district court therefore was, at the least, not plain. *See United States v. Gonzalez Becerra*, 784 F.3d 514, 518 (9th Cir. 2015) ("[a]n error cannot be plain where there is no controlling authority on point and where the most closely analogous precedent leads to conflicting results").

## D. The Within-Guidelines Sentence Was Neither Procedurally Nor Substantively Unreasonable

### 1. *Standard of review*

Defendant argues that the district court committed both procedural and substantive error at sentencing. (AOB 53–60.)

As she concedes (AOB 53), she raised no relevant procedural objections in the district court, so her claim of procedural error is reviewed for plain error. *See United States v. Sandoval-Orellana*, 714 F.3d 1174, 1180 (9th Cir. 2013) ("absent objection at sentencing, we review for plain error a claim that the district court procedurally erred").

To establish plain error, defendant has the burden to show (1) error, (2) that was clear or obvious, (3) that affected substantial rights, and (4) that seriously affected the fairness, integrity, or public

66

reputation of the judicial proceedings. *United States v. Marcus*, 560 U.S. 258, 262 (2010). "Meeting all four prongs is difficult, as it should be." *Id.* (quotation marks omitted). To establish the second prong, defendant must identify "clear or controlling authority addressing [the] question." *United States v. Liew*, 856 F.3d 585, 599 (9th Cir. 2017). "At a minimum, an error that hinges on a factual dispute is not 'obvious' as required by the 'plain error' standard." *United States v. Zhou*, 838 F.3d 1007, 1011 (9th Cir. 2016).

This Court reviews the substantive reasonableness of a district court's sentence for abuse of discretion. *Autery*, 555 F.3d at 871. To evaluate substantive reasonableness, this Court looks to the "totality of the circumstances" and reviews the district court's factual findings for "clear error." *Carty*, 520 F.3d at 993.

Reasonableness is a highly deferential standard. *United States v. Cope*, 527 F.3d 944, 952 (9th Cir. 2008). Deference is owed because "[t]he sentencing judge is in a superior position to find facts and judge their import under § 3553(a) in the individual case." *Gall*, 552 U.S. at 51. Reversal is not permitted "[e]ven if [this Court is] certain that [it] would have imposed a different sentence had [it] worn the district

judge's robe." *United States v. Whitehead*, 532 F.3d 991, 993 (9th Cir. 2008).

### 2. *The sentence was procedurally reasonable*

Defendant argues that the sentence was procedurally unreasonable because the court relied on previously undisclosed statistics at sentencing. (AOB 55–59.)

"Federal Rule of Criminal Procedure 32(i)(1)(c) requires that, at sentencing, the district court provide defense counsel the opportunity 'to comment on the probation officer's determination [in the Presentence Report] and other matters related to an appropriate sentence.'" *Warr*, 530 F.3d at 1162 (emphasis in original). This Court has "interpreted Rule 32 'to require the disclosure of all relevant factual information to the defendant for adversarial testing.'" *Id.* (quoting *United States v. Baldrich*, 471 F.3d 1110, 1114 (9th Cir. 2006)).

But where the undisclosed information is "precisely the sort of garden variety considerations that should not generally come as a surprise to trial lawyers who have prepared for sentencing," the Court will not find error. *United States v. Hernandez-Garcia*, 840 F. App'x 198, 199–200 (9th Cir. 2021) (cleaned up) (quoting *Irizarry v. United*

*States*, 553 U.S. 708, 716 (2008)).  The Rule 32 requirement of advance-notice for extra-record statistics also requires reversal only where the district court indisputably relies on those statistics.  *See, e.g.*, *Warr*, 530 F.3d at 1162–63.

There is no indication that the district court here did so, given that its pronouncement of sentence addressed defendant's individual circumstances at length.  (*See* 1-ER-53–58 & Section V(D)(3), below.)  And, if the district court did not rely on them, then the statistics cannot have affected the defendant's substantial rights.  For instance, in *Warr*, the district court "relied on [a BOP] study solely for the well-known, common sense proposition that younger offenders are more likely to recidivate." *Id.* at 1163.  The Court declined to reverse.  *Id.*  Similarly here, the district court cited its statistics solely as support for the uncontroversial notion that illegal possession of firearms is a serious offense.  (1-ER-53–58.)  The statistics were illustrations of the well-known, common-sense proposition that "gun violence is a serious problem" in America.  *Heller*, 554 U.S. at 636 ("We are aware of the problem of handgun violence in this country. . . gun violence is a serious problem.");  *see also Bruen*, 142 S.Ct. at 2157–58 (Alito, J. concurring)

(referencing the "ubiquity of guns and our country's high level of gun violence").

Indeed, this Court has recently considered another case involving this same district court, where the judge invoked the same gun violence statistics as it did here. *United States v. Molina*, No. 22-50161, 2023 WL 8715649, at *1 & n.1 (9th Cir. Dec. 18, 2023). As that panel found, the district court "did so to underscore the gravity of illegal weapons possession generally and did not necessarily or exclusively rely on the statistics as the basis for imposing an upward variance in sentencing." *Id.* Any error therefore was not plain error. *Id.*

Defendant's contrary arguments are unavailing. The district court did not need to credit her self-serving statement that she possessed the firearm for her own self-defense. (AOB 58.) Defendant was a serial robber and burglar. It was at least as plausible that a firearm was part of her ordinary criminal equipment. And the district court did not ignore the fact that defendant had suffered as part of a marginalized group (AOB 58)—to the contrary, the court discussed her traumatic background and efforts to overcome it, and gave defendant a shorter sentence for that very reason (1-ER-58).

70

In the absence of contrary authority, then, this Court should (as in *Molina*) find no plain error.

### 3. *The sentence was substantively reasonable*

"A substantively reasonable sentence is one that is 'sufficient, but not greater than necessary' to accomplish § 3553(a)(2)'s sentencing goals." *United States v. Crowe*, 563 F.3d 969, 977 n.16 (9th Cir. 2009) (quoting 18 U.S.C. § 3553(a)). "The touchstone of 'reasonableness' is whether the record as a whole reflects rational and meaningful consideration of the factors enumerated in 18 U.S.C. § 3553(a)." *United States v. Ressam*, 679 F.3d 1069, 1089 (9th Cir. 2012) (quotation marks omitted).

"[A] correctly calculated Guidelines sentence will normally not be found unreasonable on appeal." *United States v. Carty*, 520 F.3d 984, 988 (9th Cir. 2008) (en banc). In fact, there is only one reported decision in the Ninth Circuit (an attempted illegal re-entry case) holding a within-Guidelines sentence to be substantively unreasonable—and the Court noted that the scope of that decision was limited. *United States v. Amezcua-Vasquez*, 567 F.3d at 1058); *see also*

71

*United States v. Valencia-Barragan*, 608 F.3d 1103, 1108–09 (9th Cir. 2010) (discussing *Amezcua-Vasquez*'s limited scope).

The district court here imposed a within-Guidelines sentence. It did so after considering the § 3553(a) factors explicitly and at length. (1-ER-53–61.) As the district court observed, defendant had a long history of criminality, and the leniency she had received in the past had not deterred her.

Consistent with this recalcitrance, defendant also has never been willing to admit that she did anything wrong in the current case. In her sentencing allocution and prepared video statement, she never apologized. In fact, she never even mentioned her offense conduct. (*See* Ex. G.) This approach has continued on appeal: the opening brief fails to discuss the facts of the underlying offense on November 23, 2021. Instead, it skips straight to Det. Vinton and December 14.

It is surely impossible to challenge the substantive reasonableness of a sentence without discussing the offense conduct. *See* 18 U.S.C. § 3553(a)(1). But the only time defendant mentions the offense is when she claims that she "had the firearm for self-defense." (AOB 59.) As noted above, defendant could also have had the firearm because she was

72

a serial burglar and robber, and firearms were her stock in trade. But regardless of why she had the firearm, she was not allowed to have it—and given her state conviction for the *same conduct* just two months prior, the district court was certainly justified in believing that a within-Guidelines sentence was necessary to adequately deter this particular defendant.

# VI

# CONCLUSION

Defendant's conviction and sentence should be affirmed.

DATED: January 10, 2023        Respectfully submitted,

E. MARTIN ESTRADA
United States Attorney

MACK E. JENKINS
Assistant United States Attorney
Chief, Criminal Division

BRAM M. ALDEN
Assistant United States Attorney
Chief, Criminal Appeals Section

*s/ David W. Williams*

DAVID W. WILLIAMS
ALEXANDER SU
Assistant United States Attorneys

Attorneys for Plaintiff-Appellee
UNITED STATES OF AMERICA

## STATEMENT OF RELATED CASES

The government states, pursuant to Ninth Circuit Rule 28-2.6, that it is unaware of any cases related to this appeal.

## CERTIFICATE OF COMPLIANCE

I certify that:

1.      This brief complies with the length limits permitted by Ninth Circuit Rule 32-1 because the brief contains 13,996 words, excluding the portions exempted by Fed. R. App. P. 32(f).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Century Schoolbook) using Microsoft Word 2016.


DATED: January 10, 2023             *s/ David W. Williams*

                                    DAVID W. WILLIAMS
                                    Attorney for Plaintiff-Appellee
                                    UNITED STATES OF AMERICA