CA NO. 23-1022

IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,

        Plaintiff-Appellee,

v.

BRIESHANAY QUENISE FORD,

        Defendant-Appellant.

DC NO. 2:20-cr-00200-PA

---

**APPELLANT'S REPLY BRIEF**

---

APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
CENTRAL DISTRICT OF CALIFORNIA

HONORABLE PERCY ANDERSON
United States District Judge

CUAUHTEMOC ORTEGA
Federal Public Defender
MICHAEL GOMEZ
Deputy Federal Public Defender
321 East 2nd Street
Los Angeles, California 90012-4202
Telephone: (213) 894-7867
Facsimile: (213) 894-0081
Email: Michael_Gomez@fd.org
Attorneys for Defendant-Appellant

# <u>TABLE OF CONTENTS</u>

**Page(s)**

I.    INTRODUCTION ............................................................................1

II.    ARGUMENT...................................................................................2

    A.    This Court Should Reverse the District Court's Denial of the
Retaliation Motion.................................................................2

        1.    Vinton's conduct may be imputed to Corcoran. .........................2

        2.    Vinton's conduct was outrageous. ............................................8

        3.    Vinton's conduct warranted exercise of the court's
supervisory authority. ..............................................17

        4.    The district court should have dismissed the indictment for
selective enforcement.................................................21

        5.    Alternatively, this Court should remand with directions to
compel further discovery. ........................................23

            a.    Legal Standard ................................................23

            b.    Ford did not waive her discovery requests. ....................24

            c.    The district court abused its discretion in denying
discovery......................................................25

    B.    This Court Should Also Reverse the District Court's Denial of the
Motion to Dismiss Under *Bruen*. ........................................25

    C.    Resentencing Is Warranted................................................26

        1.    The district court committed plain procedural error.................26

        2.    Ford's 30-month sentence is substantively unreasonable.........28

III.    CONCLUSION.............................................................................29

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Berghuis v. Thompkins*,
    560 U.S. 370 (2010) ....................................................................11

*Elkins v. United States*,
    364 U.S. 206 (1960) ...................................................................22

*Greene v. United States*,
    454 F.2d 783 (9th Cir. 1971) ......................................................8

*Lawrence v. Chater*,
    516 U.S. 163 (1996) ...................................................................20

*Miranda v. Arizona*,
    384 F.3d 436 (1966) ...................................................................12

*Rochin v. California*,
    342 U.S. 165 (1952) .....................................................................8

*United States v. Alferahin*,
    433 F.3d 1148 (9th Cir. 2006) ..................................................24

*United States v. Armstrong*,
    517 U.S. 456 (1996) ...................................................................23

*United States v. Bassford*,
    812 F.2d 16 (1st Cir. 1987) ..........................................................2

*United States v. Beers*,
    189 F.3d 1297 (10th Cir. 1999) ...................................................2

*United States v. Black*,
    733 F.3d 294 (9th Cir. 2013) ............................................. 13, 14

*United States v. Bundy*,
    968 F.3d 1019 (9th Cir. 2020) ..................................................17

# TABLE OF AUTHORITIES

**Page(s)**

*United States v. Franco*,
  136 F.3d 622 (9th Cir. 1998) ...............................................................8

*United States v. Griffin*,
  617 F.2d 1342 (9th Cir. 1981) .............................................................3

*United States v. Joseph*,
  716 F.3d 1273 (9th Cir. 2013) ...........................................................27

*United States v. King*,
  687 F.3d 1189 (9th Cir. 2012) ...........................................................10

*United States v. Lopez*,
  474 F.3d 1208 (9th Cir. 2007) ...........................................................10

*United States v. Ng*,
  699 F.2d 63 (9th Cir. 1983) ............................................................2, 3

*United States v. Restrepo*,
  930 F.2d 705 (9th Cir. 1991) ............................................................8, 9

*United States v. Robison*,
  644 F.2d 1270 (9th Cir. 1981) .........................................................2, 3

*United States v. Rogers,*
  751 F.2d 1074 (9th Cir. 1985) ...................................................... 18, 19

*United States v. Selfa*,
  720 F. App'x 856 (9th Cir. 2018) .........................................................2

*United States v. Sellers*,
  906 F.3d 848 (9th Cir. 2018) .............................................................23

*United States v. Simpson*,
  813 F.2d 1462 (9th Cir. 1987) ...........................................................12

*United States v. Twigg*,
  588 F.2d 373 (3d Cir. 1978) ................................................................8

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

*Vega v. Tekoh*,
  597 U.S. 134, 142 (2022) ....................................................................................15

**Statutes**
18 U.S.C. § 922(g)(1)............................................................................................7

28 U.S.C. § 2106...................................................................................................20

Cal. Penal Code § 1170.12(c)(2)(A) ....................................................................20

**Rules**
Fed. R. Crim. P. 17(a) ..........................................................................................16

## I.  INTRODUCTION

Reading the government's brief, it is easy to forget what this case is about: LAPD Detective David Vinton *repeatedly* trampling over Brieshanay Ford's constitutional rights, threatening her with federal prosecution to circumvent her multiple invocations of her right to counsel, and working with his friend, FBI Special Agent Sarah Corcoran, to follow through on his threats. The only reason Ford's case is in federal court is because of Vinton's abuse of power and Corcoran's complicity.

The government largely avoids the facts of this case, perhaps because Vinton's actions are indefensible. Instead, the government draws this Court's attention in the wrong directions, raising inconsequential and irrelevant distinctions that fail to undermine Ford's arguments. This Court should vacate Ford's conviction and dismiss the indictment—pursuant to the claims in either the retaliation motion or *Bruen* motion—or remand for further discovery. Alternatively, the Court should remand for resentencing because of the district court's procedurally and substantively unreasonable sentence.

1

## II.  ARGUMENT

**A.    This Court Should Reverse the District Court's Denial of the Retaliation Motion.**

### 1.    Vinton's conduct may be imputed to Corcoran.

The government does not dispute or even attempt to defend Vinton's repeated trampling over Ford's constitutional rights, his repeated threats to refer her case for federal prosecution as retaliation for her invoking her right to counsel, or his follow-through on his threats. In fact, the government largely avoids discussing this outrageous conduct because it is indefensible; the government's silence on the matter speaks volumes.

Instead, the government argues that, because Vinton is a state law enforcement officer, his actions cannot be imputed to federal authorities. (GAB 30–32) But, the government's separate-sovereigns argument is a red herring.

First, the cases the government cites are inapposite, as they involve claims of *vindictive prosecution*, which Ford has not raised in this appeal. (GAB 30–32) (citing *United States v. Selfa*, 720 F. App'x 856 (9th Cir. 2018); *United States v. Robison*, 644 F.2d 1270 (9th Cir. 1981); *United States v. Ng*, 699 F.2d 63 (9th Cir. 1983); *United States v. Bassford*, 812 F.2d 16 (1st Cir. 1987); and *United States v. Beers*, 189 F.3d 1297 (10th Cir. 1999)) A claim of vindictive prosecution may arise without regard to the conduct of the law enforcement officers involved in the investigation. *See, e.g.*, *Robison*, 644 F.2d at 1271–73 (defendant alleging

2

vindictive federal prosecution after he successfully asserted procedural and appellate rights in state court); *see also United States v. Griffin*, 617 F.2d 1342, 1347 (9th Cir. 1981) (noting that vindictiveness may be presumed even without evidence that prosecution acted with retaliatory motive in obtaining indictment). This case deals with a state officer's outrageous conduct and a federal agent's cooperation with that officer to follow through on his retaliatory threats. The government's cases, therefore, are inapposite.

Second, in a similar vein, vindictive-prosecution cases present issues that have nothing to do with Ford's claims. Those issues include prosecutorial discretion, the interests separate sovereigns may have in pursuing a case, and rebuttable presumptions of vindictiveness based on the actions of prosecutors and judges. *See, e.g.*, *Ng*, 699 F.2d at 67–68. None of those issues is relevant to the outrageous-conduct, supervisory-authority, or selective-enforcement claims Ford raises here.

Finally, neither the cases cited by the government nor any other case has held that vindictiveness or retaliatory motive cannot be imputed from one sovereign to another. *See Robison*, 644 F.2d at 1273 (holding that "the involvement of separate sovereigns *tends to negate* a vindictive prosecution claim," not that actions cannot be imputed at all from one sovereign to another) (emphasis added).

3

The Court examines whether there was some awareness or coordination between the different sovereigns, such that the actions of one can be imputed to the other.

The record here establishes that Vinton's conduct may be imputed to Corcoran, thereby tainting Ford's federal prosecution. As explained in the defense's reply brief to the motion to dismiss below, Corcoran was aware of Vinton's threats and attempts to circumvent Ford's invocations of her right to counsel, and Corcoran's purported lack of knowledge of Vinton's actions was not credible. (2-ER-269–76, 281–92; AOB 27) Corcoran was involved in all stages of Vinton's retaliatory scheme—from his initial text to Corcoran during the December 14 interrogation through Corcoran's coordination of Ford's federal arrest and prosecution.

Notably, the government has no explanation for several facts that undermine its argument. For instance, the government cannot explain why Corcoran's communications with Vinton and her continued involvement in pursuing federal charges were related to Vinton's inability to obtain Ford's *cooperation* and *statements*. Vinton's initial text asking Corcoran if she would "file federal charges on her [*i.e.*, Ford] if need be" came during the December 14 interrogation. (5-ER-690) It appears as though Vinton and Corcoran had spoken about Ford before Vinton's interrogation, and it appears as though they spoke on the phone afterward, although the contents of those conversations are unknown. (*See* 5-ER-690) (Vinton

4

referring to Ford as "her" instead of her name, indicating prior familiarity; Vinton saying he would call Corcoran after booking Ford) After it became clear Ford was not involved with the murder, Vinton kept pursuing Ford to obtain information from her, but she persisted in declining to speak to Vinton. (2-ER-115) Vinton felt it important to relay to Corcoran that Ford was not speaking to him. (5-ER-695) (Vinton telling Cororan that Ford "[wasn't] responding to [his] texts")

Corcoran's subsequent communications with Vinton suggested that her primary goal in pursuing federal charges against Ford and coordinating her federal arrest was to obtain Ford's cooperation and statements for Vinton's state murder investigation. Indeed, when Corcoran let Vinton know about Ford's impending federal arrest, she said: "[I]f we can grab Ford tomorrow do you want to *interview her again*? If not I will likely just *do a quick interview in the back of the car and push for a proffer at a later date*, which you will obviously be at." (5-ER-696) (emphasis added)

Crucially, Corcoran's text asking Vinton if he wanted to "interview" Ford "again" demonstrates that she knew he had already interviewed Ford once, and he did not obtain the statements or information he wanted. The only time Vinton had "interviewed" Ford was in the December 14 interrogation, where she invoked her right to counsel seven times, and Vinton texted Corcoran about pursuing federal charges. Corcoran also offered to interview Ford about the murder case—which

5

Corcoran stated was not related to the federal felon-in-possession case—while Ford was a captive audience in the back of the patrol car. (5-ER-696) And she kept Vinton up-to-date about when and where Ford would be arrested so that he could be there, and informed him of the requirement to record the interrogation. (5-ER-696)

Finally, after Ford was arrested, Corcoran took Ford to meet with Vinton, who attempted to interrogate Ford about the murder case in front of Corcoran. (2-ER-115, 253, 256, 259) In that interrogation, Corcoran heard Vinton tell Ford, "You have *one more chance to tell us* who did it," and when Ford declined to speak about the murder, "You see? *I told you* this was going to happen." (2-ER-115–16, 253, 259) (emphasis added) Corcoran, therefore, knew Ford had previously had "a chance" to "tell" Vinton information about the murder case, and that Vinton had "told" her a federal prosecution would happen if she did not cooperate. Neither Corcoran nor the government has provided a reasonable explanation for why she omitted from her report Vinton's attempted interrogation after Ford's federal arrest—especially when he played such a big role in the lead-up to that arrest. (GAB 42–43; 2-ER-115–16) (government claiming Corcoran would not include in her a report an interrogation that did not happen, even though Corcoran led Ford outside of the courthouse to another building for the sole

6

purpose of allowing Vinton to interrogate Ford, and the interrogation did not happen because Ford again declined to speak to Vinton)

The government likewise cannot explain why Corcoran—and later federal prosecutors—sought to obtain access to Ford's cell phone, which had nothing to do with her federal felon-in-possession case. (*See* 2-ER-117–18, 181–211, 253) By the time federal charges were filed, Corcoran had evidence of Ford's possession of a firearm, the fact that the firearm had traveled across state lines, and Ford's prior felonies. Those were the facts necessary to establish the federal felon-in-possession offense. *See* 18 U.S.C. § 922(g)(1). There was no need for federal authorities to obtain Ford's phone or access its contents.

But, for the federal authorities, this case was never about pursuing its own sovereign interests against Ford. It was about assisting Vinton in obtaining information from Ford that he could not get because she had invoked her right to counsel. Indeed, despite its irrelevance, the federal government obtained a warrant to search Ford's cell phone. (2-ER-181–211) And, after federal charges had been filed, the federal prosecutor asked defense counsel for the passcode to Ford's phone and whether Ford would cooperate with authorities regarding the state murder investigation, even though it had no federal nexus and nothing to do with this case. (2-ER-117–18) The prosecutor said they were just assisting state officers who had asked for help. (2-ER-118)

7

At all times, Ford's federal felon-in-possession case was tied to Vinton's unrelated state murder investigation. Under these circumstances, therefore, it is unreasonable to conclude Corcoran had absolutely no idea what had transpired between Vinton and Corcoran. The district court's finding to the contrary is clearly erroneous, and Vinton's conduct may be imputed to Corcoran and the federal case.

### 2. Vinton's conduct was outrageous.

The focus of the inquiry here is on Vinton's conduct, which was shocking, outrageous, and offensive to the universal sense of justice. And, there is a direct link between Vinton's conduct and Ford's federal prosecution. As such, Ford's conviction violates due process and should be reversed. *See United States v. Restrepo*, 930 F.2d 705, 712 (9th Cir. 1991) (setting forth standard for outrageous-conduct claim).

Although the government does not dispute Vinton's conduct, it tries to distance itself from it on various technical grounds, but to no avail. First, the government argues that relief seldom has been granted on outrageous-conduct claims, so Ford's claim fails. (GAB 33, 36–37) (citing *United States v. Twigg*, 588 F.2d 373 (3d Cir. 1978); *Greene v. United States*, 454 F.2d 783 (9th Cir. 1971); *Rochin v. California*, 342 U.S. 165 (1952); *United States v. Franco*, 136 F.3d 622 (9th Cir. 1998)) But, the fact that outrageous-conduct claims do not come up often does not mean Vinton's conduct was not outrageous here. In fact, Vinton has a

8

history of misconduct that has led to dismissals and public rebuke by prosecutors. (AOB 29–30 n.12; 2-ER-89–90, 2-ER-330–3-ER-612) So, the dearth of caselaw granting relief on outrageous-conduct claims has no bearing on the outrageousness of Vinton's conduct, about which the government has nothing to say.

Second, the few cases the government cites in support of its argument are inconsequential. Outrageous-conduct claims are resolved on a case-by-case basis, so the specific factual circumstances and holdings of the government's cited cases are not dispositive.

The lack of any case with facts similar to those here shows just how outrageous Vinton's conduct was. Indeed, Ford has not come across another case where an individual pleaded with a state officer to get an attorney, and the officer repeatedly ignored her pleas and retaliated against her invocations by threatening federal prosecution for a straightforward state felon-in-possession case. There certainly is not another case where a state officer followed through on his threats and worked with a federal agent to secure a federal indictment, and the agent coordinated with the state officer to give him access to the individual after her arrest to try to circumvent her constitutional rights. This conduct is outrageous and offends our universal sense of justice. *See Restrepo*, 930 F.2d at 712. It is so outrageous, in fact, that the government does not deign to defend it.

The government finally—albeit superficially—addresses Vinton's conduct, but only to draw an inapt comparison to *United States v. Lopez*, 474 F.3d 1208 (9th Cir. 2007), *overruled on other grounds by United States v. King*, 687 F.3d 1189 (9th Cir. 2012). (GAB 33) The government claims that this Court has previously "found similar conduct at the federal level to fall short of [the outrageous-conduct] standard." (GAB 33)

A review of *Lopez* reveals, however, that it bears no resemblance to this case. In *Lopez*, the defendant, a suspected gang member, was arrested and charged in state court for possessing methamphetamine and guns. 474 F.3d. at 1210. At the same time, federal agents referred the case to federal prosecutors, who accepted the case pending further investigation. *Id.* Federal authorities then began pursuing their own interests in obtaining more information on a gang they were investigating. *Id.* They interviewed the defendant, who refused to cooperate. *Id.* The agents told the defendant he could face more time if they continued pursuing federal charges, which they would do if he did not cooperate. *Id.* The defendant still refused, and federal prosecutors proceeded with the case they had already started. *Id.*

This case stands in stark contrast to *Lopez*. First, *Lopez* was a vindictive prosecution case, which, as explained above, involves different issues than the outrageous-conduct claim at issue here. *Id.* at 1211. Second, the federal charges in *Lopez* were pursued independently of the state charges and were not instituted in

10

retaliation for the defendant invoking his constitutional rights. In fact, the *Lopez* defendant never invoked any constitutional rights, as he did not have any under the circumstances of that case.

Here, however, federal authorities did not independently pursue charges against Ford, nor did they have any other interests they were pursuing. In fact, the only way federal authorities found out about Ford's case was through Vinton's referral. The crucial distinction between this case and *Lopez* is that here, Ford invoked her constitutional right to counsel (seven times), and Vinton referred her case for federal prosecution in retaliation for those invocations. No court has ever sanctioned the type of conduct Vinton and Corcoran engaged in.

On the contrary, Vinton's trampling over Ford's constitutional rights and threatening her with federal prosecution is precisely the type of conduct that is so shocking and outrageous as to offend our universal sense of justice. The general public understanding—and indeed, the legal requirement—is that if an individual invokes her constitutional right to counsel, the police are supposed to stop talking. *See Berghuis v. Thompkins*, 560 U.S. 370, 388 (2010) ("If the right to counsel or the right to remain silent is invoked at any point during questioning, further interrogation must cease."). The officers are supposed to give the individual an opportunity to confer with an attorney, whether retained or appointed, and the interrogation cannot recommence unless an attorney is present. *See Miranda v.*

11

*Arizona*, 384 F.3d 436, 471–76 (1966). This is not just a technicality; it is a constitutional guarantee and a bedrock feature of the American criminal justice system. Neither the law nor our shared universal sense of justice permits an officer to ignore one invocation of an individual's right to counsel, let alone seven, as Vinton did. (*See* Exh. A) It certainly does not allow an officer to use those invocations—meant to cease further discussion—as a springboard to threaten, harass, and retaliate, as Vinton did.

Despite Vinton's coercive tactics, the government claims this case does not involve psychological coercion. (GAB 37) The government again avoids discussing the facts and cites cases that bear no resemblance to the outrageousness of Vinton's conduct here. The government cites *United States v. Simpson*, 813 F.2d 1462 (9th Cir. 1987), to demonstrate that this Court has sanctioned authorities' passive tolerance of a private informant's use of sex to obtain information from a suspect. (GAB 38) Here, on the other hand, it was a law enforcement officer who repeatedly violated the law and threatened Ford simply because she invoked her right to counsel. *Simpson*, therefore, is irrelevant.

The government suggests Ford is not entitled to any relief for Vinton's outrageous conduct because the government had no part in "engineering or creating the offense," and the offense had already been committed by the time of Vinton's outrageous conduct. (GAB 37–38) The government attempts to create a

12

categorical limitation that simply does not exist. There are no "bright line[s]" in outrageous-conduct claims; cases are resolved on their own facts. *United States v. Black*, 733 F.3d 294, 302 (9th Cir. 2013). In that vein, there is no requirement that the government have had a hand in creating the offense, or even that the outrageous conduct relate to the offense conduct leading to the defendant's conviction. Rather, the outrageous-conduct inquiry looks to the government's conduct related to the *prosecution*. *See id.* (noting that due process bars government from engaging in outrageous conduct to "invoke[e] *judicial processes* to obtain a conviction") (emphasis added). And, here, there is no question that Vinton's outrageous conduct is inextricably linked to Ford's federal prosecution; in fact, he set it in motion.

Perhaps due its avoidance of the unsavory facts of this case, the government fails to appreciate the extremely coercive environment Vinton created for Ford in the December 14 interrogation and the harassment that ensued. In the government's myopic view, there was nothing wrong with Vinton's actions because he did not use physical force or "brutal psychological coercion[.]" (GAB 37) (internal quotation omitted)

Vinton's actions, however, showed Ford that he was above the law, and she would have no one to protect her. Every time Vinton ignored Ford's invocations of her right to counsel, he showed her that the law did not matter in that interrogation

13

room. Every time he threatened her with federal prosecution if she did not give up her rights and give him the information he demanded, he showed her that he had the power to make her life worse if she did not obey him. And, when Vinton showed the text he had sent to Corcoran, he showed Ford that his threats were very real. Every time he contacted Ford after the interrogation, he showed her that he held that same power over her, even outside the interrogation room. And when he showed up after her federal arrest to interrogate her, and told her, "You see? I told you this was going to happen," (2-ER-116), he showed her that she had to suffer the consequences of invoking her rights. This constitutes severe psychological coercion.

Finally, the government—like the district court below—persists in mischaracterizing this case as a simple *Miranda* violation. (GAB 34–35; 1-ER-27) No matter how many times the government says it, though, it is wrong. This Court is not determining whether a technical *Miranda* violation occurred; there is no question there were multiple violations. The Court should see the government's argument for what it is: an attempt to minimize and distract from Vinton's outrageous conduct, and to foreclose any relief for Ford. (GAB 34–35) (arguing suppression of statements—which Ford never even gave—is the proper relief)

To be clear, this case presents a due-process issue, so the appropriate relief is dismissal of the indictment. *See Black*, 733 F.3d at 302 (due process bars

14

prosecution resulting from outrageous government conduct); *Restrepo*, 930 F.2d at 712. Vinton's outrageous conduct involved *Miranda* violations, but that is not the focus of the due-process question. As discussed above and in the opening brief, this Court must examine all of Vinton's outrageous conduct and how it led to Ford's federal felon-in-possession prosecution. Doing so should lead it to find that these circumstances warrant vacatur of Ford's conviction and dismissal of the indictment.

The government next suggests that Ford did not validly invoke her right to counsel, (GAB 35), but that argument, too, is unavailing. Initially, the government notes that a *Miranda* violation is not technically a violation of the Fifth Amendment, (GAB 35), but that point is irrelevant here. As stated above, this Court is reviewing a due-process question, not a *Miranda* violation. And, there is no dispute that *Miranda* rights arise from the Fifth Amendment. *See Vega v. Tekoh*, 597 U.S. 134, 142 (2022) (noting that *Miranda* created prophylactic rules that are "constitutionally based" in the Fifth Amendment) (internal quotation omitted).

The government also wrongly claims Ford did not have a valid Fifth Amendment right in the December 14 interrogation because Vinton asked her about other people, and officers can compel witnesses to provide information about others. (GAB 35 n.15) Actually, Vinton considered Ford a suspect in the murder

15

during the December 14 interrogation, (2-ER-113–14), so she had a constitutional right to counsel. Vinton did not rule out Ford as a suspect until two days after the interrogation. (2-ER-115, 118) She therefore validly invoked her right to counsel seven times in the December 14 interrogation. And, even if Vinton asked her about others, Ford's statements could have still been incriminating against her.

The government's reliance on Federal Rule of Criminal Procedure 17(a) is misplaced. (GAB 35 n.15) Rule 17(a) authorizes a party to a criminal proceeding—*i.e.*, the prosecution or the defense—to seek a subpoena to compel witness testimony in court after charges have been filed. Fed. R. Crim. P. 17(a). Rule 17(a) does not authorize a state law enforcement officer, like Vinton, to ignore a suspect's invocation of her right to counsel, even if the information sought is about other people. And, Rule 17(a) becomes relevant *after* the defendant is represented by counsel—something Vinton denied Ford.

In the end, the facts the government ignores are the most important: Vinton repeatedly trampled over Ford's rights and coordinated with his federal-agent friend to make his threats of federal prosecution become a reality. This flagrant disregard for the law and concerted effort to break down a scared, vulnerable individual is outrageous, shocking, and offensive to our universal sense of justice. This Court should vacate Ford's conviction and dismiss the indictment.

16

### 3. Vinton's conduct warranted exercise of the court's supervisory authority.

Ford argued in her opening brief that the district court should have dismissed her case pursuant to its inherent supervisory authority. (AOB 28–30) Contrary to the government's assertion, this is not a reiteration of Ford's outrageous-conduct claim. (GAB 45) Rather, the focus of the inquiry here is whether circumstances call the court to dismiss a case to deter future illegal conduct. (AOB 28–29) And, even if this Court finds that the outrageous-conduct allegations do not amount to a due-process violation to support the outrageous-conduct claim, it nevertheless may find that the same circumstances call for dismissal under the court's inherent supervisory powers. *See United States v. Bundy*, 968 F.3d 1019, 1030 (9th Cir. 2020) ("A district court can dismiss an indictment under its supervisory powers even if the conduct does not rise to the level of a due process violation.") (internal quotation omitted).

Ford discussed Vinton's sleazy and underhanded investigatory tactics—including his repeated violations of the law—to emphasize the grave need for deterrence for Vinton. (AOB 29–30) As Ford explained in the district court and the opening brief, Vinton has a significant history of misconduct and has even drawn a rare public rebuke by prosecutors as a result of his wrongdoings. (AOB 29–30 n.29; 2-ER-89–90, 2-ER-330–3-ER-612) Just like the government does not defend Vinton's actions in this case, it does not dispute or defend Vinton's past

17

misconduct. Despite this history, Vinton has never been deterred and has remained

free to continue eschewing the rule of law. This Court should send a message to

Vinton and law enforcement in general that the Constitution means something and

that police cannot violate the law with impunity. The law exists just as much to

regulate the police's conduct as it does for civilians. Accordingly, Ford maintains

dismissal is warranted in this case, and the district court abused its discretion in

denying Ford's motion. Ford does not have a "mere disagreement" with the court's

decision; dismissal was the only reasonable conclusion under these circumstances.

(GAB 46) (internal quotation omitted)

      Ford was prejudiced by Vinton's conduct, as the federal prosecution resulted

in a longer sentence than what she would have received in California state court.

(AOB 30) Indeed, it was the prospect of a longer sentence that formed the basis of

Vinton's threats. (2-ER-114) Ford acknowledged she could not say with certainty

what her sentence would have been in state court, but she calculated a likely

sentence based on her assessment of the state charges and California sentencing

law. (AOB 30–31 & n.13)

      Despite Vinton's threats of a longer federal sentence, which Ford likely

received, the government claims she was not prejudiced by Vinton's misconduct.

(AOB 45–46) In so arguing, the government relies on an inapposite case, *United

States v. Rogers,* 751 F.2d 1074 (9th Cir. 1985). *Rogers* involved an IRS agent

18

obtaining a declaration from the defendant's former attorney during an investigation of mail fraud and false tax return charges. *Id.* at 1075–76, 1077–78. In determining whether dismissal with prejudice was the appropriate remedy, this Court first noted that the case did not involve the violation of any constitutional rights. *Id.* at 1078–79. Then, the Court found that the misconduct in inducing an attorney witness to violate the ethical obligation of confidentiality during the investigatory phase did not cause the defendant substantial prejudice, such that dismissal with prejudice was warranted. *Id.* at 1078–79. The proper remedy in those circumstances was suppression of the confidential information. *Id.* at 1079.

This case is unlike *Rogers*. The misconduct here involved Vinton repeatedly steamrolling over Ford's constitutional rights. Vinton retaliated against her by threatening federal prosecution and then following through on his threat because she never waived her rights. The misconduct did not simply yield evidence that could be suppressed. It resulted in the very federal prosecution, conviction, and lengthy federal prison sentence that are the subject of this appeal. For those reasons, dismissal is the proper remedy.

Recognizing that dismissal is a remedy of last resort, though, Ford proposed an alternative remedy in case this Court found dismissal was not appropriate: remand for resentencing for no more than the sentence she likely would have received in California state court. (AOB 30) The government argues there is no

19

authority for this remedy and, in any event, Ford faced a possible sentence of 25 years to life under California's Three Strikes law. (GAB 46 n.18)

The government's arguments are unavailing and do not preclude this alternative relief. First, this Court can grant whatever relief it deems appropriate, including remanding with instructions not to impose a sentence of more than 12 months in prison and 13 months of supervised release. *See* 28 U.S.C. § 2106 (providing that appellate court may "affirm, modify, vacate, set aside or reverse any judgment" and "remand the cause and direct the entry of such appropriate judgment, decree, or order, or require such further proceedings to be had as may be just under the circumstances"); *Lawrence v. Chater*, 516 U.S. 163, 166 (1996) (stating that § 2106 confers "broad power"). It is certainly "just under the[se] circumstances" that the district court not sentence Ford to a longer term than she likely would have received in California state court.

Second, as the government acknowledges, Ford's "priors were not charged initially" in the state case. (GAB 47 n.18); *see* Cal. Penal Code § 1170.12(c)(2)(A) (requiring state to plead and prove prior felonies). It bases its three-strikes argument on its belief that "prosecutors often amend charges or add enhancements later in the case[.]" (GAB 47 n.8) But, those are not the circumstances here, and there is no basis in the record to believe the state prosecutors would have pursued a sentence under the three-strikes law. Ford's proposed alternative remedy is based

on the circumstances that existed when Vinton's retaliatory and vindictive plan of
federal prosecution finally came to fruition. But, given that Vinton's conduct in
this case was so flagrant and egregious—particularly in light of his past
experiences involving falsification of evidence and perjury—dismissal is the
appropriate remedy.

### 4. The district court should have dismissed the indictment for selective enforcement.

Vinton and Corcoran improperly selectively enforced federal felon-in-
possession laws against Ford. (AOB 31–34) The government repeats its misguided
separate-sovereigns argument, (GAB 40), but, as explained above, Vinton's
conduct can and should be imputed to Corcoran. And, although Vinton did not
personally enforce federal law against Ford, he used every tool he had at his
disposal—including his FBI agent-friend Corcoran—to make sure Ford was
punished for invoking her rights and declining to speak to him.

The government next avers that Vinton and Corcoran did not have a
discriminatory purpose in enforcing the law here. (GAB 40–43) In so arguing, the
government attempts to rewrite history. The government reframes this case as a by-
the-book investigation, going so far as to characterize this as a "commendable"
coordination between state and federal authorities. (GAB 42) An investigation that
is plagued by repeated constitutional violations and the use of the federal judicial
process as a pawn in an officer's retaliation for an individual asserting her

21

constitutional right is certainly not "commendable." *See Elkins v. United States*,

364 U.S. 206, 223 (1960) (federal courts should not be "accomplices in the willful

disobedience of a Constitution they are sworn to uphold"). It violates fundamental

principles of the American criminal justice system.

      In attempting to distance itself from Vinton's misconduct, the government

again argues that Corcoran did not know what happened between Vinton and Ford.

(GAB 40–43) But, as explained above, in the opening brief, and in Ford's moving

papers below, that claim is not credible. (Arg. II.A.1, *supra*; 2-ER-269–76, 281–

92; AOB 27) The district court's finding on this point was clearly erroneous. (1-

ER-27)

      Finally, regarding the discriminatory-effect prong of the selective-

enforcement standard, the government repeats the district court's mistake in

defining the group of similarly situated defendants. (GAB 43–44; 1-ER-26) The

government believes the group is "repeat felons, caught with a firearm, while on

probation with an open warrant." (GAB 43) That is not so. Nor is the group, as the

government characterizes Ford's argument, individuals with *Miranda* violations.

(GAB 45) Rather, the group, as Ford explained, is individuals who qualified for

federal prosecution under § 922(g)(1) and did not invoke their constitutional rights,

but whom Vinton did not refer for such prosecution. (AOB 33–34) It is Ford's

invocation of her constitutional rights that sets her apart from others. The

government does not offer any information, explanation, or statistics regarding Vinton's history of referring felon-in-possession cases for federal prosecution to defeat Ford's claim. (AOB 34; GAB 39–46) (government failing to respond to Ford's argument that Vinton's statement that "he doesn't investigate gun cases" implied he does not normally refer such cases for federal prosecution) On this record, Ford has established a claim of selective enforcement, warranting vacatur of Ford's conviction and dismissal of the indictment.

5. **Alternatively, this Court should remand with directions to compel further discovery.**

    a. **Legal Standard**

The government acknowledges that the standard for obtaining discovery for selective-enforcement claims is unsettled. (AOB 35; GAB 49) Ford argued that this Court should adopt the lower standard in *United States v. Sellers*, 906 F.3d 848 (9th Cir. 2018), for selective-enforcement claims, as opposed to the higher standard in *United States v. Armstrong*, 517 U.S. 456 (1996), for selective-prosecution claims. (AOB 35–36)

The government does not dispute Ford's arguments about the discovery standard for selective-enforcement claims in general. (GAB 49–50) Rather, the government argues that in this case, this Court should apply the higher *Armstrong* standard, based on its erroneous definition of "similarly situated individuals." (GAB 50) As discussed above, the relevant group is individuals Vinton

23

encountered who qualified for federal § 922(g)(1) prosecution and did not invoke constitutional rights, and were not referred for federal prosecution. *See* Arg. II.A.4, *supra*. In any event, the government does not dispute—and essentially concedes— Ford's arguments that, in general, the lower *Sellers* standard applies to all selective-enforcement claims.

### b. Ford did not waive her discovery requests.

The government claims Ford "orally waived" her discovery requests, other than those related to the federal government's "charging decisions." (GAB 47–48) The government is wrong. The transcript reveals that the court and defense counsel were discussing Ford's vindictive- and selective-prosecution claims (which Ford did not raise on appeal), and the defense's request for discovery related to a "local investigation" (*i.e.*, the state murder investigation) and how it may have impacted the instant federal case. (1-ER-9–10) The court was concerned because that "local investigation" was not a matter before this district court. (1-ER-10) Counsel specified that the defense was seeking discovery about the "local investigation," not generally, but only as it pertained to the charging decision in this case. (1-ER-10–11) Nowhere did counsel or Ford intentionally relinquish or abandon the rest of her discovery requests related to her other claims, as would be necessary to find a waiver. *See United States v. Alferahin*, 433 F.3d 1148, 1154 n.2 (9th Cir. 2006) (stating requirement to find waiver).

24

### c. The district court abused its discretion in denying discovery.

The government does not dispute that Ford made a sufficient showing to be entitled to discovery on her outrageous-conduct and supervisory-authority claims. (AOB 37–38; GAB 51–52) Rather, the government limits its discussion to Ford's selective-enforcement claim, arguing that she did not meet even *Sellers*'s lower standard because the allegations concerned Vinton, who did not enforce federal law. (GAB 51) That separate-sovereigns argument, however, is unavailing. *See* Arg. II.A.1, *supra*. The government further argues that it has already provided some of the discovery requested, (GAB 51–52), but that still does not address all the information Ford needs to substantiate her claims, (*see* AOB 10 n.5). Nor does it address the issue before this Court: the district court's abuse of discretion in denying Ford's discovery requests. If this Court does not dismiss the indictment, it should remand with instructions to grant Ford further discovery. (AOB 39)

## B. This Court Should Also Reverse the District Court's Denial of the Motion to Dismiss Under *Bruen*.

Ford argued in her opening brief that her felon-in-possession conviction is unconstitutional—both facially and as applied to her—because 18 U.S.C. § 922(g)(1) violates the Second Amendment and the Supreme Court's decision in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022). (AOB 39–53) The government disagrees. (GAB 53–66) Ford acknowledges that there are

25

two cases pending before this Court that raised similar Second Amendment claims. *See United States v. Duarte*, No. 22-50048 (9th Cir.); *United States v. Rojo*, No. 23-598 (9th Cir.). Ford, therefore, relies on the arguments she made in her opening brief and those of the appellants in *Duarte* and *Rojo*.

## C.    Resentencing Is Warranted

### 1.    The district court committed plain procedural error.

Ford asserted in her opening brief that the district court violated Rule 32, where it relied on irrelevant and unsourced statistics about gun violence and mass shootings without previously disclosing that information to the defense or providing counsel an opportunity to respond. (AOB 55–59) The government does not argue that the court actually disclosed the gun violence and mass shooting statistics, as required by Rule 32. Rather, the government shifts the blame for the court's error onto Ford, averring that she should not have been surprised by the court's reliance on previously-undisclosed, unsourced, extra-record statistics. (GAB 68–69) But, that does not relieve the court of its obligations under Rule 32, nor does it make the court's comments relevant to the circumstances of this case. They were not. This Court should find, as the government conceded in a similar case, that the court's comments constituted clear procedural sentencing error under Rule 32. (See AOB 56) (citing government's concession in *United States v.*

26

*Molina*, Nos. 22-50161 & 22-50162 (9th Cir.), at GAB 21) This satisfies the first two prongs of the plain-error standard.

The bulk of the government's argument concerns the substantial-rights prong. (GAB 69–71) (arguing the court's discussion of irrelevant statistics did not affect sentence) But, rather than consider the effect of the court's improper, lengthy discussion of irrelevant statistics on Ford's sentence, the government tries to justify the sentence the court imposed. (*See* GAB 70) The government questions the veracity of Ford's reasons for possessing the firearm (for self-defense from undisputed evidence of threats, stalking, and physical abuse) and even lobs a baseless accusation that the firearm could have been part of her "criminal equipment." (GAB 70) But, these arguments are nothing more than distractions from the court's two-page irrelevant discussion of gun violence and mass shootings, and the reasonable probability that it had an effect on the court's sentence. *See United States v. Joseph*, 716 F.3d 1273, 1280 (9th Cir. 2013) (substantial-rights prong met where there is reasonable probably of even slightly lower sentence).

Finally, the government does not address the fourth prong, and as such, concedes that Ford meets that prong of the plain-error standard. (AOB 58–59) This Court should vacate the sentence and remand for resentencing.

27

### 2. Ford's 30-month sentence is substantively unreasonable.

Ford argued in her opening brief that her 30-month sentence was substantively unreasonable. (AOB 59–60) The government does not squarely address Ford's arguments. Instead, the government notes that Ford never "apologized" for her offense and mentioned her offense conduct only to say that she possessed the firearm for self-defense. (GAB 72) The government repeats its doubts about Ford's reasons for possessing the firearm and its baseless accusation that the firearm was a tool for other criminal offenses, of which there is no evidence. (GAB 72)

In the end, though, there is no dispute about the circumstances of Ford's offense conduct. She has been forced to live in fear for years due to stalking, harassment, and physical abuse, and it is undisputed that law enforcement's failure to address those problems has left her with no choice but to rely on herself for protection. (PSR-18, 110, 196) Nor is there any dispute that Ford has shown tremendous promise and rehabilitation in hopes of avoiding any further involvement with the criminal justice system. (AOB 60) And finally, there is no dispute that this lengthy federal sentence was a result of Vinton's vindictive referral after Ford invoked her constitutional right to counsel. (AOB 60) Against this backdrop, the 30-month sentence is substantively unreasonable.

28

### III.  CONCLUSION

For the foregoing reasons, this Court should vacate Ms. Ford's conviction and dismiss her indictment. In the alternative, this Court should remand with instructions to compel the disclosure of additional discovery or for resentencing.

Respectfully submitted,

CUAUHTEMOC ORTEGA
Federal Public Defender


DATED: April 5, 2024          By  */s/ Michael Gomez*
                                     MICHAEL GOMEZ
                                     Deputy Federal Public Defender
                                     Attorney for Defendant-Appellant

29

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT
### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 23-1022

I am the attorney or self-represented party.

**This brief contains** | 6,451 | **words**, excluding the items exempted

by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R.

App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◉ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

○ is an **amicus** brief and complies with the word limit of Fed. R. App. P.
29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

○ complies with the longer length limit permitted by Cir. R. 32-2(b) because
*(select only one):*

　　○ it is a joint brief submitted by separately represented parties;

　　○ a party or parties are filing a single brief in response to multiple briefs; or

　　○ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated [　　　　].

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/ Michael Gomez | **Date** | Apr 5, 2024

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8** *Rev. 12/01/2018*